**LOWENSTEIN SANDLER LLP**
Sharon L. Levine, Esq.
Wojciech F. Jung, Esq.
Jillian L. Zadie, Esq.
1251 Avenue of the Americas, 17th Floor
New York, New York 10020
(212) 262-6700 (Telephone)
(212) 262-7402 (Facsimile)

-and-

65 Livingston Avenue
Roseland, New Jersey 07068
(973) 597-2500 (Telephone)
(973) 597-2400 (Facsimile)

*Proposed Counsel to the Debtors and Debtors-in-Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| ConnectEdu, Inc., *et al.*, [1] | Case No.  14 -11238 (SCC) |
| | (Joint Administration Requested) |
| Debtors. | |

**DECLARATION IN**
**SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS**

Mark D. Podgainy, pursuant to 28 U.S.C. § 1746, declares as follows:

1.      I am the Chief Restructuring Officer (the "CRO") of ConnectEdu, Inc.

("ConnectEdu"), Experience, Inc. ("Experience"), and Academic Management Systems, Inc.

("AMS"), the debtors and debtors-in-possession in the above-captioned cases (collectively the

"Debtors").  The Debtors maintain offices in New York, New York, Amherst, New York, and

Boston, Massachusetts.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: (1) ConnectEdu, Inc. (8132) and its direct subsidiaries: (2) Experience, Inc. (0757); and (3) Academic Management Systems, Inc. (0844).   The location of the Debtors' corporate headquarters is 600 Atlantic Avenue, 20th Floor, Boston, MA 02210.

2.      I have been retained as CRO shortly prior to the filing of these Chapter 11 Cases. In this capacity, I am generally familiar with the Debtors' day-to-day operations, business, financial affairs, books and records.

3.      Debtor ConnectEdu is a Delaware corporation with offices in New York, New York and Boston, Massachusetts.

4.      Debtor Experience is a Delaware corporation and a wholly owned subsidiary of ConnectEdu.

5.      Debtor AMS is a Massachusetts corporation and wholly owned subsidiary of ConnectEdu.

6.      The Debtors' corporate structure is as follows:



7.      On April 28, 2014 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (as amended, the "Bankruptcy Code").  The Debtors are operating their businesses and managing their properties

2

as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No request has been made for the appointment of a trustee or examiner, and no official committee has been appointed by the Office of the United States Trustee.

8.    Prior to the filing of this Declaration (the "Declaration"), the Debtors have filed a motion seeking joint administration of the Debtors' chapter 11 cases (the "Cases" or "Chapter 11 Cases") pursuant to Rule 1015 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

9.    Except as otherwise indicated, all facts set forth in this Declaration are based on my personal knowledge of the Debtors' operations and finances, materials provided by members of the Debtors' management, and information I have received from the Debtors' advisors.  Any opinions asserted in this Declaration are based upon my experience and knowledge of the Debtors' operations and financial condition.  I am over 18 years old and, if called upon to testify, I could and would competently testify to the facts set forth herein.  I am authorized to submit this Declaration on behalf of the Debtors.

## INTRODUCTION

10.    In order to enable the Debtors to minimize the adverse effects of the commencement of these Cases on their business and to ensure that their reorganizational goals can be implemented with limited disruption to their operations, the Debtors have requested various types of relief in certain "First Day" motions (each, a "First Day Motion" and collectively, the "First Day Motions"), filed concurrently herewith.  The First Day Motions seek relief aimed at, among other things, (a) preserving customer relationships; (b) maintaining vendor confidence and remaining employee morale; (c) ensuring the continuation of the Debtors' cash management systems and other business operations; (d) securing the postpetition availability of cash necessary to continue the Debtors' remaining operations; and (e) establishing certain administrative procedures to facilitate a smooth transition into chapter 11.  The

achievement of the aforementioned goals will be critical to the success of these Cases and the Debtors' reorganization efforts.

11.    To familiarize the Court and other interested parties with the Debtors and the relief the Debtors seek on the first day of these Cases, Part I of this Declaration sets forth the information required by Rule 1007-2(a) of the Local Bankruptcy Rules for the Southern District of New York (the "Local Rules") regarding the nature of the Debtors' businesses and a concise statement of the circumstances leading to the commencement of these Cases.  Several schedules are attached to this Declaration, which provide additional information required by Local Rule 1007-2(a).

12.    Part II of this Declaration describes the First Day Motions. I have read, and certify the contents of, each First Day Motion and believe that the relief sought therein (i) is necessary to preserve and maximize the value and productivity of the Debtors' operations, (ii) is integral to the successful reorganization of the Debtors, (iii) serves the best interests of the Debtors, the Debtors' estates and the Debtors' creditors, and (iv) with respect to all non-administrative matters, is necessary to avoid immediate and irreparable harm.

## PART I

### A.    Overview and Nature of the Debtors' Business

13.    ConnectEdu is a privately held technology company founded in 2002. ConnectEdu offers products and services to educators, students, parents, administrators, and employers to prepare and transition 21st century learners on their pathways from school to college to career.  ConnectEdu's technology solutions empower learners by informing their academic and career decisions. ConnectEdu offers a portfolio of college and career planning products that span across K-12 and postsecondary, with a focus on enhanced and personalized learning.  ConnectEdu also offers career solutions that help educators and employers engage with

students through familiar mobile and social channels, increasing student career success. Employers can reach a large network of qualified, next-generation talent looking for fulfilling, lifelong careers and advisors and students can access a robust career center management system built to support and engage them with resources and tools such as interview scheduling, career fair management, and student activity tracking. ConnectEdu also offers an array of data management, assessment, training and support, enterprise solutions and consulting and researching services. ConnectEdu currently serves more than 20 million registered learners, 5,000 educational institutions, and 130,000 employers throughout 40 countries.

14.     In November, 2012, ConnectEdu acquired Epsilen, a cloud-based eportfolio, skills assessment, professional development and social learning management platform. ConnectEdu and Epsilen have joined forces to advance their shared mission of driving student persistence and success across school-to-college-to-career pathways by improving student engagement and professional development resources.

15.     Experience, created in 2000 and acquired by ConnectEdu in November, 2011, provides online employment search and job posting platform that aids college students and recent graduates in understanding their interests and aptitudes and aligning them with career paths. The platform further connects employers and students (through methods such as career fairs) to provide a faster, more successful, and empowered job search process. This is done through e-Recruiting tools (which integrate with major campus portals and systems, making career resources easy-to-find and reachable anytime), targeted email campaigns, eNewsletters, and branding programs. For example, each year, Experience invites employers from across the country to participate in the Best Places to Work for Recent Grads survey. This initiative is dedicated to identifying and recognizing the employers who offer best-fit employment opportunities for recent college graduates.

16.     AMS was created in 1996 and acquired by ConnectEdu in 2010. Based in Amherst, New York, its mission is to provide state-of-the-art information technology products

and services to universities and institutions of higher education. AMS provides academic productivity software for course assessment, admissions management, curriculum analysis, and faculty curriculum vitae management applications in colleges, universities, and health professional schools. Its products include CoursEval, which is used for Web-based course evaluation and instructor assessment, as well as for conducting self and peer assessments, campus elections, senior exit surveys, department chair reviews, alumni surveys, and various program assessment applications. AMS's products also include ClinicEval, a companion product for self and instructor assessment of individual student performance during their clinical practices. Its SiteAssign product catalogs available clinical practices by allowing students to prioritize their selections. Its AdMIT product is an admissions management tool that assists health admissions officers in the day-to-day management of their annual admissions cycle. In addition, it offers hosting and consulting services.

17.    Given their liquidity position and inability to obtain sufficient post-petition financing, prior to the Petition Date, the Debtors terminated all but approximately ten (10) of their approximately sixty-four (64) employees.

**B.     Summary of the Debtors' Prepetition Capital Structure**

18.    As described in more detail below, as of the Petition Date, the Debtors had outstanding secured debt totaling approximately $10.7 million and in the range of $4 million in unsecured debt and other obligations.[2]  The unsecured debt is comprised primarily of loans issued pursuant to certain convertible notes and other trade obligations.

**Prepetition Credit Facilities**

*A.  Secured Obligations*

***i.        North Atlantic Debt***

---

[2]    Nothing contained herein constitutes an admission or acknowledgment that any claims, liens or security interests described and identified in this Declaration are valid, enforceable, perfected, allowable, or not subject to disputes, counterclaims, or offsets.

19.     ConnectEdu is party to a certain Amended and Restated Purchase Agreement dated as of December 31, 2012, which amends and restates a Purchase Agreement dated as of October 9, 2012 (the "NAV Purchase Agreement") with North Atlantic SBIC IV, L.P. ("North Atlantic").  Pursuant to the NAV Purchase Agreement, ConnectEdu issued to North Atlantic two secured debentures and warrants in exchange for $6,000,000.

20.     In particular, pursuant to the NAV Purchase Agreement, ConnectEdu issued two debentures to North Atlantic (together, the "NAV Debentures"): (i) a 9.50% Senior Subordinated Secured Debenture due October 9, 2018 in the principal amount of $5,000,000, dated December 9, 2012; and (ii) a 9.50% Senior Subordinated Secured Debenture due October 9, 2018 in the principal amount of $1,000,000, dated December 31, 2012 (together, the "North Atlantic Debt").

21.     Pursuant to a Security Agreement dated as of December 31, 2012 entered into in connection with the NAV Purchase Agreement, ConnectEdu granted North Atlantic a first priority lien on substantially all of its assets other than its stock in Experience (the "NAV Collateral").

22.     AMS executed a Subsidiary Guaranty dated as of December 31, 2012 and guaranteed ConnectEdu's obligations under the NAV Purchase Agreement and the NAV Debentures.  Not all of the Debtors' obligations are secured by valid and perfected liens on all of the Debtors' assets.

23.     As of the Petition Date, the North Atlantic Debt totaled approximately $6,000,000.

### ii.     Experience Debt

24.     In connection with ConnectEdu's acquisition of Experience, ConnectEdu and Experience entered into a Merger Agreement dated as of November 28, 2011 (the "Experience Merger Agreement") with, among others, Jennifer Floren Sozzi, as the Stockholders' Representative (in such capacity, the "Experience Former Stockholders' Representative") under

which ConnectEdu acquired all of the issued and outstanding stock of Experience from the former stockholders of Experience (collectively, the "Former Experience Stockholders") and Experience became a wholly owned subsidiary of ConnectEdu (the "Experience Merger").

25.    In connection with the Experience Merger, ConnectEdu issued an Amended and Restated Promissory Note dated August 3, 2012 to the Experience Former Stockholders' Representative (as amended, the "Experience Note") for her own benefit and the benefit of the other Former Experience Stockholders, in the aggregate original principal amount of $6,476,000, which represented deferred purchase price payable by ConnectEdu under the Experience Merger Agreement.

26.    Pursuant to a Pledge Agreement dated as of November 28, 2011 (the "Experience Pledge Agreement"), by and between ConnectEdu and the Experience Former Stockholders' Representative, ConnectEdu granted to the Experience Former Stockholders' Representative, for her own benefit and the benefit of the other Former Experience Stockholders, a first lien on the stock of Experience (the "Pledged Securities").

27.    Pursuant to the Experience Merger Agreement, ConnectEdu is also obligated to pay certain contingent consideration to the Experience Former Stockholders' Representative for her own benefit and the benefit of the other Former Experience Stockholders (ConnectEdu's outstanding indebtedness arising under the Experience Merger Agreement and underlying the Experience Note, together, the "Experience Debt").

28.    On August 3, 2012, ConnectEdu and Experience entered into a letter agreement (the "Experience 2012 Letter Agreement") with the Experience Former Stockholders' Representative, for her own benefit and the benefit of the other Former Experience Stockholders, pursuant to which the parties amended and restated the Experience Note and amended certain provisions of the Merger Agreement.

29.    On July 16, 2013, ConnectEdu and Experience entered into a letter agreement (the "Experience 2013 Letter Agreement") with the Experience Former Stockholders' Representative, for her own benefit and the benefit of the other Former Experience Stockholders, pursuant to which the parties restructured the Experience Debt, by, among other things, amending the payment terms of the Experience Note and fixing the amount of contingent consideration and securing the previously unsecured portion of the Experience Debt by the Pledged Securities, thereby rendering all of the Experience Debt secured pursuant to the terms of the Pledge Agreement.

30.    ConnectEdu's obligations under the Experience Note mature on June 30, 2014 at which time the total amount due on the Experience Debt will be $4.7 million.

### B.  Unsecured Loan Obligations
#### i.    Stockholder Debt

31.    Pursuant to that certain Convertible Note Purchase Agreement dated as of June 12, 2012 (as amended, the "Stockholder Note Purchase Agreement") and several related Convertible Promissory Notes, each dated December 31, 2012 (collectively, the "Stockholder Notes"), ConnectEdu borrowed $2,879,313 (the "Stockholder Debt").  As of the Petition Date, ConnectEdu's obligation with respect to the Stockholder Notes was approximately $3,600,000. The lenders under the Stockholder Debt are current and/or former investors and stockholders of ConnectEdu (together, the "Stockholder Debt Holders").

32.    The Stockholder Notes are convertible at the option of the holder into capital securities of ConnectEdu that may be issued by ConnectEdu in an equity financing occurring after July 12, 2012 on certain terms set forth in the Stockholder Note Purchase Agreement.

33.    Pursuant to that certain Subordination Agreement dated as of July 16, 2013 between the requisite Stockholder Debt Holders and North Atlantic, the Stockholder Debt

Holders agreed to subordinate the Stockholder Debt in right of payment to all obligations of ConnectEdu to New Markets Education Partners, LP ("New Markets").

34.     ConnectEdu's obligations under the Stockholder Notes mature on June 12, 2014.

> ### ii.     *New Markets Debt*

35.     Pursuant to that certain Convertible Note Purchase Agreement dated as of December 31, 2012 (the "NME Purchase Agreement") and Convertible Promissory Note dated December 31, 2012 (the "NME Note"), ConnectEdu borrowed $1 million from New Markets (the "New Markets Debt").

36.     The NME Note is convertible at the option of the holder into shares of ConnectEdu's Series F Preferred Stock or capital securities of ConnectEdu that may be issued by ConnectEdu in an equity financing occurring after December 31, 2012 on certain terms set forth in the NME Purchase Agreement.

37.     Pursuant to that certain Subordination Agreement dated as of December 31, 2012 between New Markets and North Atlantic, New Markets agreed to subordinate any security interest or lien that New Markets may have in any property of ConnectEdu and that the New Markets Debt is subordinated in right of payment to all obligations of ConnectEdu to North Atlantic.

38.     ConnectEdu's obligations under the NME Note mature on New Markets' demand, which demand may be made anytime on or after June 12, 2015 subject to the written approval of New Markets, but no later than October 10, 2018.

**The Debtors' Equity Interests**

39.     ConnectEdu is a privately-held corporation with approximately 90 stockholders, warrant holders and option holders (collectively, the "Equity Interest Holders"). Approximately 10% of the outstanding equity interests in ConnectEdu, on a fully diluted basis, is held by Allen & Company, LLC, approximately 6.8% is owned by North Atlantic, approximately 6.5% is

owned by Jay Sarles, approximately 6.0% is owned by James Burke, approximately 5.9% is owned by Habib Gorgi, approximately 5.5% is owned by Richard Dresdale, and approximately 5.3% is owed by Myrian Capital. No other Equity Interest Holders owns 5.0% or more of the outstanding equity interests in ConnectEdu, on a fully diluted basis. There are 11 classes of outstanding capital stock of ConnectEdu, which consist of the following: (1) Ordinary Common Stock; (2) Class A Common Stock; (3) Series A-1 Convertible Preferred Stock; (4) Series A-2 Convertible Preferred Stock; (5) Series A-3 Convertible Preferred Stock; (6) Series B Convertible Preferred Stock; (7) Series C Convertible Preferred Stock; (8) Series D Convertible Preferred Stock; (9) Series E Convertible Preferred Stock; (10) Series F Convertible Preferred Stock; and (11) Series G Exchangeable Preferred Stock. ConnectEdu has also issued warrants to purchase shares of Series A-3 Convertible Preferred Stock and Series F Preferred Stock and options to purchase shares of Ordinary Common Stock.

40.    ConnectEdu is the direct owner of 100% of the ownership interests in its Debtor-subsidiaries Experience and AMS.

**C.    Events Leading To Commencement of These Cases**

41.    In recent years, ConnectEdu engaged in expansion through acquisition and product development. For example, both AMS and Experience were acquired in the last four years. In connection with those acquisitions and operating expenses, the Debtors relied on third-party investments and incurred significant indebtedness.

42.    In addition to acquisition-related obligations and related debt-service obligations, the Debtors incur significant cost on product development and service. Revenues generated from licensing of the Debtors' intellectual property and other services were insufficient to meet the Debtors' debt obligations and continued operating expenses. Moreover, the Debtors' equity holders, who have funded the Debtors' operations prior to the Petition Date, declined to provide further financial support in amounts necessary to continue operations in the ordinary course. As

11

such, given significant liquidity constraints, the Debtors terminated the majority of their employees and filed these cases.

43.     Accordingly, the Debtors commenced these Cases to protect, preserve, restructure and maximize the value of their businesses for the benefit of their creditors and stakeholders. Among other things, the Debtors intend to engage one more sales under section 363 of the Bankruptcy Code for certain segments of their business.

**Other Information Required Pursuant To Local Bankruptcy Rule 1007-2.**

44.     Pursuant to Local Bankruptcy Rule 1007-2(a)(3), to the best of my knowledge, information and belief, no committee was formed prior to the order for relief in these Chapter 11 Cases.

45.     On April 28, 2014, each of the Debtors filed its voluntary petitions (the "Petitions"), attached to each Petition, among other things, is a list of creditors of the Debtor holding each Debtor's twenty (20) largest unsecured claims.  These lists include the amount of the claim, the nature of the claim (*i.e.*, trade debt, real property leases, etc.) and, if appropriate, an indication of whether such claim is contingent, unliquidated, disputed or partially secured.  As such, the lists attached to the Petitions are incorporated herein by reference.  For this reason, I am advised by counsel that Local Bankruptcy Rule 1007-2(a)(4) is satisfied.

46.     Pursuant to Local Bankruptcy Rule 1007-2(a)(6), **Schedule 1** includes a summary of the assets and liabilities of the Debtors.

47.     No shares of stock, debentures or other securities of the Debtors are publicly held. Accordingly, I am advised by counsel that Local Bankruptcy Rule 1007-2(a)(7) is inapplicable in these cases.

48.     Pursuant to Local Bankruptcy Rule 1007-2(a)(8), to the best of my knowledge, information and belief, the Debtors do not have any property that is in the possession or custody

of any custodian, public officer, mortgagee, pledgee, assignee of rents or secured creditor, or agent for any such entity.

49.    Pursuant to Local Bankruptcy Rule 1007-2(a)(9), **Schedule 2** lists all of the Debtors' leased premises.  The Debtors do not own any real property.

50.    Pursuant to Rule 1007-2(a)(10), the location of the Debtors' substantial  assets, including furniture, fixtures, equipment, and other personal property is as set forth on Schedule 2.  The Debtors' books and records are also located at these locations.

51.    Pursuant to Rule 1007-2(a)(11), to the best of my knowledge, information  and belief, other than these Chapter 11 Cases, the Debtors are not a party to any pending actions where a judgment against the Debtors may be imminent.

52.    Pursuant to Rule 1007-2(a)(12), **Schedule 3** includes the names of the Debtors' officers, their tenure with the debtor, and a brief summary of their relevant responsibilities and experience.

53.    Pursuant to Rule 1007-2(b)(1), the estimated gross amount of payroll obligations, including commissions, to employees of the Debtors (exclusive of officers, directors and members) for the thirty (30) day period following the commencement of the Debtors' Chapter 11 Cases is approximately $102,000.

54.    Pursuant to Rule 1007(b)(2), **Schedule 4** includes the projected amounts that will be paid to the Debtors' officers, stockholders, members and financial or business consultants for services for the thirty (30) day period following the commencement of the Debtors' Chapter 11 Cases.[3]

---

[3] The Debtors' have additionally retained me and my firm, Getzler Henrich & Associates, LLC ("Getzler Henrich"), as Chief Restructuring Officer.  The Debtors' Application for Retention of a Chief Restructuring Officer will be filed with the Court shortly.  Getzler Henrich's fee structure consists of a monthly fee of $20,000, which reflects 4-8 days (32-64 hours) of time incurred per month ("Base Fee").   Time required in excess of the Base Time ("Incremental Time") will be billed at a rate of $2,500 per day for up to 8 hours of time incurred ("Incremental Fee").

## PART II

## FIRST DAY MOTIONS

55.     Concurrent with the filing of these Chapter 11 Cases, the Debtors have filed a number of First Day Motions,[4] consisting of administrative motions and motions relating to the Debtors' business operations.  Approval of each First Day Motion is an important element of the Debtors' reorganization efforts and is necessary to ensure a smooth transition into and out of chapter 11 with minimal disruption to the Debtors' operations.  I have reviewed each of the First Day Motions, including the exhibits thereto, and believe that the relief requested therein is critical to the Debtors' ability to achieve a successful reorganization.  Factual information with respect to each First Day Motion is provided below and in each First Day Motion.  For a more detailed description of these First Day Motions, I respectfully refer the Court to the First Day Motions.  To the extent that this Declaration and the provisions of any of the First Day Motions are inconsistent, the terms of the respective First Day Motion shall control.

56.     The Debtors reserve the right to seek further orders and additional relief from the Bankruptcy Court to the extent the Debtors determine that such orders and relief are necessary or appropriate at such time as the bankruptcy proceedings are commenced, or not to seek portions of the relief described below.

**1.     Debtors' Motion for Entry of an Order Directing Joint Administration of the Debtors' Chapter 11 Cases (the "Joint Administration Motion")**

57.     These Chapter 11 Cases involve seventeen 3 Debtor "affiliates" as that term is defined in section 101(2) of the Bankruptcy Code.  On the Petition Date, the Debtors sought the joint administration and consolidation of their Chapter 11 Cases for procedural purposes only, pursuant to section 105(a) of the Bankruptcy Code and Rule 1015(b) of the Bankruptcy Rules. The Debtors believe that, in light of their affiliated status and interrelated business operations, the joint handling of the administrative matters respecting these Chapter 11 Cases – including,

---

[4] Capitalized terms used herein but not defined herein shall have the meaning ascribed to such terms in the applicable First Day Motion.

14

without limitation, the use of a single docket for matters occurring in the administration of the estates and the combining of notices to creditors – will aid in expediting these Chapter 11 Cases and rendering their administration more efficient and economical.

58.     The Debtors anticipate that numerous notices, applications, motions, other pleadings, hearings, and orders in these Chapter 11 Cases will affect more than one of the Debtors.   The failure to jointly administer these cases would result in numerous duplicative pleadings being filed for each issue to be served upon separate service lists.   Such duplication of substantially identical documents would be extremely wasteful.

59.     Joint administration will permit the Clerk of this Court (the "Clerk's Office") to use a single general docket for all of these Chapter 11 Cases and to combine notices to creditors of each Debtor's estate and other parties-in-interest.   Joint administration will also protect parties-in-interest by ensuring that parties-in-interest in each Chapter 11 Case will be apprised of the various matters before the Court in the other Chapter 11 Cases.

60.     The rights of the respective creditors of the Debtors will not be adversely affected by the proposed joint administration of these Chapter 11 Cases because each creditor may still file its claim against a particular estate.   In fact, the rights of all creditors will be enhanced by the reduced costs that will result from the joint administration of these Chapter 11 Cases.   The Court will also be relieved of the burden of entering duplicative orders and maintaining redundant files.

61.     For these reasons, the relief requested in the Joint Administration Motion is in the best interests of the Debtors and their estates.   Accordingly, on behalf of the Debtors, I respectfully submit that the relief requested in the Joint Administration Motion should be granted.

15

2. **Application for Entry of an Order Authorizing the Debtors to Retain and Employ Kurtzman Carson Consultants LLC as Claims and Noticing Agent for the Debtors Effective as of the Petition Date (the "156(c) Application")[5]**

62.     The Debtors request approval to retain Kurtzman Carson Consultants LLC (the "Claims Agent" or "KCC") to assist the Debtors, the Court, and the Clerk's Office, as necessary, in distributing notices and other materials, and undertaking other administrative tasks pertaining to these Chapter 11 Cases.  The Debtors have more than 250 potential creditors and other parties-in-interest.  The Debtors believe, and I agree, that engaging an independent third party to act as an agent of the Court and the Clerk's Office is the most effective, efficient and economical manner to handle these noticing and other administrative tasks.

63.     It is my understanding that the Claims Agent is well-qualified to serve in this capacity.   The Debtors chose the Claims Agent based on both its experience and the competitiveness of its fees.  It is my understanding that the Claims Agent has provided identical or substantially similar services in numerous other chapter 11 cases.

64.     I believe that the retention of the Claims Agent is in the best interests of the Debtors, their estates, creditors, and other parties-in-interest.   Accordingly, on behalf of the Debtors, I respectfully submit that the 156(c) Application should be approved.

3. **Debtors' Motion for Entry of an Order (A) Waiving the Requirement That Each Debtor File a List of Creditors, (B) Authorizing the Filing of a Consolidated List of Top Twenty Creditors, (C) Approving Notice, Case Management and Administrative Procedures, (D) Authorizing Maintenance of Consolidated List of Creditors In Lieu of Matrix and (E) Granting Related Relief (the "Matrix Motion")**

65.     By the Matrix Motion, the Debtors seek the entry of an order (a) waiving the requirement that each Debtor file a list of creditors, (b) authorizing (but not requiring) the filing and service of a single, consolidated list of the 20 largest unsecured creditors in lieu of filing and serving separate lists of the 20 largest unsecured creditors of each Debtor, (c) approving certain procedures for the Debtors to supply notice to creditors and parties in interest, certain procedures

---

[5] Other than the Claims Agent, the Debtors do not seek authority to retain their professionals on a first day basis.

for case management, and certain other administrative procedures, and (d) authorizing the Debtors to maintain a consolidated list of creditors in lieu of a matrix.

66.     The Debtors are seeking to retain KCC as notice and claims agent in connection with these Chapter 11 Cases to assist the Debtors in preparing, among other things, creditor lists and mailing initial notices.  Because KCC, if approved by this Bankruptcy Court, will serve all required notices, filing a list of creditors with the Court serves no independent purpose and should be waived in these Chapter 11 Cases.  In addition, KCC will assist with compiling a creditor database from the Debtors' records and will complete the mailing of relevant notices as set forth above.  The Debtors believe, and I agree, that providing KCC with a list of creditors in the electronic format used in the Debtors' ordinary course of business will be sufficient to allow timely notice to all creditors.  The Debtors do not believe that they could efficiently and accurately convert their own records into matrix format more quickly than a consolidated list could be completed by KCC.  The Debtors believe they would incur unnecessary expense were they to try to make such a conversion.  I believe that, allowing the Debtors to maintain a creditor list in electronic form would be in the best interests of all parties.

67.     In addition, the proposed Notice Procedures are fair, reasonable, sufficient, and proper in these Chapter 11 Cases.  The Notice Procedures will provide any party in interest that may be affected by the relief sought by a particular filing or pleading with notice thereof.  Also, interested parties who have expressed an interest in receiving notice will also be provided for under the Notice Procedures.  The Notice Procedures will not adversely affect the relevant parties in interest.  Further, the Notice Procedures will preserve the assets of the Debtors' estates that would otherwise be consumed by unnecessary expenses in providing notice to all parties-in-interest.

4.      **Debtors' Motion for Entry of an Order Authorizing the Debtors to (A) Pay Certain Prepetition Wages, Reimbursable Employee Expenses and Other Employee Compensation Expenses, (B) Honor Certain Employee Benefits and (C) Granting Related Relief (the "Wage Motion")**

68.      Currently, the Debtors employ approximately 10 employees, down from approximately 68 employees prior to the Petition Date.  The continued, uninterrupted, faithful and diligent service of the Debtors' remaining employees is absolutely essential to the Debtors' continuing operations and a successful chapter 11 process.  To minimize the personal hardship the employees will suffer if prepetition employee-related obligations are not paid when due, and to maintain the employees' morale during this critical time, the Debtors, by this Motion, seek authority, but not the obligation, to: (i) pay all prepetition employee claims for wages, salaries, commissions, contractual compensation, and other accrued compensation, and all prepetition compensation owed to Independent Contractors and Temporary Workers (to the extent outstanding) as of the Petition Date, up to the priority claim limits established under section 507(a)(4) and (5) of the Bankruptcy Code (with certain limited exceptions); (ii) make all payments for which employee payroll deductions were made; (iii) reimburse all prepetition employee business expenses; (iv) make prepetition contributions under the employee benefit plan; (v) honor workers' compensation programs; (vi) pay other miscellaneous employee-related costs; (vii) continue, in the ordinary course of business, employee programs with respect to vacation, sick, personal and holiday leave; and (viii) continue in the ordinary course of business health, insurance savings and other benefit programs and pay any miscellaneous amounts owing with respect thereto, as described more fully in the Wage Motion.

69.      As set forth in the Wage Motion, due to technical errors at ADP, the Debtors' payroll for the month of April, 2014 was not processed until shortly after the Petition Date.  As such, the Debtors request retroactive approval of the post-petition payment of outstanding wages.

70.      The Debtors also (i) request that the Court authorize and direct applicable banks and other financial institutions to receive, process, honor and pay all prepetition checks, electronic payment requests and transfers drawn on the Debtors' bank accounts to make the

18

foregoing payments, and (ii) seek authority to pay all processing costs and administrative expenses related to the foregoing payments.

71.     Except for eight employees, payment of pre-petition wages did not exceed the sum of $12,475 per employee allowable as a priority claim under sections 507(a)(4) and (5) of the Bankruptcy Code.    In the aggregate, eight employees have exceeded the cap by approximately $33,000.

72.     The Debtors seek the relief requested in the Wage Motion because they believe, and I agree, that any delay in paying the Employee Obligations set forth in the Wage Motion could severely disrupt the Debtors' relationship with their remaining employees and irreparably impair the employees' morale at the very time that their dedication, confidence and cooperation are most critical.    Further, because payroll scheduled for April 30, 2014 included the entire month of April, all employees, both current and recently terminated, would suffer undue harm if payroll was not made.

73.     The Debtors face the risk that their operations may be severely impaired if the Motion is not granted.    At this critical stage, the Debtors simply cannot risk the substantial and further disruption of their business operations that would attend any decline in workforce morale attributable to the Debtors' failure to pay the Employee Obligations in the ordinary course of their business during the pendency of these Chapter 11 Cases.

74.     For these reasons, I believe that the relief requested in the Wage Motion is in the best interests of the Debtors and their estates, and will enable the Debtors to continue to operate their business in chapter 11 without disastrous disruption.    Accordingly, on behalf of the Debtors, I respectfully submit that the relief requested in the Wage Motion should be granted.

5.    **Debtors' Motion for Entry of Interim and Final Orders Authorizing the Debtors to (I) Maintain Their Existing Bank Accounts and Cash Management System; (II) Continue to Use Their Existing Business Forms and Records; and (III) Maintain Existing Investment Practices (the "Cash Management Motion")**

75.    Pursuant to the Cash Management Motion, the Debtors seek authority to maintain their existing bank accounts and cash management system and to continue to use their existing business forms and records.  The Debtors also seek a waiver of the investment guidelines set forth in 11 U.S.C. § 345(b) and of certain of the operating guidelines established by the United States Trustee for the Southern District of New York that require the Debtors to close all of their prepetition bank accounts, open new accounts designated as debtor-in-possession accounts and provide new business forms and statements.

*Description of Existing Bank Accounts and Cash Management System*

76.    Prior to the commencement of these Chapter 11 Cases, in the ordinary course of their business, the Debtors maintained 5 bank accounts (the "Bank Accounts"), two at Citizens Bank and 2 at Bank of America.  Through their five accounts (the "Cash Management System"), the Debtors are able to make payroll, pay business operating expenses.   A list of the Debtors' Bank Accounts is attached as Exhibit 1 to the proposed order granting the relief requested in the Cash Management Motion.

77.    The Debtors will maintain detailed records reflecting all movements of funds through their Cash Management System.  The procedures employed in the use of the Cash Management System are similar to those used by other corporate enterprises.

78.    The Cash Management System provides significant benefits to the Debtors, including the ability to (i) control corporate funds centrally, (ii) ensure availability of funds when necessary, and (iii) reduce administrative expenses by facilitating the movement of funds and the development of more timely and accurate balance and presentment information.  Accordingly, the Debtors respectfully request that the Court authorize their continued use of the Cash Management System. The significant features of the Cash Management System are as follows:

20

Of the three Bank accounts with Citizens Bank, two belong to Connect and one to AMS. The two accounts at Bank of America belong to Experience. One of the Experience accounts (the "Experience Career Fair Account") is used solely to collect college fair fees from potential employers who attend the fairs. After deducting transaction charges, the Experience Career Fair Account remits the fees directly to the applicable school and institutions. As such, the Experience Debtor uses the Experience Career Fair Account as a mere pass-through.

79.    I believe that the Debtors, their estates and their creditors would be irreparably harmed by the delay that would result if the Debtors were forced to discontinue their Cash Management System. The time and expense required to discontinue the Debtors' current Cash Management System and implement new systems would result in a wasting of assets of the estates, without any concomitant benefit to the estates. In addition, the commencement of the Debtors' Chapter 11 Cases will undoubtedly place a substantial strain on the Debtors' relationships with their vendors, consultants, contractors and suppliers -- relationships that are vital to the Debtors' continued operations and are necessary to the Debtors achievement of a successful reorganization through these Chapter 11 Cases. Requiring the Debtors to open new debtor-in-possession bank accounts in substitution for their existing accounts would cause confusion and disruption to the Debtors' operations, further straining these relationships at a time when normal operations are especially crucial to the ongoing vitality of the business.

80.    In addition, the Debtors rely, among other things, on the separation within their bank account structure to demonstrate the certain operational separation of their businesses for purposes of maintaining compliance with standards applicable to the industries in which these businesses operate. The disruption of this system could irreparably impair the Debtors' ability to provide services and irreparably harm the Debtors' business.

81.    The Cash Management System allows the Debtors to effectively and efficiently run their businesses. To maximize the value of their businesses, there must be minimal disruption to the Debtors' administrative affairs, and the maintenance of their current Cash

Management System, as provided herein, is essential to limiting such disruption and enabling as smooth a transition into chapter 11 as possible.

82.     The Debtors request that the Court direct each of the banks identified in the Cash Management Motion (collectively, the "Banks") to honor all postpetition checks presented to the Banks and drawn on the Debtors' Bank Accounts, as set forth in the Cash Management Motion. Further, the Debtors request that no Bank that honors a prepetition check or other item drawn on any account that is the subject of the Cash Management Motion (a) at the direction of the Debtors, (b) in a good faith belief that the Court has authorized such prepetition check or item to be honored or (c) as a result of an innocent mistake made despite implementation of reasonable handling procedures, be deemed to be liable to the Debtors or to their estates on account of such prepetition check or other item being honored postpetition.  I believe that such protections are necessary in order to induce the Banks to continue providing cash management services to the Debtors without additional credit exposure.

### *Request for Authority to Use Existing Bank Accounts*

83.     The Debtors also seek a waiver of the United States Trustee's requirement that the prepetition Bank Accounts be closed and that new postpetition bank accounts be opened.  Given the automated infrastructure and existing setup of the Bank Accounts, if enforced in these Chapter 11 Cases, such requirements would cause serious disruption in the Debtors' businesses and would impair the Debtors' efforts to effectively reorganize their estates.

84.     Specifically, subject to a prohibition against honoring prepetition checks without specific authorization from this Court, the Debtors request that the Bank Accounts be deemed to be debtor-in-possession accounts, and that their maintenance and continued use, in the same manner and with the same account numbers, styles, and document forms as those employed during the prepetition period, be authorized.  In sum, the Cash Management System allows the Debtors to effectively and efficiently run their business.  I believe that to maximize the value of their business, there must be minimal disruption to their administrative affairs, and that the

22

maintenance of their current Cash Management System, as provided herein, is essential to limiting disruptions to the Debtors' operations.

85.     The Debtors submit that they will implement appropriate mechanisms to ensure that no payments will be made on any debts incurred by them prior to the Petition Date, other than those that are specifically authorized by this Court.  The Debtors will work closely with the Banks to ensure that appropriate procedures are in place to prevent checks issued prepetition from being honored absent this Court's approval.

86.     Accordingly, in order to avoid delays in payments to administrative creditors, to ensure as smooth a transition into chapter 11 as possible, with minimal disruption, and to aid the Debtors' efforts to successfully and rapidly reorganize, it is important that the Debtors be permitted to continue to maintain their existing Bank Accounts and, if necessary, open new accounts where needed and/or close certain Bank Accounts.

### Debit, Wire and ACH Payments.

87.     The Debtors request further relief from the requirement in the Guidelines that all receipts and all disbursements of estate funds be by check with a notation representing the reason for the disbursement.  Considering the nature of the Debtors' operations, it is necessary for the Debtors to conduct transactions by debit, wire, ACH payment and other similar methods.  To deny the Debtors the ability to conduct transactions by such methods would likely interfere with the Debtors' performance of their contracts and unnecessarily disrupt the Debtors' business operations, as well as create additional costs to be borne by the Debtors and their creditors.

### Existing Business Forms and Records

88.     In order to minimize expenses to the Debtors' estates, the Debtors also request authorization to continue to use all correspondence, business forms (including, but not limited to, letterhead, purchase orders and invoices) and check stock existing immediately prior to the Petition Date, without reference to the Debtor's status as debtors in possession.  I believe that changing correspondence and business forms would be expensive, unnecessary and burdensome

23

to the Debtors' estates and disruptive to the Debtors' business operations and would not confer any benefit upon the Debtors, their estates, their creditors or those dealing with the Debtors.

89.     Accordingly, on behalf of the Debtors, I respectfully submit that the relief requested in the Cash Management Motion should be granted.

**6.     Debtors' Motion For Entry of Interim and Final Orders (I) Prohibiting Utility Companies From Discontinuing, Altering or Refusing Service on Account of Prepetition Invoices, (II) Deeming Utility Companies to Have Adequate Assurance of Future Payment and (III) Establishing Procedures For Resolving Requests For Additional Assurance (the "Utilities Motion")**

90.     Pursuant to the Utilities Motion, the Debtors seek entry of an Order (i) prohibiting the Utility Companies from discontinuing, altering or refusing service to the Debtors on account of prepetition invoices (ii) deeming the Utility Companies adequately assured of future performance on the basis of payment of a one month security deposit (the "Utility Deposit"), and (iii) establishing procedures for resolving requests for additional assurance of payment.

91.     In the operation of their facilities, the Debtors incur utility expenses in the ordinary course of business for, among other things, electricity, gas, hosting, telephone service and internet service.  Prior to the Petition Date, the Debtors average monthly cost for utilities was approximately $80,000.  The Debtors seek to provide adequate assurance to a non-exhaustive list of the Utility Companies.  The estimated amount of the one month deposit for each is attached to the Utilities Motion as Exhibit C.[6]

92.     Uninterrupted utility services are essential to the continuation of Debtors' on-going operations and to the success of the Debtors' chapter 11 efforts.  The Debtors' operations will be negatively impacted if one or more Utility Company refuses or discontinues utility

---

[6] While the Debtors have exercised their best efforts to list all of the Utility Companies in Exhibit C to the Utilities Motion, it is possible that certain Utility Companies may have been inadvertently omitted from this list. Accordingly, the Debtors reserve the right, pursuant to the terms and conditions of the Utilities Motion and without further order of the Court, to amend Exhibit C to add any Utility Companies that were omitted therefrom and to request that the relief requested herein apply to all such entities, as well.  In addition, the Debtors reserve the right to argue that any of the entities now or hereafter listed in Exhibit C to the Utilities Motion are not "utilities" within the meaning of section 366(a) of the Bankruptcy Code.

24

services for even a brief period of time.  Accordingly, any interruption of utility services, even for a brief period of time, would negatively impact the Debtors' customer relationships, revenues and profits, seriously jeopardizing the Debtors' reorganization efforts and, ultimately, value and creditor recoveries.  It is, therefore, critical that utility services continue uninterrupted during these Chapter 11 Cases.  I believe that it is therefore critical that utility services provided to the Debtors continue uninterrupted.

93.    In accordance with section 366(c)(1)(A) of the Bankruptcy Code, the Debtors propose to provide additional assurance of payment as set forth in the Utilities Motion. Specifically, the Debtors propose to issue, within ten (10) business days after the date of entry of the interim order granting the Utilities Motion, a Utility Deposit that is equal to approximately two (2) weeks the estimated average monthly utility consumption to each Utility Company as indicated on Exhibit C to the Utilities Motion.

94.    Additionally, the Debtors seek to establish reasonable procedures by which Utility Companies may request additional adequate assurance of future payment, in the event that a Utility Company believes that the Utility Deposit does not provide them with satisfactory adequate assurances.  I believe that the procedures set forth in the Utilities Motion are reasonable and, upon information and belief, have been adopted in other bankruptcy proceedings, and provide an orderly process for providing adequate assurance of payment to the Utility Companies, without risking irreparable harm to the estate.  Without such procedures, the Debtors could be forced to address numerous requests by Utility Companies in a haphazard manner at a critical period, while the Debtors are trying to conduct these Chapter 11 Cases.  The Debtors could be forced to capitulate to almost any demands made by their Utility Companies, or face the discontinuation of utility service and a potential shutdown of their business.  The orderly process contemplated by the procedures set forth in the Utilities Motion will avert such a potentially disastrous outcome, enabling the Debtors to make a smooth transition into chapter 11, while

ensuring a fair process for providing adequate assurance to the Utility Companies to the extent required

95.     Accordingly, on behalf of the Debtors, I respectfully submit that the relief requested in the Utilities Motion should be granted.

   **7.     Debtors' Motion for Entry of Interim and Final Orders (A) Authorizing the Payment of Prepetition Sales, Use, Income, Property, and Other Taxes and Governmental Charges, (B) Authorizing Banks and Financial Institutions to Honor and Process All Checks and Wire Transfers Related Thereto and (C) Granting Related Relief (the "Tax Motion")**

96.     In the ordinary course of business, the Debtors (a) incur and/or collect taxes, including income, franchise, sales, use, property, excise, and miscellaneous taxes in the operation of their businesses (collectively, the "Taxes"); and (b) remit such Taxes to various taxing, licensing, and other governmental authorities (collectively, the "Authorities") as they become due.   The Debtors generally pay the Taxes monthly, quarterly or annually, in each case as required by applicable laws and regulations.

97.     By the Tax Motion, the Debtors seek authority, in their discretion, to pay to the relevant Authorities any accrued and outstanding Taxes in the ordinary course of business during the pendency of these Chapter 11 Cases without regard to whether such Taxes accrued or arose before or after the Petition Date.

98.     I believe that, among other things, the Debtors' successful reorganization will require good standing within the states in which they do business and a complete devotion of effort by their officers and directors to these Chapter 11 Cases.   Given that the Debtors operate in numerous locations, there is a significant number of Authorities with which the Debtors interact. If any of the Authorities attempt to exercise certain remedies against the Debtors on account of unpaid Taxes, it could have the devastating effect of distracting the attention of the Debtors' management and professionals away from the important task of the Debtors' successful reorganization.   Any regulatory dispute or delinquency that could impact the Debtors' ability to

26

conduct business in a particular jurisdiction could have a wide-ranging and adverse effect on the Debtors' operations as a whole, which, in turn, could significantly reduce the value of the Debtors' assets.

99.    The Debtors must continue to pay the Taxes to continue operating in certain jurisdictions and to avoid costly distractions during these Chapter 11 Cases.  Specifically, the Debtors' failure to pay the Taxes could affect adversely the Debtors' business operations because the Authorities could suspend the Debtors' operations, file liens, or seek to lift the automatic stay.  In addition, certain Authorities may take precipitous action against the Debtors' directors and officers for unpaid Taxes that undoubtedly would distract those individuals from their duties related to the Debtors' restructuring.   The Debtors can afford neither distraction of their officers and professionals nor interruption of their operations at this critical time.

100.    For these reasons, I believe that the relief requested in the Tax Motion is in the best interests of the Debtors and their estates.   Accordingly, on behalf of the Debtors, I respectfully submit that the relief requested in the Tax Motion should be granted.

**8.    Debtors' Motion For Entry of Interim and Final Orders (I) Authorizing the Debtors' Use of Cash Collateral, (II) Granting Adequate Protection, (III) Modifying the Automatic Stay, and (IV) Scheduling a Final Hearing (the "Cash Collateral Motion")**

101.    As discussed above, as of the Petition Date, certain of the Debtors have outstanding secured debt totaling approximately $10.7 million (the "Prepetition Obligations"). The Prepetition Obligations are comprised of approximately (i) $6 million of outstanding secured indebtedness owing to North Atlantic pursuant to the NAV Purchase Agreement and (ii) $4.7 million owing to the Experience Former Stockholders' Representative, for her own benefit and the benefit of the other Former Experience Stockholders pursuant to, *inter alia*, the Experience Debt and the Experience 2013 Letter Agreement

102.    The Debtors are in need of financial restructuring due to liquidity constraints. Prior to the Petition Date, the Debtors were unable to obtain sufficient financing and thus filed

27

these Chapter 11 Cases.  Accordingly, by the Cash Collateral Motion, the Debtors seek entry of the Interim Order approving the Cash Collateral Motion (a) authorizing the Debtors to use Cash Collateral; (b) authorizing the Debtors to provide adequate protection for the use of Cash Collateral to the Prepetition Secured Parties; (c) modifying the automatic stay; and (d) scheduling a Final Hearing for the entry of the Final Order, providing for the relief granted in the Cash Collateral Motion on a final basis.

103.    The proposed immediate use of the Cash Collateral is intended to provide working capital while the Debtors operate in chapter 11.  The Debtors require the emergent and immediate post-petition use of Cash Collateral in order to continue operating their businesses in an orderly manner during the pendency of these Chapter 11 Cases.  The Debtors have no other source of funding to operate their business.[7]

104.    In order to protect the Prepetition Secured Parties from any actual diminution in value of the Prepetition Collateral, including Cash Collateral, the Debtors have agreed to grant adequate protection in the form of replacement liens and superpriority administrative claims. Specifically, the Prepetition Secured Parties will be granted (i) the Adequate Protection Liens and (ii) the Adequate Protection Superpriority Claim for any Diminution in Value.

105.    For these reasons, I believe that the relief requested in the Cash Collateral Motion is in the best interests of the Debtors and their estates.  Accordingly, on behalf of the Debtors, I respectfully submit that the relief requested in the Cash Collateral Motion should be granted.

---

[7] The Debtors may negotiate with the Prepetition Secured Parties or other third-party lenders for debtor-in-possession financing that will enable them to operate with additional liquidity during these Chapter 11 Cases.

**9.      Debtors' Motion For Entry Of An Order Pursuant To 11 U.S.C. §§ 105(a), 363(b) And 364(c)(2) (I) Authorizing The Debtors To (A) MAINTAIN Prepetition Insurance Coverage And Pay All Related Obligations Thereunder, (B) Maintain Prepetition Premium Financing Agreement, Pay All Obligations Thereunder And Continue Grant Of Security Interest To Premium Finance Company, And (C) Enter Into New Insurance Policies And (II) Authorizing And Directing Financial Institutions To Honor Related Checks And Transfers (the "<u>Insurance Motion</u>")**

106.     In connection with the ordinary course operation of their business, the Debtors maintain insurance policies through several different insurance carriers set forth on Exhibit A to the Insurance Motion.

107.     These policies are essential to the ongoing operation of the Debtors' business. The annual premiums for the Liability and Property Insurance Policies total approximately $120,000.

108.     The Debtors finance their insurance premium though a Commercial Insurance Premium and Finance Agreement with BankDirect Capital Finance dated July 24, 2013.  As of the Petition Date, three monthly payments of $9,873.03 remained outstanding.

109.     Maintenance of the Insurance Policies, and thus continued payment under the Commercial Insurance Premium and Finance Agreement, is essential to the continued operation of the Debtors' businesses and is required under the United States Trustee's Operating Guidelines for Chapter 11 Cases and applicable state and federal law.  The insurance coverage provided under the Debtors' Insurance Policies is essential for preserving the Debtors' businesses, properties, and assets, and, in many cases, such coverage is required by various regulations, laws, and contracts that govern the Debtors' businesses.  If the Debtors do not continue to perform their obligations under the Insurance Policies and the Commercial Insurance Premium and Finance Agreement, their coverage under the Policies could be voided.  This would cause serious and irreparable harm to the Debtors' business and restructuring efforts, as it may expose the Debtors to higher costs and increased risks of loss, at a minimum.

110.     Accordingly, on behalf of the Debtors, I respectfully submit that the relief requested in the Insurance Motion should be granted.

**10.    Debtors' Motion For Entry Of Order Authorizing, But Not Directing, The Debtors to Pay Pre-Petition Claims of Two Critical Vendors (the "Critical Vendors Motion")**

111.     By the Critical Vendors Motion, the Debtors seek entry of an order authorizing, but not directing, the Debtors to pay pre-petition claims of two vendors that are critical to the Debtors' operations, as more fully described in the Critical Vendors Motion (the "Critical Vendor Claims"), up to $300,000.[8]

112.     The Debtors have identified two (2) critical business relationships and/or suppliers of services (the "Critical Vendors"), the loss of which could immediately and irreparably harm their businesses, reduce their enterprise value and/or significantly impair their going-concern viability.

113.     The Critical Vendors constitute a small portion of the Debtors' vendors. Specifically, the Critical Vendors, which include (i) OSF Global Services, Inc. ("OSF") and (ii) Dyn ("Dyn"), total two (2) vendors and the pre-petition amount owed to the Critical Vendors is approximately $300,000.[9]

114.     I have learned that the Debtors utilize services provided by the Critical Vendors that, as an actual or practical matter, may be the only supplier available to the Debtors. I further understand that the services provided by the Critical Vendors are essential for the Debtors to continue to provide ongoing operations, and specifically with respect to the Debtors' CoursEval business line. CoursEval, one of the Debtors' valuable business lines which continues to be

---

[8] I understand that the proposed cap is based on the Debtors' current accounts payable information.  Certain adjustments and reconciliations will be necessary to account for those invoices that have been issued for the two Critical Vendor Claims, but not yet received by the Debtors as of the Petition Date.  Accordingly, the Debtors (via the proposed Order approving the Critical Vendors Motion) seek to preserve their right to request an adjustment of the cap.

[9] The Debtors reserve the right to seek critical vendor treatment to parties other than these two Critical Vendors.

operated postpetition, is utilized by clients for Web-based course evaluation and instructor assessment, as well as for conducting self and peer assessments, campus elections, senior exit surveys, department chair reviews, alumni surveys, and various program assessment applications. Discontinuation of that program would cause significant harm to parties which rely upon it on a daily basis.

115.    A key strategy for CoursEval involves email campaigns that customers setup to notify students and instructors to access CoursEval email flows through certain servers to a third party servicer, Dyn. All CoursEval hosted customers must update their email systems to accept incoming email from Dyn, specifically.

116.    OSF is a contractor that assists the Debtors' and its customers by operating and maintaining the CoursEval program environment. If OSF were to terminate or discontinue its services, the CoursEval business line could be irreparably harmed due to the loss of customers and significant revenue.

117.    Similarly, Dyn provides highly critical data relay services which allows for customers to receive CoursEval messages. Without Dyn's services, CoursEval might experience delays and service issues which could further irreparably harm the Debtors.

118.    If OSF or Dyn refused to continue doing business with the Debtors, the Debtors could lose significant revenue sources and be irreparably damaged.

119.    Accordingly, on behalf of the Debtors, I respectfully submit that the relief requested in the Critical Vendor Motion is critical to the Debtors' ongoing operations and should be granted.

## <u>CONCLUSION</u>

Accordingly, for the reasons stated herein and in each of the First Day Motions, I respectfully request that each of the First Day Motions be granted in its entirety, together with such other and further relief as this Court deems just and proper.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

Dated: April 29, 2014

ConnectEdu, Inc., *et al*,

/s/
By:   Mark D. Podgainy
**Its:**   Chief Restructuring Officer

## SCHEDULE 1
[Summary of Debtors' assets and liabilities]

| Assets | | Estimated As of 4/28 |
|---|---|---:|
| Cash | $ | 318,828 |
| Accounts Receivable, Net of Allowance | | 2,267,241 |
| Prepaid Expenses and Other Current Assets | | 259,514 |
| Property and Equipment, Net of Depreciation | | 472,390 |
| Capitalized Software Development, Net of Accumulated Amortization | | 1,842,582 |
| Goodwill | | 9,092,863 |
| Intangibles, Net of Amortization | | 3,259,893 |
| Security Deposits | | 194,388 |
| **Total Assets** | **$** | **17,707,699** |

| Liabilties | | |
|---|---|---:|
| Accounts Payable | $ | 1,188,758 |
| Accrued Expenses | | 2,111,374 |
| North Atlantic Debt | | 6,000,000 |
| New Market's Debt | | 1,161,667 |
| Experience Acquisition Debt | | 4,700,000 |
| Convertible Prommissory Notes | | 3,850,268 |
| Current Portion of Capital Lease Obligations | | 53,354 |
| Current Portion of Deferred Rent | | 30,685 |
| Current Portion of Deferred Revenue | | 8,603,771 |
| Capital Lease Obligations | | 42,331 |
| Deferred Rent, Net of Current Portion | | 59,162 |
| Deferred Revenue, Net of Current Portion | | 2,296,935 |
| Warrant Liability | | 3,624,572 |
| **Total Liabilities** | **$** | **33,722,876** |

SCHEDULE 2

[Pre-Petition Real Estate Leases]

a.    150 W. 30th Street, 16th Floor, NY, New York 10001
b.    1408 Sweethome Road, Suite 12, Amherst, New York 14228
c.    1 Devonshire Place, Apt 3312, Boston, MA 02109
d.    600 Atlantic Avenue, 20th Floor, Boston, MA 02210

SCHEDULE 3

[Debtors' Officers and Directors as of Petition Date]

1. Thomas Riley, Director
2. H. Jay Sarles, Director
3. Richard Dresdale, Director
4. Bill Daugherty, Director
5. Nancy Peretsman, Director
6. Ralph James, Director
7. Michael Costello, Director
8. John Burke, Director
9. Margaret Spellings, Director, Until July 2013
10. David Coit, Director, Until April 25, 2014
11. Craig Powell, Director and Chief Executive Officer, Until May and April 2013, respectively
12. Jon Newcomb, Director, Since January 2014
13. Evan Nisonson, Chief Executive Officer, Until April, 2014
14. Paul Sheppard, Chief Financial Officer, Since January 2014
15. Mark Podgainy , Chief Restructuring Officer, Since April, 2014

SCHEDULE 4
[Projected Payments to Officers, Stockholders and Directors in next 30 Days]

      A.      The Debtors expect to incur approximately $25,000 in payments to their Officers, Stockholders and Directors in the 30 days following the Petition Date.

SCHEDULE 5
[Debtors' Projected 13-Week Cash Flow Budget]


To Be Submitted