**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| ConnectEdu, Inc., *et al.*, [1] | Case No. 14-11238 (SCC) |
| Debtors. | (Jointly Administered) |

### ORDER ON DEBTORS' *EMERGENCY* MOTION FOR ENTRY OF ORDER (I) AUTHORIZING PRIVATE SALE OF THE DEBTORS' PROPERTY FREE AND CLEAR OF LIENS, CLAIMS AND ENCUMBRANCES PURSUANT TO SECTION 363 OF THE BANKRUPTCY CODE (II) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CONTRACTS AND LEASES, AND (III) GRANTING RELATED RELIEF, OR IN CERTAIN CIRCUMSTANCE, (IV) GRANTING IMMEDIATE RELIEF FROM THE AUTOMATIC STAY AND GRANTING RELATED RELIEF

Upon the motion, (the "Sale Motion") of the above-captioned debtors (collectively, the "Debtors"), as debtors and debtors in possession in the above-captioned chapter 11 cases, pursuant to sections 105, 363 and 365 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code"), Rules 2002(a)(2), 6004, 6006 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 2002-1, 6004-1, 6006-1 and 9006-1(b) of the Local Rules for the United States Bankruptcy Court for the Southern District of New York (the "Local Rules") for an order (the "Sale Order") authorizing and approving, inter alia, the sale of the Sale Assets by private sale to North Atlantic SBIC IV, L.P. ("North Atlantic") and AMS Asset Holdings, LLC ("Holdco") or its designee(s) which may include the Debtor AMS (collectively, the "Buyers") and other related relief, all as further set forth and defined in the Sale Motion; and Buyers' assumption of certain of the Debtors' liabilities (the "Assumed

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: (1) ConnectEdu, Inc. (8132) ("ConnectEdu") and its direct subsidiaries: (2) Experience, Inc. (0757) ("Experience"); and (3) Academic Management Systems, Inc. (0844) ("AMS"). The location of the Debtors' corporate headquarters is 600 Atlantic Avenue, 20th Floor, Boston, MA 02210.

Liabilities"), subject to and as provided in the Sale Agreement dated as of May 19, 2014, attached hereto as Exhibit A (collectively with all related agreements, documents or instruments and all exhibits, schedules and addenda to any of the foregoing, the "Sale Agreement"), and due notice of the Sale Motion and the Sale Hearing having been given to all parties entitled thereto under the circumstances; and the Court having conducted a hearing on the Sale Motion (the "Sale Hearing"), at which time all interested parties were offered an opportunity to be heard with respect to the Sale Motion; and the Court having reviewed and considered (i) the Sale Motion and the exhibits thereto; (ii) the Sale Agreement; (iii) all objections to, or other responses filed in respect of, the Sale Motion; and (iv) the arguments and proffers of counsel made, and the evidence presented, at the Sale Hearing; and it appearing that the relief requested in the Sale Motion is in the best interests of the Debtors, their estates and creditors, and all other parties-in-interest in these bankruptcy cases; and upon the record of the Sale Hearing; and it further appearing that the legal and factual bases set forth in the Sale Motion and at the Sale Hearing establish just cause for the relief granted herein; and after due deliberation thereon,

**IT IS HEREBY FOUND AND DETERMINED THAT**:

A.    Jurisdiction and Venue.  This Court has jurisdiction to consider the Sale Motion and the Sale, including the transactions contemplated by the Sale Agreement, pursuant to 28 U.S.C. §§ 157(b)(1) and 1334(a).  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (N) and (O).  Venue of these cases and the Motion in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

B.    Statutory Predicates.  The statutory and other legal predicates for the relief sought in the Motion are Bankruptcy Code sections 105, 363, 365, 503, 507 and 541, Bankruptcy

Rules 2002, 6004, 6006, 7052, 9007, 9008 and 9014, and Local Rules 2002-1, 6004-1, 6006-1 and 9006-1(b).

C.      Final Order.   This Sale Order constitutes a final and appealable order within the meaning of 28 U.S.C. § 158(a).   Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), the Court expressly finds that there is no just reason for delay in the implementation of this Sale Order, and expressly directs entry of judgment as set forth herein.

D.      Notice.   As evidenced by the affidavits and/or certificates of service previously filed with the Court and the deadlines having been shorted by the Court during hearings held on May 7 and 16, 2014 for cause shown and upon the representations of counsel at the Sale Hearing: (1) proper, timely, adequate and sufficient notice of the Sale Motion, the Sale Hearing, and all related transactions collectively described in the Sale Agreement (the Sale and all such transactions being collectively referred to as the "Sale Transaction"), has been provided by the Debtors to all parties entitled to notice under the circumstances in accordance with Bankruptcy Code sections 102(a), 363 and 365 and Bankruptcy Rules 2002, 6004, 6006 and 9007; (2) such notice, and the form and manner thereof, was good, sufficient and appropriate under the circumstances; and (3) no other or further notice of the Sale Motion, the Sale Agreement, the Sale Transaction or the Sale Hearing shall be required except as set forth herein with respect to the Assumed Contracts.

E.      Opportunity to Object.   A reasonable opportunity to object or be heard with respect to the Sale Motion and the relief requested therein has been afforded to all interested persons and entities.

F.      Sale is Appropriate.   The Sale Transaction pursuant to the Sale Agreement is authorized pursuant to Bankruptcy Code section 105 and 363(b)(1).   The Sale Transaction

represents the sound business judgment of the Debtors and is appropriate in light of the facts and circumstances surrounding the Sale Transaction and the Debtors' chapter 11 cases because (1) the Sale Transaction will result in the best value received for the Purchased Assets; (2) the Buyers, by virtue of North Atlantic's lien on the Purchased Assets represents the only viable purchasers of the Purchased Assets; and (3) the terms of the sale were negotiated at arm's length with the Buyers. The record of these proceedings indicates that the Debtors have incurred and continue to incur substantial financial losses and that absent a timely sale of the Purchased Assets, there is a substantial and imminent likelihood that the value of the Debtors' assets, including the Purchased Assets, would be substantially diminished.

A.    <u>Corporate Authority</u>. The Debtors have full corporate power and authority to execute the Sale Agreement and all other documents contemplated thereby, and to consummate the transactions contemplated in connection therewith, and as sole shareholder of AMS, subject only to the rights of the Buyer, the Debtors are authorized to modify the articles of organization and bylaws of AMS as requested by the Buyer.

B.    <u>Business Justification</u>. The Debtors have (1) articulated good, sufficient and sound business reasons for consummating the Sale Agreement, the sale of the Purchased Assets and the Sale Transaction; (2) appropriately exercised their business judgment by entering into the Sale Transaction; and (3) demonstrated compelling circumstances for entry into the Sale Transaction pursuant to Bankruptcy Code section 363(b)(1), in that, among other things, the immediate approval by the Court of the Sale Transaction with Buyer is necessary and appropriate to maximize the value of the Debtors' estates.

C.    Best Interests.  Approval of the Sale Agreement and the consummation of the Sale Transaction are in the best interests of the Debtors, their estates, their creditors and other parties in interest.

D.    Highest or Otherwise Best.  As demonstrated by (1) the testimony and/or other evidence proffered or adduced at the Sale Hearing; and (2) the representations of counsel made on the record at the Sale Hearing, Buyer's offer for the purchase of the Purchased Assets and assumption of the Assumed Liabilities as set forth in the Sale Agreement is fair and reasonable and constitutes the highest or otherwise best offer possible for the Purchased Assets and provides for consideration which significantly exceeds the total consideration that the Debtors could have received by any other party for the Purchased Assets.

E.    Arm's Length Transaction and Buyer's Good Faith.  The Sale Agreement was negotiated, proposed and entered into by the Debtors and the Buyers from arm's-length bargaining positions, without collusion, in good faith within the meaning of Bankruptcy Code section 363(m).  None of the Buyers are an "insider" of the Debtors, as that term is defined in Bankruptcy Code section 101(31).  The Sale Agreement was not entered into, and neither the Debtors nor any Buyer has entered into the Sale Agreement, or propose to consummate the Sale Transaction, for the purpose of hindering, delaying or defrauding creditors of the Debtors under the Bankruptcy Code or under the laws of the United States, any state, territory, possession thereof, or the District of Columbia.  Neither the Debtors nor any Buyer have entered into the Sale Agreement or is consummating the Sale Transaction with any fraudulent or improper purpose.

F.    No Liability Under Section 363(n).  Neither the Debtors nor any Buyer have engaged in any conduct that would cause or permit the Sale Agreement to be avoided

under Bankruptcy Code section 363(n).  Specifically, no Buyer has acted in a collusive manner with any person and the purchase price was not controlled by any agreement with unrelated third parties.

   G. <u>Free and Clear</u>.  The Purchased Assets constitute property of the Debtors' estates and title thereto is vested in the Debtors' estates within the meaning of Bankruptcy Code section 541(a).  Except as provided in the Sale Agreement, and with the exception of Permitted Liens, the transfer of the Purchased Assets will be a legal, valid, and effective transfer of the Purchased Assets, and will vest the Buyers' with all right, title, and interest of the Debtors in and to the Purchased Assets, pursuant to Bankruptcy Code sections 105(a) and 363(f).  The Purchased Assets shall be free and clear, to the fullest extent available under the Bankruptcy Code or any other applicable law, of all liens (statutory, contractual, or otherwise), claims (including those that constitute a "claim" as defined in Bankruptcy Code 101(5)), rights, liabilities, encumbrances and other interests of any kind or nature whatsoever (including any Lien, Claim, Encumbrance, Interest or Liability, as such terms are defined in the Sale Agreement), including, without limitation, any debts arising under or out of, in connection with, or in any way relating to, any acts or omissions, obligations, demands, guaranties, rights, contractual commitments, restrictions, product liability claims, environmental liabilities, employment-related claims, employee pension or benefit plan claims, multiemployer benefit plan claims, retiree healthcare or life insurance claims of or against the Debtors, and any transferee or successor liability claims, rights or causes of action (whether at law or in equity, under any law, statute, rule or regulation of the United States, any state, territory, or possession thereof or the District of Columbia), whether arising prior to or subsequent to the commencement of these cases, whether known or unknown, and whether

imposed by agreement, understanding, law, equity or otherwise, and all Excluded Liabilities (all of the foregoing (excluding the Assumed Liabilities and Permitted Liens) are hereinafter collectively referred to as "Claims"), because, in each case, one or more of the standards set forth in Bankruptcy Code section 363(f)(1)-(5) have been satisfied.  Those holders of Claims who did not object (or who withdrew their objections) to the Sale Motion or the Sale Transaction are deemed to have consented to the Sale Motion and the Sale Transaction pursuant to Bankruptcy Code section 363(f)(2).  Those holders of Claims who did object fall within one or more of the other subsections of Bankruptcy Code section 363(f) and are adequately protected by having their Claims attach to the proceeds ultimately attributable to the Purchased Assets against or in which the Claims are asserted, subject to the terms of such Claims, with the same validity, force and effect, and in the same order of priority, which such Claims now have against the Purchased Assets or their proceeds, subject to any rights, claims and defenses the Debtors or their estates, as applicable, may possess with respect thereto.  The Buyers are not taking an assignment of any Assumed Contract unless specifically identified in the Sale Agreement.  Therefore, except as specifically provided in the Sale Agreement, and consistent with Bankruptcy Code section 363(f), neither the Buyers nor its designee shall have any liability for any Claims arising out of or related to the Sale or transfer of the Purchased Assets or arising from Claims against the Debtors or their estates or any liabilities or obligations of the Debtors and/or their estates, under the laws of the United States, any state, territory, or possession thereof, based, in whole or in part, directly or indirectly, in any theory of law or equity including, without limitation, any laws affecting antitrust, successor, transferee or vicarious liability.  Except as specifically provided in the Sale Agreement, all persons and entities asserting or holding any Claims in or with respect to the Purchased Assets

(whether legal or equitable, secured or unsecured, matured or unmatured, contingent or non-contingent, senior or subordinated), howsoever arising, shall be forever barred, estopped, and permanently enjoined from asserting, prosecuting or otherwise pursuing such Claims against Buyer.

H.    <u>No Successor Liability</u>.    Except as set forth in the Sale Agreement, the Sale Transaction contemplated under the Sale Agreement does not constitute a consolidation, merger or de facto merger of the Buyers and the Debtors and/or the Debtors' estates.  There is no substantial continuity between the Buyers and the Debtors, there is no common identity between the Debtors and the Buyers, there is no continuity of enterprise between the Debtors and the Buyers, the Buyers are not a mere continuation of the Debtors or their estates, and the Buyers do not constitute successors to the Debtors or their estates.  Except as otherwise set forth in the Sale Agreement, the transfer of the Purchased Assets to the Buyers will not subject the Buyers to any liability for any Claims against the Debtors or the Acquired Assets existing as of the closing of the Sale by reason of such transfer under the laws of the United States, any state, territory, or possession thereof, based, in whole or in part, directly or indirectly, in any theory of law or equity including, without limitation, any laws affecting antitrust, ERISA, taxation, successor, transferee or vicarious liability; provided however, that nothing in this paragraph shall be construed as limiting any party's rights to assert a Claim assumed by the Buyers.

I.    <u>Legal and Factual Bases</u>.    The legal and factual bases set forth in the Sale Motion and at the Sale Hearing establish just cause for the relief granted herein.

J.    <u>Validity of Transfer</u>.    As of the Closing, the transfer of the Purchased Assets to Buyer will be a legal, valid and effective transfer of the Purchased Assets, and will

vest Buyer with all right, title and interest of the Debtors in and to the Purchased Assets, free

and clear of all Claims or as otherwise set forth in the Sale Agreement.

K.    Incorporation of Sale Hearing.  All findings of fact and conclusions of law

made or announced by the Court at the Sale Hearing are incorporated herein.

**NOW, THEREFORE, IT IS ORDERED THAT**:

2.    Findings of Fact and Conclusions of Law.  The findings of fact set forth above

and conclusions of law stated herein shall constitute this Court's findings of fact and conclusions

of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to

Bankruptcy Rule 9014.   To the extent any finding of fact later shall be determined to be a

conclusion of law, it shall be so deemed and deemed so ordered, and to the extent any conclusion

of law shall be determined to be a finding of fact, it shall be so deemed and deemed so ordered.

3.    Notice:        Notice of the sale hearing was proper, sufficient and adequate

under the circumstances and the Court finds that the cause exists for the Court's approval of

shortened notice of sale and sale-related periods.

4.    Objections.  Other than as set forth below with respect to Assumed Contracts, all

objections and responses, if any, to the Sale or the relief requested therein, that have not been

withdrawn, waived or settled as announced to the Court at the Sale Hearing or by stipulation

filed with the Court or pursuant to the terms of this Sale Order, and all reservations of rights

included therein, are hereby overruled on the merits, with prejudice.  All persons and entities

given notice of the Sale Motion that failed to timely object thereto are deemed to consent to the

relief sought therein.

5.    Approval of the Sale Agreement.  The Sale and all of the terms and conditions

and transactions contemplated in connection with Sale Agreement are hereby authorized and

approved pursuant to, inter alia, Bankruptcy Code sections 105(a), 363(b) and 365(a).  Pursuant

to Bankruptcy Code section 363(b), the Debtors are authorized to consummate the Sale

Transaction pursuant to and in accordance with the terms and conditions in the Sale Agreement

and this Sale Order.  The Debtors, as well as their Affiliates, officers, employees and agents, are

authorized to execute and deliver, and authorized to perform under, consummate and implement,

the Sale Agreement together with all additional instruments and documents that may be

reasonably necessary or desirable to implement the Sale Agreement, and to take all further

actions as may be (a) reasonably requested by the Buyers for the purpose of assigning,

transferring, granting, conveying and conferring to the Buyers, or reducing to possession, the

Purchased Assets; or (b) necessary or appropriate to the performance of the obligations

contemplated by the Sale Agreement, all without further order of the Court.  The Buyers shall

have no obligation to proceed with the Closing until all conditions precedent to its obligations to

do so have been met, satisfied or waived (in a writing signed by the Buyers).

6.      Good Faith.  The Sale Transaction has been undertaken by the Buyers in good

faith. The Buyers satisfy the good faith requirement of Bankruptcy Code section 363(m) and,

accordingly, the Buyers and the Sale Transaction are entitled to all of the protections afforded by

Bankruptcy Code section 363(m).  Pursuant to Bankruptcy Code section 363(m), if any or all of

the provisions of this Sale Order are hereafter reversed, modified, or vacated by a subsequent

order of this Court or any other court, such reversal, modification, or vacatur shall not affect the

validity and enforceability of any sale, transfer or assignment under the Sale Agreement or

obligation or right granted pursuant to the terms of this Sale Order, and notwithstanding any

reversal, modification or vacatur shall be governed in all respects by the original provisions of

this Sale Order or the Sale Agreement, as the case may be.  The Sale Transaction approved by

this Sale Order is not subject to avoidance pursuant to Bankruptcy Code section 363(n).

7.      <u>Transfer of Assets Free and Clear</u>.

A.      Pursuant to Bankruptcy Code sections 105(a), 363(b), 363(f) and 365, the

Debtors are authorized and directed to transfer the Purchased Assets in accordance with the

terms of the Sale Agreement.  The Purchased Assets shall be transferred to the Buyers, and upon

consummation of the Sale Agreement, such transfer shall (1) be valid, legal, binding and

effective; (2) vest the Buyers with all right, title and interest of the Debtors in the Purchased

Assets; and, (3) with respect to the ConnectEDU Assets, be free and clear of all Claims, with all

Claims that represent interests in property to attach to the net proceeds of the Sale, in the order of

their priority and with the same validity, force and effect that they now have against the

Purchased Assets, subject to any rights, claims and defenses the Debtors or their estates, as

applicable, may possess with respect thereto.  Upon the occurrence of the Closing, this Sale

Order shall be considered and constitute for any and all purposes a full and complete general

assignment, conveyance and transfer of the Purchased Assets purchased by the Buyers under the

Sale Agreement and/or a bill of sale or assignment transferring indefeasible title and interest in

the Purchased Assets to the applicable Buyer.  All persons and entities are prohibited and

enjoined from taking any action to adversely affect or interfere with the ability of the Debtors to

transfer the Purchased Assets to the Buyers in accordance with the Sale Agreement and this Sale

Order.

B.      Except as otherwise provided in the Sale Agreement, all Governmental

Units (as defined in Bankruptcy Code sections 101(27) and 101(41)) and all persons and entities

(and their respective successors and assigns), including, without limitation, all debt security

holders, equity security holders, governmental, tax and regulatory authorities, lenders, employees, former employees, pension plans, multiemployer pension plans, labor unions, trade creditors and any other creditors holding Claims (whether legal or equitable, secured or unsecured, known or unknown, matured or unmatured, contingent or non-contingent, liquidated or unliquidated, senior or subordinated) arising under or out of, in connection with, or in any way relating to, the Purchased Assets or the transfer of the Purchased Assets to the Buyers, are hereby forever barred, estopped and permanently enjoined from asserting or pursuing any Claims against the Buyers, their respective Affiliates, successors or assigns, its property or the Purchased Assets, including, without limitation, taking any of the following actions with respect to a Claim: (1) commencing or continuing, in any manner, any action or other proceeding against any Buyer, its Affiliates, successors or assigns, assets or properties; (2) enforcing, attaching, collecting or recovering, in any manner, any judgment, award, decree, or order against any Buyer, its Affiliates, successors or assigns, assets, or properties; (3) creating, perfecting, or enforcing any liens, claims, encumbrances or other interests against the Debtors as against any Buyer, or its Affiliates, successors, assigns, assets or properties; (4) asserting any setoff, right of subrogation or recoupment of any kind for any obligation of any of the Debtors as against any obligation due to any Buyer, or its Affiliates, successors or assigns or their respective assets, including the Purchased Assets; or (5) commencing or continuing any action, in any manner or place, that does not comply, or is inconsistent with, the provisions of this Sale Order or the agreements or actions contemplated or taken in respect thereof.

    C.  This Sale Order: (1) shall be effective as a determination that, as of the Closing, except as otherwise provided in this Sale Order and the Sale Agreement, all Claims related to the ConnectEDU Assets, have been unconditionally released, discharged and

terminated as to the Buyers and the Purchased Assets, and that the conveyances and transfers described herein have been effected; and (2) is and shall be binding upon and govern the acts of all persons and entities, including all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal and local officials and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any lease; and each of the foregoing persons and entities is hereby directed to accept for filing any and all of the documents and instruments necessary and appropriate to consummate the transactions contemplated by the Sale Agreement.

D.      If any person or entity that has filed financing statements, mortgages, deeds of trust, mechanic's liens, *lis pendens* or other documents or agreements evidencing Claims against the Debtors or the Purchased Assets has not delivered to the Debtors prior to the Closing of the Sale Transaction, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of all interests which the person or entity has with respect to the Debtors or the Purchased Assets or otherwise, then with regard to the Purchased Assets that are purchased by the Buyers pursuant to the Sale Agreement and this Sale Order: (1) the Debtors are hereby authorized and directed, and the Buyers are hereby authorized, to execute and file such statements, instruments, releases and other documents on behalf of the person or entity with respect to the Purchased Assets; and (2) the Buyers are hereby authorized, but not directed, to file, register or otherwise record a certified copy of this Sale Order, which, once filed, registered or otherwise recorded, shall constitute conclusive evidence

of the release of all Claims against the Purchased Assets.  This Sale Order is deemed to be in recordable form sufficient to be placed in the filing or recording system of each and every federal, state or local government agency, department or office.  Notwithstanding and without limiting the foregoing, the provisions of this Sale Order authorizing the sale and assignment of the Purchased Assets free and clear of Claims and the Excluded Liabilities, shall be self-executing, and neither the Debtors nor any Buyer shall be required to execute or file releases, termination statements, assignments, consents, or other instruments in order to effectuate, consummate and implement the provisions of this Sale Order.

E.      Following the Closing of the Sale Transaction, no holder of any Claim shall interfere with any Buyer's title to or use and enjoyment of the Purchased Assets based on or related to any such Claim or based on any actions the Debtors may take in their chapter 11 cases.

7.      <u>No Successor or Transferee Liability</u>.

F.      Except as set forth in the Sale Agreement, with respect to the Purchased Assets, the Buyers are not and shall not be deemed a "successor" to the Debtors or their estates as a result of any action taken in connection with the Sale Agreement, the consummation of the Sale Transaction contemplated by the Sale Agreement, the transfer or operation of the Purchased Assets or any other event occurring in the chapter 11 cases under any theory of law or equity, and the Buyers shall not assume, nor be deemed to assume, or in any way be responsible for any liability or obligation of any of the Debtors (or their predecessors or Affiliates) and/or their estates including, but not limited to, any bulk sales law, pension or ERISA obligation, WARN Act obligation, Fair Labor Standards Act obligation, CERCLA obligation, any obligation under the Consolidated Omnibus Budget Reconciliation Act, successor liability, or similar liability except as otherwise expressly provided in the Sale Agreement.  The Sale of the Purchased Assets

and the assumption and assignment of the Assumed Liabilities by Holdco and the Sale Transaction approved hereby will not cause any Buyer to be deemed a successor in any respect to the Debtors.

G.      Nothing this Sale Order or the Sale Agreement shall require any Buyer to (1) continue or maintain in effect, or assume any liability in respect of any employee, collective bargaining agreement, pension, welfare, fringe benefit or any other benefit plan, trust arrangement or other agreements to which the Debtors are a party or have any responsibility therefor, including, without limitation, medical, welfare and pension benefits payable after retirement or other termination of employment; or (2) assume any responsibility as a fiduciary, plan sponsor or otherwise, for making any contribution to, or in respect of the funding, investment or administration of any employee benefit plan, arrangement or agreement (including but not limited to pension plans) or the termination of any such plan, arrangement or agreement.

H.      Nothing in this Sale Order or the Sale Agreement releases, nullifies or enjoins the enforcement of any liability to a governmental unit under environmental laws or regulations (or any associated liabilities for penalties, damages, cost recovery or injunctive relief) that any entity would be subject to as the owner, lessor, lessee or operator of property that is sold or transferred pursuant to this Sale Order.  Nothing contained in this Sale Order or in the Sale Agreement shall in any way (1) diminish the obligation of any entity to comply with environmental laws; or (2) diminish the obligations of the Debtors to comply with environmental laws consistent with their rights and obligations as debtors in possession under the Bankruptcy Code.  Nothing in this Sale Order should be construed to create for any governmental unit any substantive right that does not already exist under law.

8.      <u>Surrender of Assets and Real Property</u>.  All entities who are presently, or who as of the Closing may be, in possession of some or all of the Purchased Assets hereby are directed to surrender possession of the Purchased Assets to the applicable Buyer as of the Closing.

9.      <u>Assumption and Assignment of Assumed Contracts</u>.

A.      The Debtors are hereby granted <u>conditional</u> approval of the assumption and assignment of the Assumed Contracts set forth in Schedule 3.10(c) of the Sale Agreement.

B.      Within three (3) days of the entry of this Order, the Debtors shall provide notice to all counterparties to the Assumed Contracts (to the extent prior notice was not provided) that will provide such counterparties with the opportunity to raise objections with respect to the final assumption and assignment of such party's Assumed Contract, including, without limitation objections based on any proposed cure amounts.

C.      Any such objection to the proposed assumption and assignment of an Assumed Contract must be filed with the Court and served upon counsel to the Debtors and North Atlantic so as to be received by no later than ten (10) days from the entry of this Order (the "<u>Assignment Objection Deadline</u>").  Absent the assertion of a timely objection, the Assumed Contracts designated as such by the Buyers will be deemed assumed by the Debtors and assigned to the applicable Buyer on a final basis effective as of the Closing Date.

D.      In the event the Debtors receive an objection from an Assumed Contract counterparty by the Assignment Objection Deadline, and the parties are unable to consensually resolve that dispute, the Debtors shall then schedule a hearing before the Court to hear such objection and the Assumed Contract in question will not be assumed or assigned (effective as of the Closing Date) until the dispute is resolved.

E.      Subject to the terms of this Order, the Debtors are authorized to assume

and assign the Assumed Contracts designated for assignment to the applicable Buyer pursuant to

the Sale Agreement; provided, however, that there shall be no assumption of any such contract

absent simultaneous assignment thereof to the applicable Buyer.  The applicable Buyer shall be

deemed to be substituted for the Debtors as a party to each of the Assumed Contracts and,

pursuant to Bankruptcy Code section 365(k), the Debtors and their estates shall be relieved from

any liability for any post-Closing breach of any such Assumed Contract after assignment of such

Assumed Contract to the Buyer.  In accordance with Bankruptcy Code section 365(b)(2) and (f),

upon transfer of the Assumed Contracts to the applicable Buyer, (i) such Buyer shall have all of

the rights of the Debtors thereunder, free and clear of all Claims, except as otherwise provided in

the Sale Agreement, and each provision of such Assumed Contracts shall remain in full force and

effect for the benefit of such Buyer, notwithstanding any provision in such contract, lease or in

applicable law that prohibits, restricts or limits in any way such assignment or transfer; and (ii)

none of the Assumed Contracts may be terminated, or the rights of any party modified in any

respect, including pursuant to any "change of control" clause, by any other party thereto as a

result of the consummation of the transactions contemplated by the Sale Agreement.

F.      the Buyers shall have the absolute right, in their sole discretion, to exclude

any executory contract or lease from the Sale Agreement and from any subsequent effort to

assume and assign such contract or lease up to and through the later of the Closing Date or, if an

abjection to the assumption and assignment is timely filed by the Assignment Objection

Deadline, thirty (30) days after the Assignment Objection Deadline.  Subject to applicable

provisions of Bankruptcy Code section 365, the provisions of the Sale Agreement and the terms

thereof with respect to Cure Amounts, all defaults or other obligations of the Debtors under the

Assumed Contracts arising or accruing prior to the Closing Date shall have been cured or shall be promptly cured in accordance with the terms hereof as a condition precedent to the assumption and assignment of the respective Assumed Contracts (and without such a cure the applicable Buyer shall have no rights in or to the respective Assumed Contracts); the Buyers shall have no liability or obligations with respect to any default or obligations arising or accruing under any Assumed Contract prior to the Closing Date, except to the extent expressly provided in the Sale Agreement or in this Sale Order.

G.    There shall be no rent accelerations, assignment fees, increases or any other fees charged or chargeable to any Buyer as a result of the assumption, assignment and sale of the Assumed Contracts.  Any provision in any Assumed Contract that prohibits or conditions the assignment of such contract or lease, or allows the counterparty to such contract or lease to terminate, recapture, impose any penalty, condition renewal or extension, or modify any term or condition upon the assignment of such contract or lease, constitutes an unenforceable anti-assignment provision, and is void and of no force and effect.  The validity of the assumption, assignment and sale of the Assumed Contracts to the applicable Buyer shall not be affected by any existing dispute between the Debtors and any counterparty to an Assumed Contract.

10.    <u>Permanent Injunction</u>.  This Sale Order shall operate as a permanent injunction prohibiting any party to a contract that has been rejected by any of the Debtors that in any way relates to any of the Purchased Assets from taking any action against any Buyer in connection with the Sale Transaction, whether pursuant to the Bankruptcy Code or any other statutory or non-statutory federal, state or local law.

11.      <u>AMS Articles of Incorporation and Bylaws</u>.  The Debtors shall, prior to the Closing, adopt articles of incorporation and bylaws in a form reasonably requested by the Buyers.

12.      <u>Operation by the Buyers</u>.  To the maximum extent available under applicable law: (a) Buyer shall be authorized, as of the Closing, to operate under any license, permit, registration, and any other governmental authorization or approval of the Debtors with respect to the Purchased Assets and the Assumed Contracts; (b) all such licenses, permits, registrations, and governmental authorizations and approvals are deemed to have been, and hereby are, directed to be transferred to the applicable Buyer as of the Closing; and (c) to the extent provided by Bankruptcy Code section 525, no governmental unit may revoke or suspend any permit or license relating to the operation of the Purchased Assets sold, transferred or conveyed to Buyer on account of the filing or pendency of these chapter 11 cases or the consummation of the Sale Transaction contemplated by the Sale Agreement.

13.      <u>Enforcement</u>.  The terms and provisions of the Sale Agreement and this Sale Order, and the transactions contemplated thereby and hereby, shall, as applicable, be specifically enforceable against and be binding in all respects upon, or shall inure to the benefit of, the Debtors, their estates, and their creditors, the Buyers, and their respective Affiliates, successors and assigns, and any affected third parties, including all entities asserting Claims, notwithstanding any subsequent appointment of any trustee, examiner or receiver of the Debtors under any chapter of the Bankruptcy Code or any other law, and all such terms and provisions likewise shall be binding on and specifically enforceable against such trustee, examiner or receiver, and shall not be subject to rejection or avoidance by the Debtors, their estates, their creditors, any other representatives of their estates, or any trustee, examiner or receiver.

14.    <u>Dismissal of AMS Bankruptcy Case No. 14-11239 (SCC)</u>. Upon the closing of the Sale, the bankruptcy case of AMS shall be dismissed (Bankr. S.D.N.Y. 14-11239 (SCC)).  No counterparty to any executory contract with AMS may assert a default against AMS, following the dismissal of its case based on the filing or pendency of its case.  AMS shall remain bound on its contracts as if its bankruptcy case had never occurred.

15.    <u>No Bulk Sales</u>.  No bulk sales law, or similar law of any state or other jurisdiction shall apply in any way to the transactions contemplated by the Sale Agreement, the Motion and this Sale Order.

16.    <u>Compliance with Privacy Policy</u>.  To the extent that the Purchased Assets include personally identifiable information, the Buyers shall either comply with the Debtors' existing privacy policy or such other privacy policy provided that such other privacy policy is no less protective than the Debtors' existing privacy policy.

17.    <u>Modification</u>.  The Sale Agreement may be modified, amended or supplemented by the Buyers and the Debtors in a writing signed by such parties without further order of the Court, provided that any such modification, amendment or supplement does not materially change the terms of the Sale Agreement or modify the express terms of this Sale Order.

18.    <u>Survival</u>.  Nothing contained in any subsequent order of this Court or any court of competent jurisdiction in these chapter 11 cases (or any order entered after any conversion of a chapter 11 case of the Debtors to a case under chapter 7 of the Bankruptcy Code) or any chapter 11 plan confirmed in any Debtors' bankruptcy cases or any order confirming any such plan, or any order dismissing any cases of the Debtors shall nullify, alter, conflict with, or in any manner derogate from the provisions of this Sale Order, and the provisions of this Sale Order shall survive and remain in full force and effect. For the avoidance of doubt, if the Debtors' chapter 11

cases are converted to cases under chapter 7 of the Bankruptcy Code, the Sale Order shall be binding on the chapter 7 trustee in such chapter 7 cases.

19.    <u>Failure to Specify</u>.  The failure specifically to include any particular provision of the Sale Agreement in this Sale Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court, the Debtors and the Buyers that the Sale Agreement be authorized and approved in its entirety with such amendments thereto as may be made by the parties in accordance with this Sale Order and the terms of the Sale Agreement.

20.    <u>Non-Severability</u>.    The provisions of this Sale Order are non-severable and mutually dependent.

21.    <u>Automatic Stay</u>.  The automatic stay pursuant to Bankruptcy Code section 362 is hereby lifted with respect to the Debtors to the extent necessary, without further order of this Court, to allow: (a) the Buyers to give the Debtors any notice provided for in the Sale Agreement, and (b) the Buyers to take any and all actions provided under or contemplated by the Sale Agreement in accordance with the terms and conditions thereof.  Should the Closing not occur as of the does not occur prior to the later of: (a) the date that is three (3) business days following entry of this Sale Order or (b) the commencement of the Auction (as defined in the bidding procedures order for the Bankruptcy Cases as entered by the Bankruptcy Court and as may be adjourned by the Debtors from time to time) or, if ConnectEdu determines that an Auction will not take place, the date that is three (3) business days after the Buyer's receipt of written notice from ConnectEdu of such determination, for reasons other than (i) the failure of the Buyer or Holdco to comply with its obligations under the Purchase Agreement or (ii) the mutual agreement by the Buyers and the Sellers, the Buyers shall be granted relief from the automatic stay as provided in Section 8.03 of the Purchase Agreement and the Court shall hold

an expedited hearing at which a Form of Order shall be agreed upon or at which time Debtors

may contest whether or not the Buyers were responsible for any failure to close timely (and that

relief from the automatic stay should not be granted), the Debtors and the Buyers shall schedule

a further hearing before this Court for further adjudication of the Motion.

22.     <u>Order Immediately Enforceable</u>.  Notwithstanding the provisions of Bankruptcy

Rules 6004 and 6006 or any applicable provisions of the Local Rules, this Sale Order shall not be

stayed for 14 days after the entry hereof, but shall be effective and enforceable immediately upon

entry.

23.     <u>No Broker's Fee</u>.  The Buyers are not and will not be liable to any agent, broker,

person or firm acting or purporting to act on behalf of either the Debtors or the Buyers for any

commission, broker's fee or finder's fee respecting the Sale Transaction.

24.     <u>Conflicts</u>.  In the event of a direct conflict between the terms of this Sale Order

and the terms of (a) the Sale Agreement, or (b) any other order of this Court, the terms of this

Sale Order shall govern and control.

25.     <u>No Waiver</u>.  Except as otherwise expressly set forth herein, nothing in this Sale

Order shall modify or waive any closing conditions or termination rights in the Sale Agreement,

and all such conditions and rights shall remain in full force and effect in accordance with their

terms.

26.     <u>Retention of Jurisdiction</u>.  This Court shall retain exclusive jurisdiction to, among

other things, (a) interpret, enforce and implement the terms and provisions of this Sale Order and

the Sale Agreement, all amendments thereto, any waivers and consents thereunder and of each of

the agreements executed in connection therewith in all respects; (b) to adjudicate disputes related

to this Sale Order or the Sale Agreement or the rights and duties provided hereunder or

thereunder or any issues relating to the Sale Agreement and this Sale Order including, but not limited to, the interpretation of the terms, conditions and provisions hereof and thereof, the status, nature and extent of the Assumed Liabilities, Purchased Assets and any Assumed Contracts and all issues and disputes arising in connection with the relief authorized herein, inclusive of those concerning the transfer of the Purchased Assets and Assumed Contracts; and (c) to enforce the injunctions set forth herein.

27.    <u>Allocation of Proceeds of Sale of Additional NAV Collateral</u>.  In the event of a sale, disposition or collection of NAV Collateral other than the Purchased Assets, North Atlantic and Buyer agree to waive, relinquish and forever discharge any and all rights, claims and interests to twenty-five percent (25%) of any cash proceeds remaining after the allocable funding of the Debtors' Professionals Carve Out Amount to be provided for in a further interim and/or final order authorizing the Debtors' use of cash collateral in these Chapter 11 Cases.  North Atlantic further acknowledges and agrees that any right, claim or interest that it may assert with respect to (i) the proceeds of any sale, disposition or collection of, or with respect to, the stock in or the assets of Experience, Inc. or (ii) any existing cash on hand of Experience, Inc. will be subordinate to the claims secured by that Pledge Agreement dated November 28, 2011, by and between ConnectEDU and Jennifer Floren Sozzi as the representative (the "**<u>Stockholders'</u>** **<u>Representative</u>**") of the former stockholders of Experience, Inc. (as amended, restated, supplemented or otherwise modified from time to time).  In connection with the agreement of North Atlantic described in the preceding sentence, North Atlantic and the Stockholders' Representative have entered into a letter agreement providing for (i) the exchange of releases, including the release of any right of North Atlantic to share in any proceeds of any claims or causes of action brought by the Stockholders' Representative against the Debtors and/or the

Debtors' directors and officers and (ii) North Atlantic's agreement to use its good faith efforts to assist the Stockholders' Representative, and/or any purchaser of the stock in or assets of Experience, Inc., in connection with obtaining the rights to certain of the Purchased Assets or certain assets of ConnectEDU that are subject to the liens held by North Atlantic and, in each case, that are reasonably necessary to the operation of Experience, Inc. in the manner in which it was operated prior the Petition Date.

28.    Acquisition of Avoidance Claims.  Except as set forth in the second sentence of this paragraph, the Purchased Assets shall include: (i) all of the claims and causes of action of Debtors AMS and ConnectEdu arising under sections 502(d), 544, 545, 547, 548, 549, 550 and 553 of the Bankruptcy Code and any other avoidance or similar action under the Bankruptcy Code or state law and the proceeds thereof; and (ii) all of the claims and causes of action of Experience, Inc. (if any) against North Atlantic, David Coit and Debtor AMS, arising under sections 502(d), 544, 545, 547, 548, 549, 550 and 553 of the Bankruptcy Code and any other avoidance or similar action under the Bankruptcy Code or state law and the proceeds thereof (collectively, "Avoidance Claims").  The Purchased Assets do not include (i) any Avoidance Claims against Nicholas Ciarcia, Timothy Brown and Anthony "Craig" Powell or (ii) any claims or causes of action against any of the Debtors' current or former directors and officers, other than David Coit.  All claims against those individuals listed in clauses (i) and (ii) of the preceding sentence are retained by the Debtors and are not transferred or released.   On the Closing Date, Buyer and North Atlantic shall covenant not to sue on and/or otherwise enforce the Avoidance Claims except in connection with setoff or recoupment rights by the Buyer, AMS, North Atlantic or David Coit in any action brought against any of them.  Nothing herein shall release or be deemed to release any claims arising under the Sale Agreement or this Sale Order.

Dated: May 27, 2014
New York, New York

_/s/ Shelley C. Chapman_
HONORABLE SHELLEY C. CHAPMAN
UNITED STATES BANKRUPTCY JUDGE

# EXHIBIT A

**[APA]**

**ASSET PURCHASE AGREEMENT**

**DATED AS OF**

**MAY 19, 2014**

**BY AND AMONG**

**NORTH ATLANTIC SBIC IV, L.P.,**

**AMS ASSET HOLDINGS, LLC,**

**CONNECTEDU, INC.**

**AND**

**ACADEMIC MANAGEMENT SYSTEMS, INC.**

## TABLE OF CONTENTS

**Page**

ARTICLE I DEFINITIONS ..................................................................5

    Section 1.01   Definitions .................................................5

ARTICLE II PURCHASE AND SALE ......................................11

    Section 2.01   Purchase and Sale ....................................11
    Section 2.02   Assumption of Liabilities ........................11
    Section 2.03   Excluded Liabilities ................................12
    Section 2.04   Nonassignable Assets ..............................12
    Section 2.05   Assignment of Additional ConnectEDU Assets ........12
    Section 2.06   Shared Assets ..........................................13
    Section 2.07   Designation ..............................................13
    Section 2.08   Purchase Price; Payment Terms ..............13
    Section 2.09   Closing .....................................................13
    Section 2.10   Condition Precedent to Obligations of the Buyer .......14
    Section 2.11   Post-Closing Assistance ..........................14
    Section 2.12   Certain Transition Services. ....................14

ARTICLE III REPRESENTATIONS AND WARRANTIES REGARDING THE
COMPANIES ...................................................................16

    Section 3.01   Corporate Existence and Power ..............17
    Section 3.02   Corporate Authorization .........................17
    Section 3.03   Governmental Authorization ...................17
    Section 3.04   Non-Contravention .................................17
    Section 3.05   Consents ..................................................17
    Section 3.06   Financial Statements ...............................17
    Section 3.07   Properties. ................................................18
    Section 3.08   Title to Purchased Assets ........................18
    Section 3.09   Investigations; Litigation ........................19
    Section 3.10   Contracts .................................................19
    Section 3.11   Licenses and Permits ..............................19
    Section 3.12   Compliance with Laws ...........................19
    Section 3.13   AMS Proprietary Rights ........................19
    Section 3.16   Finders' Fees ..........................................21
    Section 3.17   Taxes. To the Companies' Knowledge: ....21
    Section 3.18   Significant Relationships ........................22
    Section 3.19   Accounts Receivable; Accounts Payable .................22

Section 3.20    ERISA Benefits ................................................................................22

ARTICLE IV REPRESENTATIONS AND WARRANTIES OF THE BUYER AND
HOLDCO ......................................................................................................22

Section 4.01    Organization and Existence ...............................................................22
Section 4.02    Corporate Authorization ....................................................................23
Section 4.03    Governmental Authorization ..............................................................23
Section 4.04    Non-Contravention ............................................................................23
Section 4.05    Finders' Fees .....................................................................................23
Section 4.06    Litigation ...........................................................................................23
Section 4.07    No Inducement or Reliance; Independent Assessment .......................23

ARTICLE V COVENANTS OF ALL PARTIES ............................................................24

Section 5.01    Interim Operations of the AMS Business ...........................................24
Section 5.02    Commercially Reasonable Efforts; Further Assurances. ...................25
Section 5.03    Certain Filings ..................................................................................25
Section 5.04    Public Announcements ......................................................................25
Section 5.05    AMS Articles of Organization and Bylaws .........................................25

ARTICLE VI TAX MATTERS .....................................................................................26

Section 6.01    Tax Cooperation: Allocation of Taxes ...............................................26

ARTICLE VII EMPLOYEE BENEFITS .......................................................................27

Section 7.01    ConnectEDU .....................................................................................27
Section 7.02    No Third Party Beneficiaries .............................................................27

ARTICLE VIII SURVIVAL; INDEMNIFICATION; RELIEF FROM STAY ..................27

Section 8.01    Survival .............................................................................................27
Section 8.03    Relief from Stay ................................................................................27

ARTICLE IX .................................................................................................................27

Section 9.01    Notices ..............................................................................................27
Section 9.02    Amendments; No Waivers ..................................................................28
Section 9.03    Expenses ...........................................................................................28
Section 9.04    Successors and Assigns ....................................................................28
Section 9.05    Governing Law ..................................................................................29
Section 9.06    Counterparts; Effectiveness ..............................................................29
Section 9.07    Entire Agreement ..............................................................................29
Section 9.08    Captions ............................................................................................29

Section 9.09    Mutual Releases. ............................................................................................29

*Exhibits*

Exhibit A .................................................................................................... Business
Exhibit B ...................................................Form of Assignment and Assumption Agreement
Exhibit C ......................................................................................Form of IP Assignment
Exhibit D ............................................................................................Form of Sale Order
Exhibit E ..............................................................................AMS Stock Certificate

*Schedules*

Schedule 1.01 ............................................................................. Excluded Assets
Schedule 2.01 .............................................................................ConnectEDU Assets
Schedule 2.02 .................ConnectEDU Accounts Payable Related to ConnectEDU Assets
Schedule 2.06 ...................................................................................Shared Assets
Schedule 2.12 ..............................................Domain Name and E-mail Services
Schedule 3.06 .............................................................. Financial Statements
Schedule  3.07(a) ....................................................................Real Property
Schedule  3.07(b)........................................................................Fixed Assets
Schedule  3.10(a)...........................................................ConnectEDU Contracts
Schedule  3.10(b)........................................................... AMS Contracts
Schedule  3.10(c)..........................................................Cure Amounts
Schedule  3.13(a) ........................................... Proprietary Rights Contracts
Schedule 3.13(d)............................................................................. Marks
Schedule 3.13(f) .......................................................................... Net Names
Schedule 3.15 ....................................................................Employees
Schedule 3.18 ..............................................Significant Relationships
Schedule 3.19(a) ......................................................AMS Accounts Receivable
Schedule 3.19(b).........................................................AMS Accounts Payable
Schedule 3.20 .................................................Employee Benefit Plans

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT dated as of May 19, 2014 is entered into by and among North Atlantic SBIC IV, L.P., a Delaware limited partnership (the "Buyer"), and AMS Asset Holdings, LLC, a Delaware limited liability company and wholly-owned subsidiary of the Buyer ("Holdco"), on one hand and  ConnectEdu, Inc., a Delaware corporation ("ConnectEDU"), and Academic Management Systems, Inc., a Massachusetts corporation ("AMS" and together with ConnectEDU, the "Companies" and each, a "Company") on the other.

### WITNESSETH:

WHEREAS, AMS conducts a business as described on attached Exhibit A (the "AMS Business");

WHEREAS, the Buyer and ConnectEDU are party to a certain Purchase Agreement, dated October 9, 2012, pursuant to which ConnectEDU issued to the Buyer a 9.50% Senior Subordinated Debenture in the original principal amount of $5,000,000 (the "October Debenture");

WHEREAS, the Buyer and ConnectEDU are party to a certain Amended and Restated Purchase Agreement, dated December 31, 2012, pursuant to which ConnectEDU issued to the Buyer a 9.50% Senior Subordinated Debenture in the original principal amount of $1,000,000 (the "December Debenture" and together with the October Debenture, the "Debentures");

WHEREAS, on April 28, 2014 (the "Petition Date"), the Companies filed voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as amended (the "Bankruptcy Code"), in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"), which cases are being jointly administered under Case No. 14-11238 (SCC)(the "Bankruptcy Cases");

WHEREAS, the Buyer and Holdco desire to purchase certain assets of the AMS Business from ConnectEDU, including without limitation all of the issued and outstanding capital stock of AMS, and ConnectEDU desires to sell such assets of the AMS Business to the Buyer and Holdco, upon the terms and subject to the conditions hereinafter set forth and as authorized under Sections 105, 363 and 365 of the Bankruptcy Code; and

WHEREAS, the Companies desire to assign to the Buyer, Holdco or to a designee or designees of the Buyer, and the Buyer, Holdco, or its designee(s) desires to assume from the Companies, certain liabilities, upon the terms and subject to the conditions hereinafter set forth and as authorized under Sections 105, 363 and 365 of the Bankruptcy Code.

NOW, THEREFORE, in consideration of the foregoing and the representations, warranties, covenants and agreements herein contained, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

# ARTICLE I
## DEFINITIONS

Section 1.01 <u>Definitions</u>. The following terms, as used herein, have the following meanings:

"<u>Accounts Receivable</u>" means (a) all trade accounts and other rights to payment from customers of the AMS Business and the full benefit of all security for such accounts or rights to payment, including all trade accounts receivable representing amounts receivable in respect of goods shipped or products sold or services rendered by the Companies to customers of the AMS Business, (b) all other accounts or notes receivable of the AMS Business and the full benefit of all security for such accounts or notes and (c) any claim, remedy or other right related to any of the foregoing.

"<u>Additional Assets</u>" has the meaning set forth in <u>Section 2.05</u>.

"<u>Affiliate</u>" means, with respect to any Person, any Person directly or indirectly controlling, controlled by, or under common control with such other Person.

"<u>AMS</u>" has the meaning set forth in the preamble of this Agreement.

"<u>AMS Business</u>" has the meaning set forth in recitals of this Agreement.

"<u>AMS Proprietary Rights</u>" means all Proprietary Rights that are owned, held, or currently under development by AMS and all Proprietary Rights that are owned, held, or currently under development by ConnectEDU and that are used, or are intended for use, exclusively or primarily by AMS, in the operation of the AMS Business including, without limitation: (a) all assumed fictional business names, trading names, registered and unregistered trademarks, service marks, and applications (collectively, "<u>Marks</u>"); (b) all patents, patent applications and inventions and discoveries that may be patentable (collectively, "<u>Patents</u>"); (c) all registered and unregistered copyrights in both published works and unpublished works (collectively, "<u>Copyrights</u>"); (d) all rights in mask works; (e) all know-how, trade secrets, confidential or proprietary information, customer lists, software, technical information, data, process technology, plans, drawings and blue prints (collectively, "<u>Trade Secrets</u>"); and (f) all rights in internet websites and internet domain names listed on <u>Schedule 3.13(g)</u> (collectively "<u>Net Names</u>").

"<u>AMS Software</u>" means all of the computer software (including firmware and other software embedded in hardware devices) currently owned, developed (or currently being developed), used, marketed, distributed, licensed, or sold by the AMS Business (other than "off-the-shelf," non-customized third-party software licensed to AMS for internal use on a non-exclusive basis).

"<u>AMS Stock</u>" has the meaning set forth in <u>Section 2.01</u>.

"<u>Ancillary Agreements</u>" means the Assignment and Assumption Agreement and the IP Agreement.

"<u>Assignment and Assumption Agreement</u>" has the meaning set forth in <u>Section 2.08(b)</u>.

"Assumed Contracts" has the meaning set forth in Section 2.02.

"Assumed Liabilities" has the meaning set forth in Section 2.02.

"Bankruptcy Cases" has the meaning set forth in recitals of this Agreement.

"Bankruptcy Code" has the meaning set forth in recitals of this Agreement.

"Bankruptcy Court" has the meaning set forth in recitals of this Agreement.

"Business Names" has the meaning set forth in Section 2.12(b).

"Business Proceeding" means any lawsuit, action, arbitration, administrative or other proceeding, criminal prosecution, indictment or governmental investigation or inquiry or examination or audit involving a Company, the AMS Business or any Contract to which a Company is a party or by which it or any of the assets of a Company or the AMS Business may be bound.

"Buyer" has the meaning set forth in the preamble of this Agreement.

"Carve Out Amount" means, solely for the purposes of this Agreement, the fees and expenses incurred by the debtors' professionals in the Bankruptcy Cases and allowed by the Bankruptcy Court before or after the Closing Date, as provided for in the Cash Collateral Order.

"Cash Collateral Order" means that Interim Order authorizing the use of cash collateral entered on May 19, 2014 in the Bankruptcy Cases.

"CEDU Domain Names" means the connectedu.com and connectedu.net domain names and any other domain names held by ConnectEDU access to which is reasonably necessary for the Buyer to operate and conduct the AMS Business as currently conducted and to transition the provision of the related information technology services of the AMS Business from service providers of ConnectEDU to service providers of the Buyer's choosing.

"Closing" has the meaning set forth in Section 2.08.

"Closing Date" means the close of business on the date of the Closing, which date shall be mutually agreed upon by the parties, and shall, in any event, be a date that is within three business days following the entry of the Sale Order.

"COBRA" means the health care continuation coverage requirements of Section 4980B of the Code and Sections 601 through 608 of ERISA.

"Code" means the Internal Revenue Code of 1986, as amended.

"Company" has the meaning set forth in the preamble of this Agreement.

"Confidentiality Agreement" has the meaning set forth in Section 10.07.

"ConnectEDU" has the meaning set forth in the preamble of this Agreement.

"ConnectEDU Assets" has the meaning set forth in <u>Section 2.01</u>.

"ConnectEDU Business" means the business of providing products and services to educators, students, parents, administrators, and employers to prepare and transition learners on their pathways from school to college to career, with a focus on enhanced and personalized learning, and also providing solutions that assist educators and employers engage with students through familiar mobile and social channels as conducted by ConnectEDU and/or Experience, and excluding for all purposes the AMS Business.

"Contracts" means any and all binding written, oral or other agreements, contracts, leases, licenses, commitments, sales and purchase orders and other undertakings of any nature.

"Conveyance Documents" has the meaning set forth in <u>Section 2.08(b)</u>.

"Cure Amounts" means, with respect to any Contract, all amounts that (i) are required to be paid under Section 365(b)(1)(A) or (b)(1)(B) of the Bankruptcy Code in order to assume and assign such Contract, or (ii) are due pursuant to an order of the Bankruptcy Court as a condition to assuming and assigning such Contract.

"Debentures" has the meaning set forth in recitals of this Agreement.

"December Debenture" has the meaning set forth in recitals of this Agreement.

"Domain Name Assignment" has the meaning set forth in <u>Section 2.12(a)</u>.

"Employee Benefit Plan" means all employee benefit plans (as defined in Section 3(3) of ERISA) and all bonus, stock or other security option, stock or other security purchase, stock or other security appreciation rights, incentive, deferred compensation, retirement or supplemental retirement, severance, golden parachute, vacation, cafeteria, dependent care, medical care, employee assistance program, education or tuition assistance programs, insurance and other similar fringe or employee benefit plans, programs or arrangements, and any current or former employment or executive compensation or severance agreements, written or otherwise, which are sponsored, maintained, contributed to, or required to be contributed to by AMS or an ERISA Affiliate thereof for the benefit of, or relating to, any present or former employees, officers, directors, consultants or agents (and/or their respective dependents and beneficiaries) of the Company that provide services to the AMS Business.

"Employees" means all of AMS' officers and employees as listed on <u>Schedule 3.15</u>.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"ERISA Affiliate" means any trade or business (whether or not incorporated) that is or has been a member of a "controlled group of corporations" with, under "common control" with, or a member of an "affiliated service group" with, or otherwise required to be aggregated with, AMS under Sections 414(b), (c), (m) or (o) of the Code or Section 4001(14) of ERISA

"Excluded Assets" means: (a) all of the issued and outstanding capital stock and all assets and properties of Experience; (b) all Contracts that are not specifically included in the

ConnectEDU Assets and listed on <u>Schedule 2.01</u>, except for any Contracts required for the operation of the AMS Business; (c) any rights, claims or causes of action of the Companies under this Agreement or the Ancillary Agreements; (d) all receivables, claims or causes of action related to any Excluded Asset; (e) all insurance policies of the Companies and all rights under any insurance policies; (f) any avoidance claims or causes of action under the Bankruptcy Code or applicable Law with respect to the Excluded Assets; (g) all books, records, files and documents relating primarily to an Excluded Asset or an Excluded Liability; (h) any claim, right or interest of either Company in or to any refund, rebate, abatement or other recovery for Taxes with respect to the AMS Business or the Purchased Assets, together with any interest due thereon or penalty rebate arising therefrom, for any Tax period (or portion thereof) ending on or before the Closing Date; (i) all Accounts Receivable of ConnectEDU, other than Accounts Receivable included in the Purchased Assets; (j) all cash and cash equivalents; and (k) all assets of ConnectEDU other than the ConnectEDU Assets, including, without limitation, the assets listed on <u>Schedule 1.01</u>.

"<u>Excluded Liabilities</u>" has the meaning set forth in <u>Section 2.03</u>.

"<u>Experience</u>" has the meaning set forth in <u>Section 2.03</u>.

"<u>Financial Statements</u>" has the meaning set forth in <u>Section 3.06(a)</u>.

"<u>GAAP</u>" means United States generally accepted accounting principles, as in effect from time to time, applied on a consistent basis.

"<u>Governmental Authority</u>" means any: (a) nation, state, county, city, town, borough, village, district or other jurisdiction; (b) federal, state, local, municipal, foreign or other government; (c) governmental or quasi-governmental authority of any nature (including any agency, branch, department, board, commission, court, tribunal, grand jury or other entity exercising governmental or quasi-governmental powers); (d) body exercising, or entitled or purporting to exercise, any administrative, executive, judicial, legislative, police, regulatory or taxing authority or power, including any arbitration or mediation panel or similar body; or (e) official of any of the foregoing.

"<u>Holdco</u>" has the meaning set forth in the preamble of this Agreement.

"<u>Knowledge of the Companies</u>" (or similar usage) means the actual knowledge of ConnectEDU's Chief Restructuring Officer based solely on his limited exposure to, and understanding of, the Companies' businesses and affairs since his appointment in such capacity.

"<u>Law</u>" means any statute, law, ordinance, regulation, decision, order or rule of any Governmental Authority including but not limited to any federal, state, or local procurement law or regulation and any so-called procurement integrity act and any other applicable procurement law or regulation or any other legal requirement, or any equal employment opportunities and affirmative action requirements.

"<u>Liability</u>" means any direct or indirect liability, indebtedness, obligation, expense, claim, deficiency or guaranty of or by any person of any type, whether known or unknown, accrued, absolute, contingent, matured or unmatured, including any liability for Taxes.

"Lien" means any mortgage, lien, pledge, option, charge, claim, defect in title, security interest, community property interest, condition, equitable interest, restriction on transferability, voting, receipt of income or exercise of any other attribute of ownership or encumbrance of any kind in respect of such asset.

"Material Adverse Effect" means any fact, condition, change, violation, inaccuracy, circumstance, effect or event, individually or in the aggregate, that has, or would be reasonably expected to have, a material adverse effect on the property, business, operations, assets (tangible and intangible), or condition (financial or otherwise) of the AMS Business or the Purchased Assets, in either case, taken as a whole, which occurs other than by reason of the filing of the Bankruptcy Cases or operating in bankruptcy.

"Most Recent Balance Sheet Date" has the meaning set forth in Section 3.06(a).

"Most Recent Financial Statements" has the meaning set forth in Section 3.06(a).

"Nonassignable Asset" has the meaning set forth in Section 2.04.

"Ordinary Course of Business" means the ordinary course of business of the AMS Business consistent with past customs and practice (including with respect to quantity and frequency).

"Permitted Liens" means, collectively, those Liens described in (i), (ii) and (iii) of Section 3.08(d).

"Person" means an individual, corporation, partnership, association, trust or other entity or organization, including a government or political subdivision or an agency or instrumentality thereof.

"Post-Closing Tax Period" means any Tax period (or portion thereof) ending after the Closing Date.

"Pre-Closing Tax Period" means any Tax period (or portion thereof) ending on or before the Closing Date.

"Proprietary Rights" means all (a) inventions (whether patentable or unpatentable and whether or not reduced to practice), all improvements thereto, and all patents, patent applications, patent disclosures and all related continuation, continuation-in-part, divisional, reissuance, re-examination, revision, extension, utility, model, certificate of invention and design patents, patent applications, registrations and applications for registrations, (b) trademarks, service marks, trade dress, logos, slogans, tradenames, service names, corporate names, internet domain names and rights in telephone numbers, together with all translations, adaptions, derivations and combinations thereof and including all goodwill associated therewith, and all registrations, applications for registration and renewals in connection therewith, (c) copyrights and applications, registrations and renewals in connection therewith, (d) mask works and registrations and applications for registration in connection therewith, (e) computer software (including, without limitation, source codes, executable code, data, databases and related documentation), schematics, firmware and technology, data and documentation, (f) trade secrets,

negative trade secrets and confidential business information, whether patentable or non-patentable and whether or not reduced to practice (including, without limitation, ideas, know-how, formulas, methodologies, moral rights, compositions, manufacturing and product processes and techniques, research and development information, technical data, designs, drawings, specifications, copyrightable works, financial, marketing and business data, pricing and cost information, business and marketing plans and proposals and customer and supplier lists and information), (g) rights in internet web sites, internet domain names and keywords, (h) other tangible and intangible proprietary information, materials and rights relating to any of the foregoing (including without limitation associated goodwill and remedies against infringements thereof and rights of protection of an interest therein under the laws of all jurisdictions), (i) documents, records and files relating to design, end user documentation, manufacturing, quality control, sales, marketing or customer support for all intellectual property and proprietary rights described in (a) through (h) above, (j) copies and tangible embodiments all intellectual property and proprietary rights described in (a) through (h) above, and (k) all license and similar rights in any third-party product or any third-party intellectual property and proprietary rights of the types described in (a) through (j) above.

"Public Software" means any software that (a) contains, or is derived in any manner (in whole or in part) from, any software that is distributed as free software or open source software (e.g., Linux) and (b) requires as a condition of its use, modification or distribution that it be disclosed or distributed in source code form or made available at no charge. "Public Software" includes without limitation software licensed under or distributed pursuant to the GNU's General Public License (GPL) or Lesser/Library GPL, the Mozilla Public License, the Netscape Public License, the Sun Community Source License, the Sun Industry Standards License, the Artistic License (e.g. PERL), the BSD License, the Open SSL License, and the Apache License, or any license or distribution model similar to any of the foregoing.

"Purchase Price" has the meaning set forth in Section 2.06.

"Purchased Assets" has the meaning set forth in Section 2.01.

"Real Property" has the meaning set forth in Section 3.07(a).

"Sale Order" means that final non-appealable order in the form attached hereto as Exhibit D.

"Schedules" has the meaning set forth in Section 2.09(d).

"Section 338(h)(10) Election" has the meaning set forth in Section 6.01(a).

"Services" has the meaning set forth in Section 2.12(a).

"Shared Assets" has the meaning set forth in Section 2.06.

"Significant Party" has the meaning set forth in Section 3.18.

"Straddle Period" means any Tax period that begins before and includes (but does not end on) the Closing Date.

"Tax" means any federal, state, local, or foreign income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental (including taxes under §59A of the Code), customs duties, capital stock, franchise, profits, withholding, social security (or similar), unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated, or other tax of any kind whatsoever, including any interest, penalty, or addition thereto, whether disputed or not.

"Tax Return" means any return, amended return, declaration, report, estimate, claim for refund, or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"Treasury Regulations" has the meaning set forth in Section 6.01(a).

"Year-End Financial Statements" has the meaning set forth in Section 3.06(a).

## ARTICLE II
## PURCHASE AND SALE

Section 2.01 Purchase and Sale. Upon the terms and subject to the conditions of this Agreement, the Buyer agrees, through Holdco, or one or more of its designees, to purchase from ConnectEDU, and ConnectEDU agrees to sell, transfer, assign and deliver, or cause to be sold, transferred, assigned and delivered, to the Buyer, Holdco or its designee(s) at the Closing, free and clear of all Liens other than Permitted Liens, all of the Companies' right, title and interest in, to and under (i) all of the issued and outstanding capital stock of AMS (the "AMS Stock") and (ii) the assets set forth on Schedule 2.01 owned, held or used in the conduct of the AMS Business by ConnectEDU (the "ConnectEDU Assets" and together with the AMS Stock, the "Purchased Assets").    Nothing herein contained shall be deemed to sell, transfer, assign or convey the Excluded Assets to the Buyer or to Holdco, and ConnectEDU shall retain all right, title and interest to, in and under the Excluded Assets, subject to the Buyer's liens and rights under the Cash Collateral Order.

Section 2.02 Assumption of Liabilities. Upon the terms and subject to the conditions of this Agreement, Holdco agrees, effective upon the later of (i) the Closing or (ii) the approval of any required assumption and assignment, that Holdco or its designee(s) will assume the following liabilities in connection with the ConnectEDU Assets (the "Assumed Liabilities"):

(a)    any trade account payable which remains unpaid at the Closing and which is specifically set forth on Schedule 2.02 and related to the ConnectEDU Assets;

(b)    any Liability of ConnectEDU arising after the Closing Date under the Contracts that are specifically included in the ConnectEDU Assets and listed on Schedule 2.01 (the "Assumed Contracts");

(c)    all Cure Amounts associated with the Assumed Contracts; and

(d)    up to $100,000 of the Carve Out Amount, but solely to the extent the Carve Out Amount is not funded by or paid in full from other sources, all in accordance with the Cash Collateral Order.

Section 2.03 <u>Excluded Liabilities</u>. Notwithstanding any provision in this Agreement or any other writing to the contrary, Holdco or its designee(s) is assuming only the Assumed Liabilities and neither the Buyer, Holdco, nor any of their designee(s) is assuming any other liability or obligation of ConnectEDU or of Experience, Inc., a Delaware corporation ("<u>Experience</u>"), of any nature whether presently in existence or arising or asserted hereafter. All such other liabilities and obligations shall remain obligations and liabilities of, ConnectEDU and Experience (all such liabilities and obligations not being assumed being herein referred to as the "<u>Excluded Liabilities</u>").

Section 2.04 <u>Nonassignable Assets</u>. To the extent that any Asset otherwise to be acquired or assumed by Holdco or its designee(s) upon the Closing hereunder is determined by the Bankruptcy Court to be non-assignable pursuant to Section 365(c) of the Bankruptcy Code or otherwise (each, a "<u>Nonassignable Asset</u>"), such Nonassignable Asset shall be held, as of and from the Closing Date, for the benefit and burden of Holdco or its designee(s) and the covenants and obligations thereunder shall be fully performed by Holdco or its designee(s) on ConnectEDU's behalf (to the extent such covenants and obligations are Assumed Liabilities) and all rights (to the extent such rights are ConnectEDU Assets ) existing thereunder shall be for Holdco's account.  To the extent permitted by applicable law and requested in writing by Holdco, ConnectEDU shall take or cause to be taken, at Holdco's expense, such actions as Holdco may reasonably request in light of ConnectEDU's then current operations and capabilities which are required to be taken or appropriate in order to provide Holdco or its designee(s) with the benefits and burdens of the Nonassignable Asset.

Section 2.05 <u>Assignment of Additional ConnectEDU Assets</u>.  Following the execution of this Agreement, if the Buyer or Holdco determines that additional assets of ConnectEDU that are not included in the ConnectEDU Assets (the "<u>Additional Assets</u>") are necessary in connection with operation of the AMS Business, it shall provide notice to ConnectEDU identifying such Additional Assets.  Promptly following the receipt of such notice, ConnectEDU shall execute and deliver such documents and instruments of conveyance and transfer as the Buyer, Holdco or their designee(s) may reasonably request in order to consummate the assignment and assumption of such Additional Asset to the Buyer, Holdco or their designee(s) (and such Additional Asset shall constitute a ConnectEDU Asset hereunder and such transfer shall be subject to, and effected in accordance with the terms and conditions hereof) provided that: (i) such Additional Asset is then available for sale by ConnectEDU; (ii) the value of any one such Additional Asset is less than $100,000.00; (iii) the cumulative value of all such Additional Assets is less than $300,000.00; and (iv) the Additional Asset was subject to the liens held by the Buyer on the Petition Date.  The sale of any additional assets of ConnectEDU or Experience that are not included in the ConnectEDU Assets and are not subject to the immediately preceding sentence, shall be effected outside of this Agreement on terms and conditions mutually acceptable to ConnectEDU or Experience, as the case may be, on the one hand, and Holdco, the Buyer or their designee, as the case may be, on the other hand.

Section 2.06 <u>Shared Assets</u>. The parties hereto acknowledge that the assets set forth on <u>Schedule 2.06</u> are used by both AMS in connection with the AMS Business and by ConnectEDU in connection with the ConnectEDU Business (the "<u>Shared Assets</u>"). The parties hereto agree and acknowledge that all of the Shared Assets shall be included in the Purchased Assets and shall be assigned to Holdco or its designee(s) hereunder. Holdco agrees that it, or its designee(s), including AMS, will, on a non-exclusive basis, license back to ConnectEDU or any purchaser of assets of the ConnectEDU Business pursuant to an order of the Bankruptcy Court, or any of their respective designees, any rights to use such Shared Assets that are reasonably necessary for ConnectEDU to conduct the ConnectEDU Business, upon reasonable terms and conditions to be negotiated and agreed upon by the parties designed to effect a cost sharing relative to actual use, provided that, such licenses shall be solely for (i) the purpose of conducting the ConnectEDU Business and (ii) any other purpose agreed to by Holdco, in its good faith, reasonable discretion. For the avoidance of doubt, Holdco shall have no obligations hereunder to license the rights to any portion of any Shared Asset to the extent relating solely to AMS Business.

Section 2.07 <u>Designation</u>. For the avoidance of doubt, the parties agree, acknowledge and understand that the Buyer and Holdco may assign its rights to purchase the ConnectEDU Assets hereunder to one or more designees, including to AMS.

Section 2.08 <u>Purchase Price; Payment Terms</u>. In consideration for the purchase and sale of the Purchased Assets, Holdco agrees to assume, or cause its designee(s) to assume, the Assumed Liabilities and the Buyer agrees to pay and transfer to ConnectEDU an aggregate amount of Four Million Dollars ($4,000,000) in Debentures (the "<u>Purchase Price</u>") thereby reducing the aggregate outstanding amount due under the Debentures by $4,000,000. The parties agree to allocate for income tax purposes the Purchase Price to the assets set forth on <u>Schedule 2.01</u> up to their fair market values, with the remainder allocated to the AMS Stock (subject to <u>Section 6.01(b)</u>).

Section 2.09 <u>Closing</u>. The closing (the "<u>Closing</u>") of the purchase and sale of the Purchased Assets and the assumption of the Assumed Liabilities hereunder shall take place at the offices of Nixon Peabody LLP at 100 Summer Street, Boston, Massachusetts 02110 on the Closing Date, or at such other time or place as the Buyer and ConnectEDU may agree. At the Closing:

(a)    The Buyer shall deliver to ConnectEDU a statement of reduction in the amount of the Purchase Price of the outstanding amounts due under the Debentures.

(b)    ConnectEDU and Holdco shall enter into an assignment and assumption agreement substantially in the form attached hereto as <u>Exhibit B</u> (the "<u>Assignment and Assumption Agreement</u>"), and ConnectEDU shall deliver to Holdco, to Buyer or its designee(s), as applicable, such deeds, bills of sale, endorsements, consents, assignments and other good and sufficient instruments of conveyance and assignment (the "<u>Conveyance Documents</u>") as the parties and their respective counsel shall deem reasonably necessary or appropriate to vest in Buyer, Holdco and/or its designee(s), as applicable, all right, title and interest in, to and under the Purchased Assets;

(c)    To the extent the ConnectEDU Assets include any registered intellectual property of ConnectEDU, ConnectEDU and Holdco shall enter into an intellectual property assignment agreement substantially in the form attached hereto as <u>Exhibit C</u> (the "<u>IP Assignment</u>") and any confirmatory assignments of AMS Proprietary Rights as may be reasonably requested, pursuant to which ConnectEDU shall convey to Holdco, the AMS Proprietary Rights;

(d)    The Companies shall deliver to the Buyer disclosure schedules to this Agreement (the "<u>Schedules</u>") as of the Closing Date;

(e)    The Companies or the Buyer shall obtain a certified copy of the Sale Order and a copy of the docket of the Bankruptcy Court evidencing the entry of the Sale Order (updated through the date and time of the Closing); and

(f)    The Companies, the Buyer, Holdco, or its designee(s), as applicable, shall also execute and deliver all such instruments, documents and certificates as may be reasonably requested by the other party that are necessary, appropriate or desirable for the consummation at the Closing of the transactions contemplated by this Agreement.

(g)    The Buyer shall deliver to ConnectEDU the mutual releases as provided in <u>Section 9.08</u>.

Section 2.10 <u>Condition Precedent to Obligations of the Buyer</u>. The Buyer's and Holdco's obligations under this Agreement are contingent upon the entry of the Sale Order and the Companies having made such modification to the Articles of Organization and Bylaws of AMS as the Buyer may reasonably request, with all such modifications having been approved in the Sale Order.

Section 2.11 <u>Post-Closing Assistance</u>.    After the Closing, to the extent reasonably practicable in light of ConnectEDU's then current operations and capabilities, the Companies shall (i) make those portions of their books and records that relate to the Purchased Assets or the AMS Business available to the Buyer and Holdco and its advisors and representatives; and (ii) to the extent applicable, use their commercially reasonable efforts and execute such documents as Buyer reasonably requests to facilitate the transfer of the domain names, telephone numbers and other ConnectEDU Assets.  After the Closing, the Buyer and Holdco shall make all books and records of AMS and all books and records included in the ConnectEDU Assets available to the Companies, as shall be reasonably requested by ConnectEDU during normal business hours and the Buyer and Holdco shall use commercially reasonable efforts to make any employees of AMS available to assist the Company and any of its Affiliates or representatives with post-Closing matters (including the administration of the Bankruptcy Cases and/or the wind-down of ConnectEDU or any of its affiliates businesses) at no-cost to ConnectEDU or any of its Affiliates or representatives.

Section 2.12 <u>Certain Transition Services.</u>

(a)    <u>General</u>.  After the Closing, to the extent as is reasonably practicable in light of ConnectEDU's ownership of the applicable assets and ConnectEDU's then current operations and capabilities, ConnectEDU shall, or shall cause third-party providers to, provide the Buyer

(which includes Buyer's Service Providers and AMS Employees) with the domain name and e-mail services set forth on Schedule 2.12 (collectively, the "Services") for the period of up to six (6) months, but no less than thirty (30) days, with respect to each Service (each, a "Transition Period"). Nothing in this Agreement shall obligate ConnectEDU to provide the Buyer with any service that is materially different in amount, kind, scope, quality or manner of performance from the services provided to AMS Businesses as of the date of this Agreement, except that ConnectEDU shall provide Services sufficient to enable the Buyer to continue to operate and conduct the AMS Business as currently conducted to the extent reasonably practicable in light of ConnectEDU's then current operations and capabilities. The Buyer shall receive the Services only for the benefit of the AMS Business as transferred to the Buyer pursuant to this Agreement and not for the benefit of the Buyer's other businesses or facilities. The parties agree and acknowledge that, at the Closing, ConnectEDU shall execute and deliver to the Buyer a domain name assignment in the form mutually agreed by the Buyer and ConnectEDU (the "Domain Name Assignment") hereto to be held in escrow pending release or termination of release in accordance with the terms of this Section 2.12(a). Provided that the CEDU Domain Names have not been transferred to a purchaser of assets of the ConnectEDU Business pursuant to an order of the Bankruptcy Court, upon the earlier to occur of: (w) the conversion of the Bankruptcy Cases from chapter 11 to chapter 7 or (x) the conclusion of ConnectEDU's efforts to effect a sale of the assets of the ConnectEDU Business, as determined by ConnectEDU in its reasonable and good faith discretion, or (y) the failure of ConnectEDU to provide Services in accordance with this Section 2.12(a) or the failure of any of ConnectEDU's third-party providers, domain registrars or any one of the Service Providers to provide Services to the Buyer for any reason, including without limitation, as a result of actions taken or not taken by ConnectEDU, which failure materially and adversely affects the operation of the AMS Business and ConnectEDU fails to cure such breach within the cure period set forth below or (z) the mutual written agreement of the Buyer and ConnectEDU, the Domain Name Assignment shall be automatically released from escrow without further action, notice or deed. It is further agreed that: (a) if released from escrow pursuant to the immediately preceding sentence, the Domain Name Assignment will be considered effective as of, and will be dated, the date that the Domain Name Assignment is so released; (b) the Domain Name Assignment while sitting in escrow shall not be modified or amended in any respect except with the mutual consent of the parties; (c) the release from escrow shall be automatically terminated upon a default or event of default by the Buyer occurring under this Agreement; (d) the release shall be automatically terminated after the expiration of the Transition Period if the CEDU Domain Names are transferred to a purchaser of assets of the ConnectEdu Business pursuant to an order of the Bankruptcy Court; (e) the Domain Name Assignment shall be automatically released three (3) business days after ConnectEDU is notified in writing that the Buyer has stopped receiving Services under this Section 2.12(a) and Services have not been restored prior to the three (3) business day cure period and (f) if the release is terminated per this sentence, then the Domain Name Assignment will not have gone into effect and shall be *void ab initio* and the Buyer will return ConnectEDU's signature page thereto (solely as a ministerial action and not as a condition to termination of the release).

(b)    Transitional Use of Trademarks. During the Transition Period, the Buyer shall have the right to use the name "ConnectEdu" and all trademarks, trade names, services marks and logos associated therewith (collectively, the "Business Names") solely to the extent necessary for, and in connection with, the Buyer's operation of the AMS Business and solely to the extent the Business Names are embodied on the Closing Date in any of the Purchased

Assets or assets of the AMS Business, or in signage, business cards, marketing or advertising materials or stationary included in the Purchased Assets or assets of the AMS Business.  At the expiration of Transition Period, the Buyer shall remove or cease all use of the Business Names on any Purchased Asset or assets of the AMS Business bearing any of the Business Names .  As a condition to this non-exclusive license granted by this <u>Section 2.12(b)</u>, the Buyer will use the Business Names  only in connection with its operation of the AMS Business and in compliance with all applicable laws and regulations.  ConnectEDU does not make any representations or warranties of any kind with respect to the rights granted under this non-exclusive license nor shall ConnectEDU or any of its Affiliates have any liability whatsoever based upon such license, including without limitation as to validity, non-infringement, right to use, scope or enforceability of the name "ConnectEdu".  Notwithstanding the foregoing, ConnectEDU will be the sole and exclusive owner of name "ConnectEdu" and all other business names used in the ConnectEDU Business except for those used exclusively in the AMS Business or otherwise included in the Purchased Assets.  The Buyer agrees that after the Closing Date, and notwithstanding anything in this Agreement to the contrary, the Buyer will not, expressly or by implication, (i) do any business or represent themselves as "ConnectEdu" or an affiliate or division thereof, or (ii) represent, expressly or by implication, that they have any authority to enter into agreements or otherwise bind ConnectEDU or Experience.; <u>provided</u>, <u>however</u>, that the Buyer may at any time after the Closing identify itself as the successor to ConnectEDU with respect to the AMS Business.

(c)     Notwithstanding the foregoing, in connection with any sale of any of the assets relating to the Services, ConnectEDU shall use commercially reasonable efforts to cause the purchaser of such assets to assume ConnectEDU's duty to provide the related Services as set forth in this <u>Section 2.12</u> to the extent applicable to such assets and to the extent the applicable Services are then required by the Buyer for the continued operation of the AMS Business as then conducted.

(d)     At the Closing, ConnectEDU shall provide the Buyer all login IDs, passwords and access codes necessary for the Buyer to access the accounts of the Service Providers and the Buyer's access to these accounts shall be limited to the websites, portals, data, and services that are reasonably necessary to enable the Buyer to continue to operate and conduct the AMS Business as currently conducted and transition the provision of the related information technology services of the AMS Business from service providers of ConnectEDU to service providers of the Buyer's choosing.

(e)     The parties agree that monetary damages would not be an adequate remedy for any breach of this <u>Section 2.12</u> and accordingly the Companies agree that the Buyer may seek and shall be entitled to seek, emergency injunctive relief to enforce the provisions of this <u>Section 2.12</u> against the Companies or any third party required to cooperate with the Companies.

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES REGARDING THE COMPANIES

ConnectEDU represents and warrants to the Buyer and to Holdco, solely with respect to ConnectEDU, and AMS represents and warrants to the Buyer and to Holdco, solely with respect to AMS, that:

Section 3.01 <u>Corporate Existence and Power</u>. Each of the Companies has been duly organized and is validly existing in good standing under the laws of its respective jurisdiction of incorporation or organization, with the requisite power and authority to own its properties and conduct the AMS Business as currently conducted.   Each of the Companies has been duly qualified as a foreign corporation or organization for the transaction of business and is in good standing under the laws of each other jurisdiction in which it owns or leases properties and conducts any business so as to require such qualification, except to the extent that the failure to be so qualified or be in good standing has not had, and will not have, a Material Adverse Effect.

Section 3.02 <u>Corporate Authorization</u>. Subject to the entry of the Sale Order, the execution, delivery and performance by each Company of this Agreement and each of the Ancillary Agreements, and the consummation by each Company of the transactions contemplated hereby and thereby are within such Company's corporate powers and have been duly authorized by all necessary corporate action on the part of such Company. This Agreement has been and, when executed and delivered each other Ancillary Agreement to which each of them is to be a party, will be, duly and validly delivered by each Company and, subject to the entry of the Sale Order, constitutes (in the case of this Agreement) and will constitute (in the case of each of the Ancillary Agreements) the valid and binding obligation of each Company, enforceable against such Company in accordance with its terms, subject to laws of general application relating to bankruptcy, insolvency, and the relief of debtors and other laws of general application affecting enforcement of creditors' rights generally, rules of law governing specific performance, injunctive relief and other equitable remedies.

Section 3.03 <u>Governmental Authorization</u>. The execution, delivery and performance by each Company of this Agreement and each of the Ancillary Agreements do not require any action by or in respect of, or filing with, any governmental body, agency, official or authority, except the entry of the Sale Order and the expiration, or waiver by the Bankruptcy Court, of the 14-day period set forth in Bankruptcy Rules 6004(h) and 3020(e), as applicable.

Section 3.04 <u>Non-Contravention</u>. To the Knowledge of the Companies, subject to the entry of the Sale Order, the execution, delivery and performance by each Company of this Agreement and each of the Ancillary Agreements do not and will not (i) violate any provision of any law, regulation, judgment, injunction, order or decree binding upon or applicable to such Company or the AMS Business; and (ii) result in the creation or imposition of any Lien on any Purchased Asset, other than Permitted Liens.

Section 3.05 <u>Consents</u>. To the Knowledge of the Companies, no each Assumed Contract or Contract of AMS requires consent as a result of the execution, delivery and performance of this Agreement and the Ancillary Agreements or the consummation of the transactions contemplated hereby and thereby (each such consent, a "<u>Consent</u>") the failure of which to obtain would result in a Material Adverse Effect.

Section 3.06 <u>Financial Statements</u>.

Attached hereto as <u>Schedule 3.06</u> and subject in all respects to the qualifications and limitations set forth therein, are copies of the unaudited balance sheet of the AMS Business dated February 28, 2014.

Section 3.07 <u>Properties</u>.

(a)     To the Knowledge of the Companies, ConnectEDU leases or subleases all real property used by AMS in the AMS Business. To the Knowledge of the Companies, <u>Schedule 3.07(a)</u> describes all real property used by AMS in the AMS Business (the "<u>Real Property</u>").

(b)     To the Knowledge of the Companies, <u>Schedule 3.07(b)</u> sets forth a list of (i) all material fixed assets used in the AMS Business by AMS and (ii) all material fixed assets of ConnectEDU that are included in the ConnectEDU Assets, including, but not limited to, machinery, equipment, furniture, spare and replacement parts and other trade fixtures and fixed assets, and any Liens thereon, specifying in the case of leases or subleases, the name of the lessor or sublessor, the lease term and basic annual rent.

(c)     To the Knowledge of the Companies, the Companies have good and marketable, indefeasible, fee simple title to, or, in the case of leased Real Property or leased personal property, valid leasehold interests in, the assets (whether real, personal, tangible or intangible) reflected on <u>Schedules 3.07(a)</u> and <u>3.07(b)</u>.

(d)     To the Knowledge of the Companies, no ConnectEDU Asset and no asset of AMS is subject to any Lien, except:

(i)     Liens held by Buyer;

(ii)     Liens for Taxes not yet due; or

(iii)     Liens that do not detract from the value or transferability of any ConnectEDU Asset as now used or intended to be used, and do not and will not interfere with any present or intended use of such ConnectEDU Asset.

Section 3.08 <u>Title to Purchased Assets; Stock of AMS</u>.

(a)     Subject to the entry of the Sale Order, upon consummation of the transactions contemplated hereby, the Buyer will have acquired good and marketable title in and to, or a valid leasehold interest in, each of the Purchased Assets, free and clear of all Liens, except for Permitted Liens.

(b)     To the Knowledge of the Companies: (i) the authorized capital stock of AMS consists of 200,000 shares of Common Stock, without par value, of which 90,000 shares of Common  Stock are issued and outstanding as represented by Stock Certificate Number 8, dated July 31, 2010, a copy of which is attached as <u>Exhibit E</u> hereto; (ii) the AMS Stock has been duly authorized and validly issued and is fully paid and nonassessable; (iii) AMS has no other equity securities authorized, issued or outstanding and there are no options, warrants, subscription rights, preemptive rights, proxies, put rights or call rights or agreements of any kind or nature related to the issuance, transfer sale or other disposition of any equity securities of AMS; and (iv) there are no Contracts, rights, obligations, agreements, arrangements, understandings or commitments of any kind or character, whether written or oral, relating to the AMS Stock obligating AMS to

repurchase redeem or otherwise acquire, or cause to be repurchased, redeemed or otherwise acquired any equity or securities of AMS.

(c)    The bank accounts and cash referenced in the Cash Collateral Order as property of AMS shall remain property of AMS at and following the Closing.

Section 3.09 <u>Investigations; Litigation</u>. There is no Business Proceeding now pending or, to the Knowledge of the Companies, threatened before any Governmental Authority relating to or affecting the Purchased Assets or the AMS Business. There is no judgment, decree, injunction or order of any Governmental Authority outstanding against the Company or otherwise negatively and materially affecting the AMS Business. There is no Business Proceeding now pending or, to the Knowledge of the Companies, threatened before any Governmental Authority that could prevent or delay the consummation of the transactions contemplated by this Agreement.

Section 3.10 <u>Contracts</u>.  To the Knowledge of the Companies:

(a)    <u>Schedule 3.10(a)</u> contains a list of all of the Contracts pursuant to which ConnectEDU is a party and that are required to operate the AMS Business;

(b)    <u>Schedule 3.10(b)</u> contains a list of all of the Contracts pursuant to which AMS is party; and

(c)    each Contract disclosed on <u>Schedules 3.10(a)</u> and <u>3.10(b)</u> is valid and binding agreement of ConnectEDU and/or AMS, as applicable. To the Knowledge of the Companies, <u>Schedule 3.10(c)</u> sets forth a complete and correct list of all Cure Amounts with respect to each Assumed Contract.

Section 3.11 <u>Licenses and Permits</u>. To the Knowledge of the Companies, the Companies do not hold any license, franchise, permit, certification or other similar authorization with respect to the AMS Business.

Section 3.12 <u>Compliance with Laws</u>. To the Knowledge of the Companies: the Companies (a) are not in violation of, (b) since January 1, 2013 has not violated, and (c) are not under investigation with respect to, and have not been threatened to be charged with or given written notice of any violation of, any law, rule, ordinance or regulation, or judgment, order or decree entered by any court, arbitrator or Governmental Authority, domestic or foreign, applicable to the Purchased Assets or the AMS Business.

Section 3.13 <u>AMS Proprietary Rights</u>.  To the Knowledge of the Companies:

(a)    <u>Schedule 3.13(a)</u> contains a list and summary description, and AMS has identified to the Buyer and Holdco, all Contracts relating to the AMS Proprietary Rights, except for any unwritten license implied by the sale, license or delivery of a product or service and perpetual, paid-up licenses for commonly available software programs with a value of less than $5,000 under which AMS is the licensee.

(b)    The AMS Proprietary Rights are all the Proprietary Rights necessary for the operation of the AMS Business as it is currently conducted in all material respects. Except for any AMS Proprietary Rights held by ConnectEDU, AMS is the owner or licensee of all right, title and interest in and to the AMS Proprietary Rights, free and clear of all Liens, or has the right to use without payment to a third party all of the AMS Proprietary Rights, other than in respect of licenses listed on Schedule 3.13(a), as applicable.

(c)    There are no Patents used in the AMS Business.

(d)    Schedule 3.13(d) contains a list and summary description of all Marks included in the AMS Proprietary Rights (the "**AMS Marks**") that have been registered with the United States Patent and Trademark Office.   Except as set forth on Schedule 3.13(d), the AMS Marks are currently in compliance with all formal legal requirements and are valid and enforceable. No AMS Mark is now involved in any opposition, invalidation or cancellation proceeding and no such action is threatened with respect to any of the AMS Marks.  There is no potentially interfering trademark or trademark application of any other Person.  No AMS Mark is infringed or has been challenged or threatened in any way.  No AMS Mark infringes or is alleged to infringe any tradename, trademark or service mark of any other Person.

(e)    There are no registered Copyrights used in the AMS Business.

(f)    The Companies have good title and an absolute right to use the Trade Secrets.  The Trade Secrets are not part of the public knowledge or literature, and have not been used, divulged or appropriated either for the benefit of any Person (other than the Companies) or to the detriment of the Companies.  No Trade Secret is subject to any adverse claim or has been challenged or threatened in any way or infringes any intellectual property right of any other Person.

(g)    Schedule 3.13(g) contains a list and summary description of all Net Names included in the AMS Proprietary Rights.  All such Net Names have been registered in the name of AMS and are in compliance with all formal legal requirements in all material respects. No such Net Name is now involved in any dispute, opposition, invalidation or cancellation proceeding and no such action is threatened with respect to any such Net Name.  No such Net Name is infringed or has been challenged, interfered with or threatened in any way.  No such Net Name infringes, interferes with or is alleged to interfere with or infringe the trademark copyright or domain name of any other Person.

Section 3.14 AMS Software.  To the Companies' Knowledge:

(a)    Bugs.  No AMS Software (i) contains any bug, defect, or error (including any bug, defect, or error relating to or resulting from the display, manipulation, processing, storage, transmission, or use of date data) that materially and adversely affect the use, functionality, or performance of the AMS Software or (ii) fails in any

material respect to comply with any applicable warranty or other contractual commitment relating to the use, functionality, or performance of such software.

(b)    Harmful Code.  No AMS Software contains any "back door," "drop dead device," "time bomb," "Trojan horse," "virus," or "worm" (as such terms are commonly understood in the software industry) or any other code designed or intended to have, or capable of performing, any of the following functions: (i) disrupting, disabling, harming, or otherwise impeding in any manner the operation of, or providing unauthorized access to, a computer system or network or other device on which such code is stored or installed, or (ii) damaging or destroying any data or file without the user's consent.

(c)    Source Code.  AMS does not have any duty or obligation (whether present, contingent, or otherwise) to deliver, license, or make available the source code for the AMS Software to any escrow agent or other Person.  No event has occurred, and no circumstance or condition exists, that (with or without notice or lapse of time) will, or would reasonably be expected to, result in the delivery, license or disclosure of any source code for the AMS Software to any other Person, other than as may be required under Section 365(n) of the Bankruptcy Code.

(d)    Open Source Code.  No AMS Software is subject to any "copyleft" or other obligation or condition (including any obligation or condition under any Public Software) that (i) could require, or could condition the use or distribution of the AMS Software on, the disclosure, licensing, or distribution of any source code for any portion of the AMS Software or (ii) could otherwise impose any limitation, restriction, or condition on the right or ability of Holdco or AMS to use or distribute the AMS Software.

Section 3.15 Employees; Independent Contractors.  To the Companies' Knowledge, set forth on Schedule 3.15 is a list of the employees of AMS as of March 31, 2014.

Section 3.16 Finders' Fees.  There is no investment banker, broker, finder or other intermediary which has been retained by or is authorized to act on behalf of the Companies who might be entitled to any fee or commission from the Buyer or Holdco in connection with or upon consummation of the transactions contemplated by this Agreement.

Section 3.17 Taxes. To the Companies' Knowledge:

(a)    AMS has duly and timely filed or caused to be filed when due, all material Tax Returns relating to any material Tax imposed by any Governmental Authority required to be filed by the Companies in respect of AMS, for all regular periods prior to the Closing Date. All such Tax Returns are, or if not yet filed will be, true, accurate, and complete in all material respects and reflect all material Taxes payable by the Companies.

(b)    There is no action, suit, proceeding, audit or express claim pending or threatened in writing in respect of any material Taxes for which any of the Companies is or may become liable, nor has any deficiency or claim for any Taxes been imposed or assessed in writing. There are no outstanding written notices of deficiencies,

- 21 -

adjustments, or changes in assessments with respect to any material Taxes. There is no written agreement, waiver, or consent providing for an extension of time with respect to the assessment of any material Taxes against any of the Companies.

(c)    All amounts required to be withheld or collected by the Companies for Taxes have been so withheld or collected and paid to the appropriate Governmental Authority. AMS is not a party to or bound by any material Tax allocation, indemnity or sharing agreement.

(d)    AMS has not made any payments, and is not a party to any agreement that, under any circumstances, could obligate it to make any material payment that will not be deductible under Section 280G of the Code or that would be subject to an excise tax under Section 4999 of the Code.

Section 3.18    Significant Relationships.  To the Companies' Knowledge, Schedule 3.18 lists all material customers of AMS.

Section 3.19 Accounts Receivable; Accounts Payable.  To the Companies' Knowledge:

(a)    Schedule 3.19(a) sets forth a complete list of all Accounts Receivables of AMS as of the date set forth on Schedule 3.18(a).  Except as set forth on Schedule 3.19(a), all of the Accounts Receivables of AMS (i) are valid and existing Accounts Receivable arising from bona fide sales of goods or services in the Ordinary Course of Business, and (ii) are owned free and clear of any Liens (other than Permitted Liens).  To the Knowledge of the Companies, none of the Accounts Receivables of AMS are subject to any setoffs or counterclaims.

(b)    Schedule 3.19(b) sets forth a complete list of all accounts payable of AMS as of April 29, 2014. All accounts payable of AMS that arose after March 31, 2014 have been recorded on the accounting books and records of AMS.

(c)    AMS is not obligated for any off balance sheet or deferred performance obligations.

Section 3.20 ERISA Benefits.  To the Companies' Knowledge, Schedule 3.20 contains a list of all Employee Benefit Plans.

**ARTICLE IV**
**REPRESENTATIONS AND WARRANTIES OF THE BUYER AND HOLDCO**

Each of the Buyer and Holdco hereby represents and warrants to the Companies that:

Section 4.01 Organization and Existence. The Buyer is a limited partnership duly organized, validly existing and in good standing under the laws of the State of Delaware.  Holdco is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware.

Section 4.02 <u>Corporate Authorization</u>. The execution, delivery and performance by the Buyer and Holdco of this Agreement and each of the Ancillary Agreements to which each is a party and the consummation by the Buyer and Holdco of the transactions contemplated hereby and thereby are within the organizational powers of the Buyer and of Holdco and have been duly authorized by all necessary action on the part of the Buyer and of Holdco, respectively. This Agreement has been and, when executed and delivered each other Ancillary Agreement to which the Buyer and/or Holdco is to be a party, will be, duly and validly delivered by the Buyer and Holdco, as applicable, and, subject to the entry of the Sale Order, constitutes (in the case of this Agreement) and will constitute (in the case of each of the Ancillary Agreements) the valid and binding obligation of the Buyer and/or Holdco, as applicable, enforceable against the Buyer and/or Holdco, as applicable, in accordance with its terms, subject to laws of general application relating to bankruptcy, insolvency, and the relief of debtors and other laws of general application affecting enforcement of creditors' rights generally, rules of law governing specific performance, injunctive relief and other equitable remedies.

Section 4.03 <u>Governmental Authorization</u>. The execution, delivery and performance by the Buyer and Holdco of this Agreement and each of the Ancillary Agreements to which each is a party require no action by or in respect of, or filing with, any governmental body, agency, official or authority.

Section 4.04 <u>Non-Contravention</u>. The execution, delivery and performance by the Buyer and Holdco of this Agreement and each of the Ancillary Agreements to which each is a party does not and will not contravene or conflict with any provision of any law, regulation, judgment, injunction, order or decree binding upon the Buyer.

Section 4.05 <u>Finders' Fees</u>. There is no investment banker, broker, finder or other intermediary that has been retained by or is authorized to act on behalf of the Buyer or Holdco who might be entitled to any fee or commission from the Companies or any of its Affiliates upon consummation of the transactions contemplated by this Agreement.

Section 4.06 <u>Litigation</u>. There is no action, suit, investigation or proceeding pending against, or to the knowledge of the Buyer or Holdco threatened against or affecting, the Buyer or Holdco before any court or arbitrator or any governmental body, agency or official which in any matter challenges or seeks to prevent, enjoin, alter or materially delay the transactions contemplated hereby.

Section 4.07 <u>No Inducement or Reliance; Independent Assessment</u>. With respect to Purchased Assets or any other rights or obligations to be transferred hereunder, neither the Buyer nor Holdco has been induced by or has relied upon any representations, warranties or statements, whether express or implied, made by the Companies, any of their respective Affiliates, or any agent, employee, attorney or other representative of the Companies representing or purporting to represent the Companies that are not expressly set forth herein (including the schedules and exhibits hereto), whether or not any such representations, warranties or statements were made in writing or orally, and none of the Companies, any Affiliates of the Companies, or any director, officer, agent, employee, attorney, other representative of the Companies or any other Person will have or be subject to any liability to the Buyer or Holdco or any other Persons resulting from the distribution to the Buyer or Holdco, or the Buyer's or Holdco's use of, any such information,

including any information, document or material made available to the Buyer or Holdco in expectation of the transactions contemplated by this Agreement.

## ARTICLE V
## COVENANTS OF ALL PARTIES

Section 5.01 <u>Interim Operations of the AMS Business</u>.   From the date of this Agreement through the Closing Date, subject to any limitations imposed on the Companies as a result of their status as debtor-in-possession in the Bankruptcy Cases, the Companies shall ensure that, and the Companies covenant and agree that, except as expressly provided in this Agreement, required by Applicable Law or as may be agreed in writing by the Buyer, such agreement not to be unreasonably withheld, conditioned or delayed

(a)   the Companies shall not take or agree to or commit to assist any other Person in taking any action that would result (i) in a failure of any of the conditions to the Closing as set forth herein or (ii) that would impair the ability of the Companies or the Buyer or Holdco to consummate the Closing in accordance with the terms hereof or to materially delay such consummation;

(b)   the Companies shall use commercially reasonable efforts not to, with respect to the Purchased Assets or the AMS Business, make or authorize any material change to its Tax accounting principles, methods or practices other than, in each case, as required by changes in Applicable Law, or GAAP, or as would not affect any material Tax related to the AMS Business or the Purchased Assets after the Closing Date;

(c)   AMS shall only make expenditures in accordance with a cash collateral budget acceptable to the Buyer;

(d)   the Companies shall not settle any claim, action, proceeding, Action or Avoidance Action, or waive or release any material rights or claims, or agree or consent to the issuance of any injunction, decree, order or judgment restricting or otherwise affecting the AMS Business;

(e)   the Companies shall use commercially reasonable efforts to continue to maintain the insurance covering the Purchased Assets and the AMS Business in effect as of the date of this Agreement until the Closing Date;

(f)   the Companies shall not enter into any agreement or agreements for the sale of a material amount of any of the Purchased Assets or a material amount of any of the assets of the AMS Business except as permitted by the Bankruptcy Court in the Companies' Chapter 11 Cases;

(g)   the Companies shall not (A) modify, assume, reject or terminate any Assumed Contract in any material respect, or (B) enter into or modify any Contract containing material penalties which would be payable as a result of, and upon the consummation of, the transaction contemplated by this Agreement; and

(h)    grant any increase in the compensation or benefits of any Employee or enter into any employment, change in control, severance or similar agreement or arrangement with any Employee (in each case, other than the ordinary course of business consistent with past practice).

Section 5.02 <u>Commercially Reasonable Efforts; Further Assurances</u>.

(a)    Subject to the terms and conditions of this Agreement, each party will use its commercially reasonable efforts to take, or cause to be taken, to the extent reasonably practicable, all actions and to do, or cause to be done, all things necessary or desirable under applicable laws and regulations to consummate the transactions contemplated by this Agreement. The Companies, the Buyer and Holdco each agree to execute and deliver such other documents, certificates, agreements and other writings and to take such other actions as may be necessary or desirable in order to consummate, effectuate, evidence or implement expeditiously the transactions contemplated by this Agreement and to vest in Holdco good and marketable title to the Purchased Assets, subject to Permitted Liens.

(b)    The Companies hereby constitutes and appoints, effective as of the Closing Date, Holdco and its successors and assigns as the true and lawful attorney of the Companies with full power of substitution in the name of Holdco or in the name of the Companies, but for the benefit of Holdco (i) to collect for the account of Holdco any items of Purchased Assets and (ii) to institute and prosecute all proceedings which Holdco may in its sole discretion deem proper in order to assert or enforce any right, title or interest in, to or under the Purchased Assets, and to defend or compromise any and all actions, suits or proceedings in respect of the Purchased Assets. Holdco shall be entitled to retain for its account any amounts collected pursuant to the foregoing powers, including any amounts payable as interest in respect thereof.

Section 5.03 <u>Certain Filings</u>. The Companies, the Buyer and Holdco shall cooperate with one another (i) in determining whether any action by or in respect of, or filing with, any governmental body, agency, official or authority is required, or any actions, consents, approvals or waivers are required to be obtained from parties to any material Contracts, in connection with the consummation of the transactions contemplated by this Agreement and (ii) in taking such actions or making any such filings, furnishing information required in connection therewith and seeking timely to obtain any such actions, consents, approvals or waivers.

Section 5.04 <u>Public Announcements</u>. The Companies shall not issue any press release or make any public statement with respect to this Agreement or the transactions contemplated hereby, without the prior written consent of the Buyer and Holdco.

Section 5.05 <u>AMS Articles of Organization and Bylaws</u>. The Companies agree that, to the extent not approved and adopted prior to the date hereof, promptly following the execution of this Agreement and its approval by the Court, they shall take, and shall cause AMS to take, all necessary corporate action required to approve and adopt an Amended and Restated Articles of Organization and an Amended and Restated Bylaws, in each case in a form and substance satisfactory to the Buyer.

## ARTICLE VI
## TAX MATTERS

Section 6.01 <u>Tax Cooperation: Allocation of Taxes</u>.

(a)    If the Buyer desires to make an election under Section 338(h)(10) of the Code in connection with the sale of the AMS Stock under this Agreement, (i) ConnectEDU agrees to cooperate with all reasonable requests of the Buyer relating to the Section 338(h)(10) Election, including the execution of documents presented to ConnectEDU by the Buyer, at the Buyer's sole cost and expense, (ii) the Buyer agrees that it will be responsible for taking all actions required in order to make the Section 338(h)(10) Election (except for the execution of any documents that must be executed by ConnectEDU), including all costs and expenses relating thereto, and for filing such election in the manner required by applicable rules and regulations promulgated under the Code ("<u>Treasury Regulations</u>"), (iii) the Buyer shall pay an amount (if any) to ConnectEDU such that ConnectEDU shall receive an after tax amount equal to such amount that ConnectEDU would receive had no Section 338(h)(10) Election been made, taking into account the taxability of any amounts paid pursuant to this <u>Section 6.01(a)(iii)</u>, and (iv) the provisions of <u>Section 2.6(b)</u> below will be applicable. For purposes of this Agreement, the term "<u>Section 338(h)(10) Election</u>" shall be deemed to include the federal election described above and any such state and local income Tax elections.

(b)    This <u>Section 6.01(b)</u> will only be applicable if the Buyer desires to make a Section 338(h)(10) Election as contemplated above.  The Buyer and ConnectEDU agree that the "Aggregate Deemed Sale Price" (as defined under applicable Treasury Regulations) shall be allocated among the assets of AMS in the manner set forth on <u>Schedule 6.01(b)</u>, and each of the Buyer and ConnectEDU shall file IRS Form 8883 and any similar state Tax forms in accordance with such allocation. Seller shall deliver a copy of its filed IRS Form 8883 to the Buyer. The Buyer shall be responsible for the preparation of all filings and related forms, and taking all other required actions, at their sole cost and expense, with respect to the Section 338(h)(10) Election, including the preparation of an IRS Form 8023 (and equivalent documents for state and local taxation purposes)

(c)    The Buyer will be responsible for the preparation and filing of all Tax Returns related to the operation of the AMS Business for all periods as to which Tax Returns are due after the Closing Date (other than for Taxes with respect to periods for which the consolidated, unitary and combined Tax Returns of the Companies will include the operations of the AMS Business) subject to <u>Section 6.01(d)</u>. The Buyer will make all payments required with respect to any such Tax Return.

(d)    No transfer, documentary, sales, use or other Taxes will be assessed upon or with respect to the transfer of the Purchased Assets to the Companies. Any such

Taxes and any recording or filing fees with respect thereto shall be the responsibility of the Buyer.

## ARTICLE VII
## EMPLOYEE BENEFITS

Section 7.01 <u>ConnectEDU</u>. Neither the Buyer nor Holdco is assuming any obligation to employ, or pay any compensation to, any employee of ConnectEDU or Experience.

Section 7.02 <u>No Third Party Beneficiaries</u>. No provision of this Article shall create any third party beneficiary or other rights in any employee or former employee (including any beneficiary or dependent thereof) of the Companies or of any of its Affiliates in respect of continued employment (or resumed employment) with either the Buyer, Holdco or the Companies or any of their Affiliates and no provision of this ARTICLE VII shall create any such rights in any such Persons in respect of any benefits that may be provided, directly or indirectly, under any employee benefit plan or arrangement that may exist or be established by the Buyer, Holdco or any of their respective Affiliates. No provision of this Agreement shall constitute a limitation on rights to amend, modify or terminate after the Closing Date any such plans or arrangements of the Buyer, Holdco, the Companies or any of their Affiliates.

## ARTICLE VIII
## SURVIVAL; INDEMNIFICATION; RELIEF FROM STAY

Section 8.01 <u>Survival</u>.  The representations and warranties of the Companies contained in this Agreement or in any certificate or other writing delivered pursuant hereto or in connection herewith shall survive the Closing until, and terminate on, the date of the Closing.

Section 8.03 <u>Relief from Stay</u>.  In the event that the Closing does not occur prior to the later of: (a) the date that is three (3) business days following entry of the Sale Order or (b) the commencement of the Auction (as defined in the bidding procedures order for the Bankruptcy Cases as entered by the Bankruptcy Court and as may be adjourned by the Debtors from time to time) or, if ConnectEDU determines that an Auction will not take place, the date that is three (3) business days after the Buyer's receipt of written notice from ConnectEDU of such determination, for reasons other than (i) the failure of the Buyer or Holdco to comply with its obligations under this Agreement or (ii) the mutual agreement by the parties, the Buyer will the Buyer shall be granted relief from the automatic stay and the Bankruptcy Court shall hold an expedited hearing at which the Companies may contest whether or not the Buyers were responsible for any failure to close timely (and that relief from the automatic stay should not be granted) and the Companies and the Buyer shall schedule a further hearing before the Bankruptcy Court for further adjudication of the sale motion.

## ARTICLE IX

## MISCELLANEOUS

Section 9.01 <u>Notices</u>. All notices, requests and other communications to either party hereunder shall be in writing (including telex, telecopy or similar writing) and shall be given,

if to the Buyer or to Holdco, to:

> North Atlantic SBIC IV, L.P.
> c/o North Atlantic Capital Corporation
> Two City Center
> Portland, Maine 04101
> Attention: David M. Coit, Managing Director

with a copy to:

> Nixon Peabody LLP
> 100 Summer Street
> Boston, Massachusetts 02110
> Attn: David A. Martland, Esq.
>     Richard E. Pedone, Esq.

if to the Companies, to:

> ConnectEdu, Inc.
> Academic Management Systems, Inc.
> 600 Atlantic Avenue
> Boston, Massachusetts  02110
> Attn: Chief Restructuring Officer

with a copy to:

> Lowenstein Sandler LLP
> 1251 Avenue of the Americas
> New York, New York 10020
> Attn: Steven E. Siesser, Esq.
>     Brooke A. Gillar, Esq.

Section 9.02 <u>Amendments; No Waivers</u>. No amendment of any provision of this Agreement shall be valid unless the same shall be in writing and signed by the Buyer, Holdco and the Companies.  No failure or delay by either party in exercising any right, power or privilege hereunder shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege. The rights and remedies herein provided shall be cumulative and not exclusive of any rights or remedies provided by law.

Section 9.03 <u>Expenses</u>. Except as otherwise provided herein, all costs and expenses incurred in connection with this Agreement and the transactions contemplated hereby shall be paid by the party incurring such cost or expense.

Section 9.04 <u>Successors and Assigns</u>. The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

Section 9.05 <u>Governing Law</u>. This Agreement shall be construed in accordance with and governed by the laws of the Commonwealth of Massachusetts, without regard to its conflicts of law rules.

Section 9.06 <u>Counterparts; Effectiveness</u>. This Agreement may be signed in any number of counterparts, each of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument. The exchange of copies of this Agreement and of signature pages by facsimile transmission (whether directly from one facsimile device to another by means of a dial-up connection or whether mediated by the worldwide web), by electronic mail in "portable document format" (".pdf") form or by any other electronic means intended to preserve the original graphic and pictorial appearance of a document, or by combination of such means, shall constitute effective execution and delivery of this Agreement as to the parties and may be used in lieu of the original Agreement for all purposes.  This Agreement shall become effective when each party hereto shall have received a counterpart hereof signed by the other party hereto.

Section 9.07 <u>Entire Agreement</u>. This Agreement, the Ancillary Agreements and that certain confidentiality agreement dated April 25, 2014 by and between the Companies and the Buyer (the "<u>Confidentiality Agreement</u>") constitute the entire agreement between the parties with respect to the subject matter hereof and supersede all prior agreements, understandings and negotiations, both written and oral, between the parties with respect to the subject matter of this Agreement. No representation, inducement, promise, understanding, condition or warranty not set forth herein has been made or relied upon by either party hereto. None of this Agreement, the Ancillary Agreements or the Confidentiality Agreement, nor any provision hereof or thereof, is intended to confer upon any Person other than the parties hereto any rights or remedies hereunder.

Section 9.08 <u>Captions</u>.  The captions herein are included for convenience of reference only and shall be ignored in the construction or interpretation hereof.

Section 9.09 <u>Mutual Releases</u>.  As a condition to ConnectEDU's obligation to sell, assign, convey, and deliver the Purchased Assets to the Buyer at the Closing, the Buyer shall execute and deliver to ConnectEDU, at or prior to the Closing, mutual releases between the Buyer and each individual who served as a director of ConnectEDU immediately prior to the filing of the Bankruptcy Cases providing for the release of all claims related to the Companies, each of which shall become effective upon the director's delivery of a countersigned copy thereof to the Buyer.

*[Signature Page Follows]*

IN WITNESS WHEREOF, the parties hereto make this Asset Purchase Agreement effective as of the date first set forth above.

**NORTH ATLANTIC SBIC IV, L.P.**

By: **NORTH ATLANTIC** INVESTORS SBIC IV, LLC, its General Partner

By: _____
Name: David M. Coit
Title:  Managing Director


**AMS ASSET HOLDINGS, LLC**

By: NORTH ATLANTIC INVESTORS SBIC IV, L.P., its Sole Member

By: NORTH ATLANTIC INVESTORS SBIC IV, LLC, its General Partner

By: _____
Name: David M. Coit
Title:  Managing Director


**ACADEMIC MANAGEMENT SYSTEMS, INC.**

By: _____
Name:  Mark Podgainy
Title: Chief Restructuring Officer


**CONNECTEDU, INC.**

By: _____
Name:  Mark Podgainy
Title: Chief Restructuring Officer


[Signature Page to Asset Purchase Agreement]

**EXHIBIT A**

**"AMS Business"**

The "<u>AMS Business</u>" means the business of providing instructors, students, and administrators with critical feedback used to foster the continual improvement of teaching and learning, and ultimately student success through the use of AMS' CoursEval online evaluation tool.

**EXHIBIT B**

**ASSIGNMENT AND ASSUMPTION AGREEMENT**

This ASSIGNMENT AND ASSUMPTION AGREEMENT (this "Agreement") is made as of [_____], 2014 (the "Closing Date"), by and between ConnectEDU, Inc., a Delaware corporation (the "Assignor"), and AMS Asset Holdings, LLC, a Delaware limited liability company (the "Assignee"). Capitalized terms not defined herein shall have the meanings given to such terms in the Asset Purchase Agreement (as defined below).

RECITALS

WHEREAS, the Assignee and the Assignor are parties to that certain Asset Purchase Agreement, dated as of May 18, 2014 (the "Asset Purchase Agreement"), pursuant to which the Assignor has agreed to sell and the Assignee has agreed to purchase substantially all of the assets of the AMS Business; and

WHEREAS, pursuant to the Asset Purchase Agreement, the Assignor has agreed to assign the Purchased Assets and the Assignee has agreed to assume and perform, pay or discharge, when due, the Assumed Liabilities, as more fully described in the Asset Purchase Agreement.

NOW, THEREFORE, in consideration of the respective covenants, agreements, representations and warranties contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

AGREEMENT

1.      Assignment and Assumption.  The Assignor hereby grants, conveys, assigns, transfers and delivers to the Assignee (the "Assignment"), all of the Assignor's right, title and interest in, to and under, and all of the Assignor's burdens, obligations and liabilities in connection with the Purchased Assets and the Assumed Liabilities.  The Assignee hereby accepts the assignment and assumes and agrees to observe and perform when due all of the duties, obligations, terms, provisions and covenants, and to pay and discharge when due all of the liabilities of the Assignor to be observed, performed, paid or discharged from and after the Closing Date in connection with the Assumed Liabilities.  The Assignee shall not assume or become responsible for, and shall not be deemed to have assumed or have become responsible for, any other obligation or liability of the Assignor, whether known or unknown, absolute or contingent, other than the Assumed Liabilities.

2.      Terms of the Asset Purchase Agreement.  The terms of the Asset Purchase Agreement including, without limitation, the Assignor's representations, warranties, covenants and agreements relating to the Purchased Assets and the Assumed Liabilities, are incorporated into this Agreement by reference.  The Assignor and the Assignee acknowledge and agree that the representations, warranties, covenants and agreements contained in the Asset Purchase Agreement shall not be superseded hereby, but shall remain in full force and effect to the full extent provided therein.  In the event of any conflict or inconsistency between the terms of the

Asset Purchase Agreement and the terms of this Agreement, the terms of the Asset Purchase Agreement shall govern.

      3.    <u>Further Assurances</u>.  The Assignee and the Assignor shall execute and deliver, or cause to be executed and delivered, from time to time hereafter upon request, all such further documents and instruments and shall do and perform all such acts as may be reasonably necessary to give full effect to the intent of this Agreement.

      4.    <u>Miscellaneous</u>.

      (a)    This Agreement shall be binding upon, and inure to the benefit of and be enforceable by the respective successors and permitted assigns of the parties.

      (b)    This Agreement shall be construed in accordance with and governed by the laws of the Commonwealth of Massachusetts, without regard to its conflicts of law rules.

      (c)    This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall constitute the same instrument.

      (d)    This Agreement may not be amended except by a writing signed by the Assignor and the Assignee.

*[Signature page follows.]*

IN WITNESS WHEREOF, the Assignee and the Assignor have caused this Agreement to be executed and delivered by their duly authorized respective officers, all as of the date first written above.

**ASSIGNEE:**                                    **ASSIGNOR:**

**AMS ASSET HOLDINGS, LLC**          **CONNECTEDU, INC.**


By: _____          By: _____
Name:                                    Name:
Title:                                    Title:

*Assignment and Assumption Agreement Signature Page*

EXHIBIT C

**INTELLECTUAL PROPERTY ASSIGNMENT AGREEMENT**

This Intellectual Property Assignment Agreement (this "Assignment Agreement"), dated as of [__], 2014 (the "Effective Date"), is by and between ConnectEDU, Inc., a Delaware corporation (the "Assignor") and AMS Asset Holdings, LLC, a Delaware limited liability company (the "Assignee").

WHEREAS, in connection with the Asset Purchase Agreement by and among the Assignee, the Assignor and Academic Management Systems, Inc., a Massachusetts corporation ("AMS"), dated as of May 19, 2014(the "Asset Purchase Agreement") the Assignor wishes to assign and transfer to the Assignee the Intellectual Property Rights (as defined below) in and to the AMS Business (as defined in the Asset Purchase Agreement).

NOW THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and in further consideration of the mutual covenants and agreements contained in the Asset Purchase Agreement, the parties hereto agree as follows:

**1.     Definitions.**   For purposes of this Assignment Agreement, "Intellectual Property Rights" means all Proprietary Rights (as defined in the Asset Purchase Agreement) that are owned, held, or currently under development by AMS and all Proprietary Rights that are owned, held, or currently under development by ConnectEDU and that are used, or are intended for use, primarily by AMS, in the operation of the AMS Business including, without limitation: (a) all assumed fictional business names, trading names, registered and unregistered trademarks, service marks, and applications (collectively, "Marks"); (b) all patents, patent applications and inventions and discoveries that may be patentable; (c) all registered and unregistered copyrights in both published works and unpublished works; (d) all rights in mask works; (e) all know-how, trade secrets, confidential or proprietary information, customer lists, software, technical information, data, process technology, plans, drawings and blue prints; and (f) all rights in internet websites and internet domain names (collectively "Net Names").

**2.     Assignment of Intellectual Property Rights.**   The Assignor hereby sells, assigns, transfers, and conveys unto Assignee or its designees, all right, title, and interest (whether or not now existing) in and to the Intellectual Property Rights of the Assignor in and to the AMS Business, including, without limitation, the Marks, and Net Names described individually and further assigned by the following specific provisions and accompanying Schedules 1 and 2 of this Assignment Agreement.

**3.     Net Names.**   The Assignor hereby sells, assigns, transfers, and conveys unto Assignee or its designees, all right, title, and interest (whether or not now existing) in and to the Net Names set forth in Schedule 1.  Without limiting the foregoing, the Assignor agrees to promptly perform all actions required by the applicable domain name registrar to complete the conveyance of such Net Names to the Assignee.

**4.** **Terms of the Asset Purchase Agreement.** The terms of the Asset Purchase Agreement including, without limitation, the Assignor's representations, warranties, covenants and agreements relating to the Intellectual Property Rights, are incorporated into this Agreement by reference. The Assignor and the Assignee acknowledge and agree that the representations, warranties, covenants and agreements contained in the Asset Purchase Agreement shall not be superseded hereby, but shall remain in full force and effect to the full extent provided therein. In the event of any conflict or inconsistency between the terms of the Asset Purchase Agreement and the terms of this Agreement, the terms of the Asset Purchase Agreement shall govern.

**5.** **Cooperation Post-Execution.** Following the execution of this Assignment Agreement, each party shall deliver to the other such further information and documents and shall execute and deliver to the other such further instruments and agreements as the other party shall reasonably request to consummate or confirm the transactions provided for in this Assignment Agreement, to accomplish the purpose of this Assignment Agreement or to assure to the other party the benefits of this Assignment Agreement. Specifically, Assignor hereby authorizes the respective patent office, intellectual property office, or governmental agency in each jurisdiction to issue any and all patents, certificates of invention, utility models or other governmental grants or issuances that may be granted upon any of the Net Names set forth in <u>Schedule 1</u> of this Assignment Agreement, respectively, in the name of Assignee, as the assignee to the entire interest therein. The terms and conditions of this Assignment Agreement will inure to the benefit of Assignee, its successors, assigns, and other legal representatives and will be binding upon Assignor, its successors, assigns, and other legal representatives.

[*Signature page follows.*]

IN WITNESS WHEREOF, the parties have executed this Assignment Agreement as of the date first written above.

**ASSIGNOR:**

**CONNECTEDU, INC.**

By: _____
Name:
Title:
*(Signature MUST be notarized)*

STATE OF _____          )
                                 ) ss.
COUNTY OF _____         )

On _____, before me, _____, Notary Public in and for said State, personally appeared _____, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her authorized capacity, and that by his/her signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument.

WITNESS my hand and official seal.

        Signature _____          (Seal)

**ASSIGNEE:**

**AMS ASSET HOLDINGS, LLC**

By: _____
Name:
Title:

<u>Schedule 1</u>

Net Names

COURSEVAL.NET – Registration Expires on 7/18/2014
COURSEVAL.ORG – Registration Expires on 3/17/2016
COURSEVAL.CO – Registration Expires on 10/31/2014
COURSEVAL.BIZ – Registration Expires on 10/31/2014
COURSEVAL.INFO – Registration Expires on 11/1/2014
COURSEVAL.US – Registration Expires on 10/31/2014
COURSEVALUATION.COM – Registration Expires on 3/17/2016
COURSEVALUATION.NET – Registration Expires on 3/17/2016
COURSEVALUATION.ORG – Registration Expires on 3/17/2016
ACADEMICMANAGEMENT.COM – Registration Expires on 12/29/2015

**EXHIBIT D**

**SALE ORDER**

*See attached*

**EXHIBIT E**

**AMS STOCK CERTIFICATE**

*See attached*

## Schedule 1.01

## Excluded Assets

**Patents**

1. US Patent Application 11/406,065 has an effective filing date of April 18, 2005. The title of the application is Apparatus and Methods for an Application Process and Data Analysis.

2. US Patent Application 13/459,726 has an effective filing date of April 16, 2007. The title of the application is "Transcript, Course Catalog, and Financial Aid Apparatus, Systems, and Methods.

3. US Patent Application 13/618,015 has a priority date of April 18, 2005. This is a continuation-in-part to the 11/406,065 application titled Apparatus and Methods for an Application Process and Data Analysis.

4. US Patent Application 13/618,149 has a priority date of April 18, 2005. This is a continuation-in-part to the 11/406,065 application titled Apparatus and Methods for an Application Process and Data Analysis.

5. US Patent Application 13/618,249 has a priority date of April 18, 2005. This is a continuation-in-part to the 11/406,065 application titled Apparatus and Methods for an Application Process and Data Analysis.

6. US Provisional Patent Application 61/701,278 has an effective filing date of September 14, 2012. The title of the application is Client Device Lockdown and Control System.

**Trademarks**

| Registration No. | Mark | Filing Date | Status |
|---|---|---|---|
| 4213643 | CONNECTEDU | February 17, 2012 | Live |
| 4213642 | CONNECT! | February 17, 2012 | Live |
| 3922735 | EARLYIQ | July 1, 2010 | Live |
| 3934194 | EARLYIQ EARLY ALERT AND INTERVENTION | July 1, 2010 | Live |
| 3222295 | PREP HEADQUARTERS | January 9, 2007 | Live |
| 3222294 | PREPHQ | January 9, 2007 | Live |
| 3276695 | USCENE | September 26, 2006 | Live |
| 3459352 | UPORTFOLIO | July 24, 2007 | Live |
| 3190286 | UBLOG | November 2, 2006 | Live |
| 3276223 | UPEERS | July 26, 2005 | Live |
| 2993337 | CONNECT! | December 28, 2004 | Live |

| 4026426 | PURPOSE NETWORK | March 31, 2009 | Live |
| 2746911 | CONNECTEDU | May 13, 2003 | Abandoned |
| 2740226 | CONNECTING GREAT KIDS WITH GREAT COLLEGES | April 29, 2003 | Abandoned |
| N/A | IT'S HOW YOU LEARN | August 24, 2011 | Application Serial No. 85405757 |
| N/A | IT'S HOW YOU LEARN | August 24, 2011 | Application Serial No. 85405753 |
| N/A | COMPLETIONPLUS | July 13, 2012 | Application Serial No. 85676662 |

7.  "COLLEGEZAPS" mark (Trademark Registration No. 3559901. registered on January 13, 2009) acquired pursuant to Website Assignment Agreement dated July 30, 2009 between ConnectEdu, Inc. and Efficient College Applications, LLC. These Trademarks have not been registered to the Company as of June 12, 2012, however, the Company has the right to use these marks.

8.  ConnectEDU's common law rights under the marks CAREERCONNECT; COLLEGE COST CALSULATOR; CONNECT!COMMUNITY; CONNECT!COMMUNITY; CONNECTRECOMMENDS; CONNECTPREPHQ; COUNSELORSUCCESS; COUNSELORSUITE; 21ST CENTURY CLASSROOM; C!DOC; C!OS; DATAREPORTING; ECRUIT; EYOP; FYRE; GEARUP; HEALTH & WELLNESS; K12EARLYWARNING; K6EXPLORER; THE LEARNER LIFECYCLE; PARTNERCONNECT; POWERED BY CONNECTEDU; RECORDEXCHANGE;SMARTSEARCH; STUDENTRECRUIT; STUDENTS PLANT THE SEED; SUPERAPP; TALENTCONNECT

## Licenses

9.  Pursuant to a Strategic Partner Agreement dated December 8, 2006, by and among the Company and Council of North Central Two Year Colleges, the Company has been granted a license to use the name of Council of North Central Two Year Colleges.

10. Pursuant to an Affiliate Agreement dated as of March 29, 2007 by and between the Company and Ambassadors Group, Inc., the Company has been granted a license to use the name, marks and content of Ambassadors Group and the Company has granted license to Ambassadors Group to use the Company's name and marks.

11. Pursuant to a Distribution and Technology Integration Agreement dated as of June 17, 2007, by and between the Company, and Rediker Software, Inc. the Company has been granted a license to use the name and marks of Rediker and the Company has granted a license to Rediker to use the Company's name and marks, resell access to the Company's

platform and demonstrate use of platform.

12. Licensing and Distribution Agreement between OneSource Information Products, Inc. and the Company dated August 20, 2007.

13. Website Support Agreement dated as of July 18, 2012 between Massachusetts Educational Financing Authority and the Company.

14. Software License and Services Agreement between Efficient College Applications, LLC and the Company dated July 1, 2009 (as amended).

15. License Agreement dated as of September 21, 2012, by and between The New York Times Company and the Company

**Software**

16. Internet platform used for the transmission of transcripts from high schools directly to colleges, which platform is branded with the name "Connect!" and all directly related assets

17. Internet platform used for facilitating college students' transition from college to the workplace and is branded with the name "TalentConnect!" and all directly related assets

18. Internet platform used for the transmission of college applications from high school students directly to colleges, which platform is branded with the name "SuperApp" and all directly related assets

19. The database, in its entirety and all underlying data, containing information relating to the users of its Connect! platform

20. All software products from the Asset Purchase Agreement dated September 24, 2012, by and between Epsilen, LLC and the Company, which include "Epsilen Engage"; "Epsilen Educate"; "Epsilen CompletionPLUS"; and "Edsteps"

21. All software products from the Asset Purchase Agreement dated June 30, 2011, by and between EducationDynamics, Inc. and the Company, which include "E&R Platform"; "Blackboard Building Block"; "SmartSearch"; "eCRUIT"; "Admitted Student Yield Program"; "FYRe"; "HealthQuest"; EarlyIQ"; "Alumnet"; and "EYOp"

**Domain Names/Internet Sites**

CONNECTEDU.COM
CONNECTEDU.MOBI
CONNECTEDU-EMAIL.COM
CONNECTEDU-EMAIL.NET

**Schedule 2.01**

**ConnectEDU Assets**

1.    The following domain names:

COURSEVAL.NET – Registration Expires on 7/18/2014
COURSEVAL.ORG – Registration Expires on 3/17/2016
COURSEVAL.CO – Registration Expires on 10/31/2014
COURSEVAL.BIZ – Registration Expires on 10/31/2014
COURSEVAL.INFO – Registration Expires on 11/1/2014
COURSEVAL.US – Registration Expires on 10/31/2014
COURSEVALUATION.COM – Registration Expires on 3/17/2016
COURSEVALUATION.NET – Registration Expires on 3/17/2016
COURSEVALUATION.ORG – Registration Expires on 3/17/2016
ACADEMICMANAGEMENT.COM – Registration Expires on 12/29/2015

2.    All rights to the telephone numbers used by AMS in connection with the AMS Business, including the number 716-208-0464 and all related extensions.

3.    All books and records exclusively related to AMS (including without limitation, electronic copies of such records) and/or the operation of the AMS Business.

4    All of the ConnectEDU Contracts listed on Schedule 3.10(a) and to the extent that ConnectEDU is party to any Contract listed on Schedule 3.10(b), all such Contracts.

5.    All of the fixed assets that are owned or leased by ConnectEDU and that are listed on Schedule 3.07(b).

6.    A non-exclusive, irrevocable license to the existing source code for the ConnectEDU websites ("CEDU Source Code") for the sole purpose of maintaining and operating the AMS Business as currently conducted for the term of the Transition Period (as defined in Section 2.12 of this Agreement), and an exclusive, perpetual and irrevocable license, subject to ConnectEDU's retained rights provided herein, to that portion of the CEDU Source Code that is necessary for the maintenance and continued operation of the AMS Business as currently conducted ("AMS Source Code"). ConnectEDU retains a limited right to use, reproduce or modify the AMS Source Code for the limited purpose of maintaining and operating the ConnectEDU Business as currently conducted. With respect to the CEDU Source Code and the AMS Source Code, the parties covenant and agree (1) not to disclose any of that source code to any third party except as necessary to continue the AMS Business and ConnectEDU Business, as currently conducted or as may be conducted by a successor to the ConnectEDU Business and only under commercially reasonable confidential terms, and (2) to use the source code only to continue the AMS Business and ConnectEDU Business, as currently conducted or as may be conducted by a successor to the ConnectEDU Business. ConnectEDU agrees not to use the AMS Source Code in a matter that would interfere or compete with the continued operation of the AMS Business and the Purchaser

and Holdco agrees not to use the ConnectEDU Source Code in a matter that would interfere or compete with the continued operation of the ConnectEDU Business, as currently conducted or as may be conducted by a successor to the ConnectEDU Business.

7.    The marketing booths used at Educause, including the infrastructure and coverings.

8.    Contact lists related to AMS and/or the operation of the AMS Business.

9.    Logins for social media accounts related to AMS and/or the operation of the AMS Business.

10.    The following Navisite CoursEval servers:

**Production Servers**

| Domain | External IP | Machine Name | Internal IP |
|--------|-------------|--------------|-------------|
| ce1.connectedu.net | 207.127.3.156 | CoursEvalPROD01 | 10.192.77.61 |
| ce2.connectedu.net | 207.127.3.157 | CoursEvalPROD02 | 10.192.77.62 |
| ce3.connectedu.net | 207.127.3.158 | CoursEvalPROD03 | 10.192.77.63 |
| ce4.connectedu.net | 207.127.3.159 | CoursEvalPROD04 | 10.192.77.64 |
| ce5.connectedu.net | 207.127.3.208 | CoursEvalPROD05 | 10.192.77.65 |
| ce6.connectedu.net | 207.127.3.209 | CoursEvalPROD06 | 10.192.77.66 |
| ce7.connectedu.net | 207.127.11.223 | CoursEvalPROD07 | 10.192.77.67 |
| ce8.connectedu.net | 62.32.117.156 | CoursEvalPROD08 | 10.129.43.20 |
| ce9.connectedu.net | 207.127.20.91 | CoursEvalPROD09 | 10.192.77.69 |
| n/a | n/a | Courseval-storedb01 | 10.192.77.251 |

**Test Servers**

| Domain | External IP | Machine Name | Internal IP |
|--------|-------------|--------------|-------------|
| cetest1.connectedu.net | 168.75.165.77 | CETest1 | 10.192.77.31 |
| cetest3.connectedu.net | 207.127.12.149 | CETest3win2k8 | 10.192.77.33 |
| cetest4.connectedu.net | 62.32.117.157 | CETest04 | 10.129.43.30 |

Schedule 2.02[1]

ConnectEDU Accounts Payable Related to ConnectEDU Assets[2]

| Vendor ID | Vendor | Amount | Entity | Description | Notes |
|---|---|---|---|---|---|
| V0139 | Five Star Cleaning Service | 188.50 | AMS | | |
| V0221 | National Fuel | 48.64 | AMS | | |
| V0340 | Time Warner Cable | 720.05 | AMS | | [Note: Amount to be updated prior to Closing to deduct any amounts relating to any past due payments owed to Time Warner Cable relating to services provided by such vendor to ConnectEDU's office located at 150 West 30th Street, New York, New York, 10001. Any such amounts are not accounts payable related to ConnectEDU Assets. ] |
| V0405 | Crystal Rock, LLC | 38.45 | AMS | | |
| V0379 | Doyle Security System | 123.91 | AMS | | |
| V0240 | North Forest Properties | 1,805.10 | AMS | | [Note: Amount to be updated prior to Closing.] |
| V0119 | EDUCAUSE | 1,875.00 | CDU | | |
| V0745 | Dyn | 15,000.00 | CDU | Shared | [Note: Analysis is ongoing as to whether the agreement with this vendor will be transferred hereunder.] |
| V0254 | Paetec Communication | 22,631.16 | CDU | Shared | [Note: Analysis is ongoing as to whether the |

[1] [Note: Buyer has until the Closing Date to determine whether Contracts with any of the vendors identified on this Schedule 2.02 will be excluded from the ConnectEDU Assets.]

[2] [Note: The Companies agree to update this Schedule 2.02 prior to the Closing, to provide updated amounts that are as of a date that is within three (3) days of the Closing Date.]

| | | | | | agreement with this vendor will be transferred hereunder.] |
|---|---|---|---|---|---|
| | Michele Borucki | 6,872.34 | AMS | Q1 2014 Commissions | |
| | Brian Hopewell | 3450.00 | AMS | Q1 2014 Commissions | |
| | David Neiss | 5,248.80 | AMS | Q1 2014 Commissions | |
| | Laura Sandino | 10,221.70 | AMS | Q1 2014 Commissions | |
| | Michele Borucki | 5,118.68 | AMS | Pre 2014 Commissions | |
| | David Neiss | 3,810.60 | AMS | Pre 2014 Commissions | |
| | **Total** | **$77,152.93** | | | |

<u>**Schedule 2.06**</u>

**Shared Assets[3]**

1.  Vendor Agreement with DYN (temporary) – AMS to enter into its own direct contract with DYN promptly following Closing and thereupon services to AMS under existing ConnectEDU contract to be terminated, notwithstanding the inclusion of such agreement on this <u>Schedule 2.06</u>, unless such agreement (and all related Cure Costs) is able to be assumed, and is assumed, by the Buyer or Holdco, ConnectEDU retains all rights to reject such agreement in the Bankruptcy Cases in its sole and absolute discretion

    *Shared Asset Fee:* The amount charged by ConnectEDU for the foregoing Shared Asset shall be the reasonable and documented out-of-pocket costs or expenses incurred by ConnectEDU, as the case may be, in connection with the performance of such Services.

2.  Vendor Agreement with Paetec Communication (temporary) – AMS to enter into its own direct contract with Paetec promptly following Closing and thereupon services to AMS under existing ConnectEDU contract to be terminated, notwithstanding the inclusion of such agreement on this <u>Schedule 2.06</u>, unless such agreement (and all related Cure Costs) is able to be assumed, and is assumed, by the Buyer or Holdco, ConnectEDU retains all rights to reject such agreement in the Bankruptcy Cases in its sole and absolute discretion

    *Shared Asset Fee:* The amount charged by ConnectEDU for the foregoing Shared Asset shall be the reasonable and documented out-of-pocket costs or expenses incurred by ConnectEDU, as the case may be, in connection with the performance of such Services.

3.  Client Account Agreement by and between ADP, Inc. and the Company, dated October 31, 2012 (temporary) – AMS to enter into its own direct contract with provider of its choice for payroll and insurance services promptly following Closing and thereupon services to AMS under existing ConnectEDU contract to be terminated, notwithstanding the inclusion of such agreement on this <u>Schedule 2.06</u>, unless such agreement (and all related Cure Costs) is able to be assumed, and is assumed, by the Buyer or Holdco, ConnectEDU retains all rights to reject such agreement in the Bankruptcy Cases in its sole and absolute discretion

    *Shared Asset Fee:* The amount charged by ConnectEDU for the foregoing Shared Asset shall be the reasonable and documented out-of-pocket costs or expenses incurred by ConnectEDU, as the case may be, in connection with the performance of such Services.

4.  Health insurance agreement with Tufts Health Plan (temporary) – AMS to enter into its own direct contract with provider of its choice for health insurance benefits promptly

---

[3] **[Note: Analysis is ongoing as to whether the agreements set forth on this <u>Schedule 2.06</u> will be agreed by the parties to be moved to Schedule 3.10(a) and transferred hereunder as a ConnectEDU Asset.]**

following Closing and thereupon services to AMS under existing ConnectEDU contract to be terminated, notwithstanding the inclusion of such agreement on this <u>Schedule 2.06</u>, unless such agreement (and all related Cure Costs) is able to be assumed, and is assumed, by the Buyer or Holdco, ConnectEDU retains all rights to reject such agreement in the Bankruptcy Cases in its sole and absolute discretion

***Shared Asset Fee***:  The amount charged by ConnectEDU for the foregoing Shared Asset shall be the reasonable and documented out-of-pocket costs or expenses incurred by ConnectEDU, as the case may be, in connection with the performance of such Services.

5. Dental insurance agreement with Humana (temporary) – AMS to enter into its own direct contract with provider of its choice for dental insurance benefits promptly following Closing and thereupon services to AMS under existing ConnectEDU contract to be terminated, notwithstanding the inclusion of such agreement on this <u>Schedule 2.06</u>, unless such agreement (and all related Cure Costs) is able to be assumed, and is assumed, by the Buyer or Holdco, ConnectEDU retains all rights to reject such agreement in the Bankruptcy Cases in its sole and absolute discretion

6. Life insurance agreement Lincoln Financial Group (temporary) – AMS to enter into its own direct contract with provider of its choice for life insurance benefits promptly following Closing and thereupon services to AMS under existing ConnectEDU contract to be terminated, notwithstanding the inclusion of such agreement on this <u>Schedule 2.06</u>, unless such agreement (and all related Cure Costs) is able to be assumed, and is assumed, by the Buyer or Holdco, ConnectEDU retains all rights to reject such agreement in the Bankruptcy Cases in its sole and absolute discretion

7. The following workstation software licenses (temporary):

   - (6) Microsoft Office Pro 2010 Licenses (Word, Excel, PowerPoint, Access, Outlook)
   - (3) Microsoft Visio 2010
   - (5) Microsoft Project 2010
   - (4) Microsoft Publisher 2010
   - (3) Microsoft Access 2010
   - (6) Snagit Licenses
   - (1) Help and Manual Professional Addition V6.4
   - (5) Microsoft Windows 7 operating system
   - (1) Windows XP Pro (Development environment – one license MS)
   - (6) Carbonite Pro – for workstation backup
   - (1) Higher Education Director – for sales research and contact names

AMS to enter into its own direct licenses with software providers of its choice for each of the foregoing programs (or substitute therefor) promptly following Closing and thereupon such licenses under existing ConnectEDU contracts to revert exclusively to ConnectEDU, notwithstanding the inclusion of such agreement on this <u>Schedule 2.06</u>, unless such agreement (and all related Cure Costs) is able to be assumed, and is assumed, by the Buyer or

Holdco, ConnectEDU retains all rights to reject such agreement in the Bankruptcy Cases in its sole and absolute discretion

## Schedule 2.12

### Certain Transition Services

Domain Name and E-mail Services:

*Services:* During the Transition Period, to the extent reasonably practicable in light of ConnectEDU's then current operations and capabilities, ConnectEDU will, or will cause third-party providers to, grant shared administrative access to (i) ConnectEDU's domain registrar account for the CEDU Domain Names, (ii) ConnectEDU's accounts at the Service Providers (as defined below) for the websites accessible using the CEDU Domain Names, in each case solely for the limited purpose of, and to the extent as shall be reasonably required for service and redirection of Internet traffic  for web pages, data and portals accessible through the use of the CEDU Domain Names and necessary for the Buyer to conduct the AMS Business as currently conducted, to new domain names and hosting servers of the Buyer (which shall include AMS after the Closing), and (iii) ConnectEDU's email services to enable the Buyer to forward emails and related communications addressed to AMS employees and systems that use the CEDU Domain Names to new email systems established by the Buyer for the AMS Business.  During the Transition Period, to the extent reasonably practicable in light of ConnectEDU's then current operations and capabilities, ConnectEDU will, or will cause third-party providers to, cooperate with the Buyer so that e-mail directed to the AMS Business will be forwarded to AMS Employees.  The receipt of the Services shall be subject to customary and appropriate confidentiality, privacy and information security measures to be established by the parties with respect to any information transmitted or accessible that is unrelated to the AMS Business.

*Service Fee:* The amount charged by ConnectEDU for the foregoing Services shall be the reasonable and documented out-of-pocket costs or expenses incurred by ConnectEDU, as the case may be, in connection with the performance of such Services.

"Services Providers" means the web and domain name related service providers to ConnectEDU that relate to the Internet, web and e-mail services used by the AMS Business as currently conducted, including, without limitation, NaviSite, OSF Global Services, Inc., DYN, Salesforce.com and Project Leadership Associates, Inc.

**NOTWITHSTANDING ANY PROVISION OF THIS AGREEMENT TO THE CONTRARY OR THE INCLUSION OF FOREGOING SERVICE PROVIDERS ON THIS SCHEDULE 2.12, CONNECTEDU RETAINS ALL RIGHTS TO REJECT ANY AND ALL AGREEMENTS WITH SUCH SERVICE PROVIDERS IN THE BANKRUPTCY CASES IN ITS SOLE AND ABSOLUTE DISCRETION UNLESS SUCH AGREEMENT (AND ALL RELATED CURE COSTS) IS ASSUMED BY THE BUYER OR HOLDCO.**

## <u>Schedule 3.06</u>

**Financial Statements**

*See attached*

**Schedule 3.07(a)**

**Real Property**

ConnectEDU leases the premises located at 1408 Sweet Home Road, Suite 12, the University Commons, Amherst, New York, 14228, pursuant to the terms of that certain Office Suite Lease, dated July 21, 2011, by and between ConnectEDU and North Forest Properties #1, LLC, which premises are used by AMS in the AMS Business.

## Schedule 3.07(b)

### Fixed Assets

The following is a list of the material fixed assets that used in the AMS Business. To the extent any assets listed herein are owned or leased by ConnectEDU, such assets are included in the ConnectEDU Assets. Notwithstanding the foregoing, Buyer is determining whether certain leased assets identified below will, in fact, be transferred as a ConnectEDU Asset, and may, prior to the Closing remove certain assets set forth below from this Schedule.

| | Item | Model | Serial Number | Ownership |
|---|---|---|---|---|
| 1. | Probst Desktop – 5+years old | Dell OHY388 | 144549950536 | CDU |
| 2. | Probst 20" Monitor | AOC | ACYBBOA004853 | CDU |
| 3. | Probst 20" Monitor | AOC | ACYB8OA001293 | CDU |
| 4. | Probst laptop | dell | 0KXGVD | CDU |
| 5. | Microsoft wireless keyboard and mouse | Microsoft | | CDU |
| 6. | VIVTEK DLP Projector | D537W | WD537W1310100 | CDU |
| 7. | Bouricki laptop | Dell latitude E 5430 | H9J7ZW1 | CDU |
| 8. | Bouricki docking | Dell | QAD0121700369 | CDU |
| 9. | Bouricki wireless keyboard and mouse | Logitech | | CDU |
| 10. | Bouricki 20"monitor | Samsung 3433 | CM24H9NS300155D | CDU |
| 11. | Sandino laptop | Lenovo thinkpad | R83CC4V | CDU |
| 12. | Sandino docking station | Thinkpad | 4337M2L2NRK | CDU |
| 13. | 20" monitor with usbplugs | Dell | CJCP2310H | CDU |
| 14. | Sandino wireless keyboar and mouse | n/a | n/a | CDU |
| 15. | Neiss laptop | Lenovo thinkpad | R8-9BCX3 | CDU |
| 16. | Neiss docking station | Lenovo | 4337M2L6D3T | CDU |
| 17. | Neiss wireless mouse and keypad | Logitech | | CDU |
| 18. | Neiss 20" monitor | Viewsonic VS13223 | RWC104820378 | CDU |
| 19. | Darrigo Dell laptop with windows 7 | Vostro | OKXGVD | CDU |
| 20. | Darrigo Samsung 27" monitor | N/A | Z30DHCKB701979Y | CDU |
| 21. | wireless keyboard and mouse | Microsoft | | CDU |
| 22. | Hopewell laptop | Lenova T410 | 25184HU | CDU |
| 23. | Hopewell docking station | Type 4337 | M2L0840 | CDU |
| 24. | Brother print/fax/scanner | MFC-946-CDN | U62511K0J123556 | CDU |
| 25. | 7 @ Paetec multiline desktop phones | N/A | N/A | Leased |
| 26. | 8 @ Office chairs | N/A | N/A | CDU |
| 27. | 7 @ desks with Credenzas | N/A | N/A | CDU |
| 28. | Small round conference table (4 person) | 36" diameter | N/A | CDU |
| 29. | Cubical divider with windows | N/A | N/A | CDU |
| 30. | 6@ 3'x5' White boards | N/A | N/A | CDU |
| 31. | 7 @ Desk chair floor mats | N/A | N/A | CDU |
| 32. | 10 @ stackable Guest Chairs | N/A | N/A | CDU |
| 33. | Keurig coffee maker | 8 CUP | N/A | CDU |
| 34. | Microwave | GE | N/A | CDU |
| 35. | Small GE refridgerator | WMR03GABABB | GV042304 | CDU |
| 36. | Toaster | Black and Decker | N/A | CDU |
| 37. | Adtran Netvanta 1234 Switch-24 port switch | | | CDU |

| | | | | |
|---|---|---|---|---|
| 38. | Server - Dell Server | SVUA | 7565LC1 | CDU |
| 39. | AlWorx Phone Switch | 6X | 06X000ADD030872 | Leased |
| 40. | NetGear ProSafe 24 port 10/100 smart switch w/ 2gb ports | FS726TP | | Leased |
| 41. | WatchGuard Firewall | XTM5 series | | Leased |
| 42. | APC UPS | XS1300 | | Leased |
| 43. | Time Warner Cable Modem (2) | not owned by cdu | not owned by cdu | Leased |
| 44. | Backup drive | | | CDU |
| 45. | Kevin Barney's Macbook Pro | | | |
| 46. | 10 tower computers, together with monitors, keyboards, chargers, mouse and other related peripherals. | | | |

## Schedule 3.10(a)

### ConnectEDU Contracts

The following is a list of the ConnectEDU Contracts, which Contracts are included in the ConnectEDU Assets[4]:

1.  Lease agreement by and between North Forest Properties# 1 LLC and ConnectEdu, Inc. dated July 21, 2011 for office space at 1408 Sweet Home Rd. Suite 12, Amherst NY.

2.  Partner agreement by and between Jenzabar and ConnectEdu, Inc. dated May 19, 2009.

3.  First addendum to partner agreement by and between Jenzabar and ConnectEdu, Inc. date October 2, 2013.

4.  Partner agreement with Blackboard

5.  Partner agreement with Desire2Learn

6.  Partner Agreement with Smarter Services (BRH has original)

7.  Vendor licensing Agreement with WAICU (Wisconsin Assoc. of Independent Colleges and Universities)

8.  Vendor Agreement with Timewarner used in the AMS Business.  For the avoidance of doubt, the vendor agreement with Timewarner that relates to ConnectEDU's office located at 150 West 30th Street, New York, New York, 10001 and is not used in the AMS Business, shall not be transferred hereunder.

9.  Vendor Agreement with Doyle Security System

10.  Vendor Agreement Five Star Cleaning

11.  Vendor Agreement with Crystal Rock Water

12.  The following licenses, to the extent such licenses are owned by ConnectEDU:

    1.  Visual FoxPro 9.0 (two licenses)

    2.  Software's IP Works SSL (AMS has a license for unlimited distribution)

---

[4] [**Note: Buyer has until the Closing Date to determine whether any Contracts listed on this Schedule 3.10(a) will be excluded from the ConnectEDU Assets.**]

3.  IDM Solutions – UltraEdit (two licenses)

4.  Graphics Server 5.0 (AMS has a license for unlimited distribution)

5.  ChilKatCrypt2 – for authentication within the CoursEval application (licensed with unlimted free distribution)

6.  ChilKat Mail2 – for sending email within the CoursEval application (licensed with unlimited free distribution)

7.  eTalus – an application framework in Visual FoxPro licensed by AMS from Academic Solutions Plus, LLC

8.  Licenses granted to AMS pursuant to an Amended and Restated Software License Agreement dated as of July 31, 2010 among The Research Foundation of State University of New York, Academic Software Plus, LLC and AMS.

## **Schedule 3.10(b)**

### **AMS Contracts[5]**

a.  Stock Purchase Agreement by and among Academic Management Systems, Inc., Liaison International LLC, John Eisner, and Mike Russo, and Connectedu, Inc. dated July 31, 2010

b.  Derivative Works Security Agreement dated July 31, 2010 by and among the Company, Liaison International LLC, John Eisner, And Mike Russo

c.  Consulting Agreement dated July 31, 2010 between the Company And John Eisner

d.  Consulting Agreement dated July 31, 2010 between the Company And Mike Russo

e.  Escrow Agreement by and among the Company, CSC Trust Company of Delaware, Academic Management Systems, Inc., Liaison International LLC, John Eisner and Mike Russo

f.  Assignment Agreement by and between Jenzabar, Inc. and AMS, dated December 6, 2010.

g.  Partnership Agreement with Instructure dated April 4, 2013.

h.  Customer Contracts With:
    1.  C0003--Agnes Scott College
    2.  C0004--Algonquin College
    3.  C0009--American University of Sharjah
    4.  C0010--Arizona State University
    5.  C0013--Auburn University
    6.  C0014--Augsburg College
    7.  C0017--Bay Path College
    8.  C0019--Bentley University
    9.  C0021--Bermuda College
    10. C0028--Brookline College
    11. C0029--Bryant University
    12. C0033--California Lutheran University
    13. C0034--California State University- Channel Isl

---

[5] To the extent any Contract disclosed on this Schedule is owned by ConnectEDU, such Contract is deemed to be disclosed on Schedule 3.10(a)(i) and is a ConnectEDU Asset to be included as a Purchased Asset.

14.     C0036--California University of Pennsylvania
15.     C0040--Case Western Reserve University
16.     C0041--Catholic University of America
17.     C0042--CCF-Lemer College of Medicine
18.     C0043--Central College
19.     C0044--Central European University
20.     C0045--Central Ohio Technical College
21.     C0047--Charles Sturt University
22.     C0048--Charleston Southern University
23.     C0049--Charter Oak State College
24.     C0051--Choate Rosemary Hall
25.     C0053--Claflin University
26.     C0055--Cleveland State University
27.     C0057--College of St. Elizabeth
28.     C0058--College of St. Scholastica
29.     C0061—Columbia College Chicago
30.     C0063--Community College System of New Hampshire
31.     C0064--Concordia College
32.     C0065--Concordia University Wisconsin
33.     C0067--Converse College
34.     C0070—Cumberland County College
35.     C0071--Darton College
36.     C0073--Deerfield Academy
37.     C0074--DeSales University
38.     C0077--Dixie State University
39.     C0078--Dorninican University
40.     C0080--Duke University- Nursing
41.     C0081--East Tennessee State University-Pharmacy
42.     C0081--East Tennessee State University-Pharmacy
43.     C0085--Episcopal High School
44.     C0087--Ferrurn College
45.     C0094--Frostburg State University
46.     C0097--Galveston College
47.     CO100--Georgetown University - Medical School
48.     C0101--Georgetown University- Undergrad
49.     C0102--Georgia Southern University
50.     CO105--Goucher College
51.     CO106--Grace College
52.     C0107--Grant MacEwan University
53.     C0108--Grayson County College
54.     C0110--Hannah E Mullins School of Practical Nursing
55.     C0111--Harding University
56.     C0112--Harvard Divinity School
57.     CO115--Illinois College
58.     C0117--Indiana University- Education
59.     C0118--Indiana University-Dentistry

60. C0123--Iowa Valley Community College
61. CO125--Jacksonville University
62. C0127--Jenzabar, Inc.
63. C0136--Life Pacific College
64. CO138--Lorna Linda University- Pharmacy
65. C0139--Lorna Linda University- Public Health
66. C0142--Long Island University
67. C0140--Loma Linda University-Dentistry
68. C0143--Louisiana State University- Nursing
69. C0145--Louisiana State University- SAHP
70. COl 54--Marquette University- Site License
71. COl 55--Marshall University
72. COl 56--Maryville University
73. COl 58--Mazda Institute of Science and Technology
74. C0159--Mass College of Pharmacy & Hath Sciences
75. C0164--Mercer University
76. C0165--Meredith College
77. C0167--MGH IHP
78. C0172--Mills College
79. C0173--Mineral Area College
80. C0174--Mississippi State University- Vet
81. C0175--Missouri Baptist University
82. C0178--Monterey Institute of International Studies
83. C0180--Moses Brown School
84. C0181--Mount Carmel Nursing
85. C0183--Mount St. Mary's College
86. CO184--University of Mount Union
87. C0186--Murray State College
88. C0192--Nevada State College
89. C0193--New England College of Optometry
90. C0203--North Arkansas College
91. C0205--North Carolina Central University
92. C0206--North Central Missouri College
93. C0208--Northampton Community College
94. C0210--Northeastern University
95. C0216--Ohio Northem University
96. C0221--PCOM
97. C0222--PCOM- School of Pharmacy
98. C0223--Pennsylvania State University-Medicine
99. C0224--Pepperdine University
100. C0225--Philadelphia University
101. C0226--Piedmont College
102. C0227--Piedmont Virginia Community College
103. C0228--Pike's Peak Community College
104. C0229--Plymouth State University
105. C0231--Prince Mohammed Bin Fahd University

106.    C0234--Purdue University
107.    C0237--Red Deer College
108.    C0238--Regis University
109.    C0244--Roger Williams University
110.    C0245--Ross University School of Medicine
111.    C0247--Sacred Heart University
112.    C0255--San Jacinto Community College
113.    C0258--Seton Hall University- CE
114.    C0262--Southern Illinois University Edwardsville
115.    C0263--Southern New Hampshire University
116.    Southern Polytechnic State University
117.    C0267--St. George's University
118.    C0268--St. Mary's College of Maryland
119.    C0269--Saint Paul College
120.    C0279--SUNY Optometry
121.    C0281--Sweet Briar College
122.    C0282--Taylor University
123.    C0285--Texas A&M HSC
124.    C0289--Texas Lutheran University
125.    C0294--The City University of New York (CUNY)
126.    C0296--The College of Wooster
127.    C0303--The University of Melboume
128.    C0304--Thomas Edison State College- DIAL Program
129.    C0306--Thomas More College
130.    C0311--University of Buffalo - College of Arts & Sciences
131.    C0312--University of Buffalo- Dentistry
132.    C0313--University of Buffalo- Nursing
133.    C0314--University of Buffalo- School of Public Hlth & Hlth Prof.
134.    C0318--UCSF - Nursing
135.    C0319—Rutgers - Dental School
136.    C0320--Rutgers School of Public Health
137.    C0324--University of Arkansas
138.    C0326--University of Cincinnati
139.    C0328--University of Detroit Mercy
140.    C0330--University of Houston- Business
141.    C0331--University of Houston- Optometry
142.    C0333--University of Houston -Pharmacy
143.    C0334--University of Illinois at Chicago -Dental
144.    C0335--University of Kentucky- Nursing
145.    C0337--University of Kentucky- Pharmacy
146.    C0341--University of Massachusetts, Dartmouth
147.    C0342--University of Miami
148.    C0344--University of Michigan- Dentistry
149.    C0345--University of Michigan Flint
150.    C0346--University of Minnesota- Allied Health
151.    C0347--University of Minnesota- Dentistry

152.   C0348--University of Minnesota- Law
153.   C0349--University of Minnesota- Medical
154.   C0350--University of Minnesota- Nursing
155.   C0351--University of Minnesota- Pharmacy
156.   C0352--University of Minnesota- VTH
157.   C0353--University of Minnesota-Public Health
158.   C0354--University of Mississippi Medical Center
159.   C0357--University of Missouri-St. Louis
160.   C0359--University of New England
161.   C0362--University of North Carolina- Pembroke
162.   C0363--University of North Carolina- Pharmacy
163.   C0366--University of Oklahoma HSC- Nursing
164.   C0367--University of Oklahoma HSC- Pharmacy
165.   C0368--University of Pittsburgh- Medicine
166.   C0369--University of Prince Edward Island
167.   C0370--University of Puerto Rico
168.   C0372--University of Richmond
169.   C0376--University of Southern California School of Pharmacy
170.   C0377--University of St. Thomas- Houston
171.   C0378--University of the Incarnate Word
172.   C0382--University of Trinidad & Tobago
173.   C0384--University of Vermont College of Medicine
174.   C0386--University of Washington- Dentistry
175.   C0388--University of West Georgia
176.   C0394--Valley City State University
177.   C0395--Valparaiso University
178.   C0397--Virginia College Online
179.   C0399--Virginia Western Community College
180.   C0400--Webster University
181.   C0401--Weill Cornell Medical College in Qatar
182.   C0407--West Virginia Northern Community College
183.   C0409--Western Carolina University
184.   C0411--Western Texas College
185.   C0412--Western University of Health Sciences
186.   C0415--William Mitchell College of Law
187.   C0417--Wingate University-site license
188.   C0419--Wofford College
189.   C0422--Young Harris College
190.   C0424--University of Texas of the Permian Basin\
191.   C0425--Three Rivers Community College
192.   C0431--National Park Community College
193.   C0435--American University of Rome
194.   C0436--Huston-Tillotson University
195.   C0437--Westchester Community College
196.   C0438--Ana G Mendez University System
197.   C0441--Wesley College

198.    C0450--Simpson College
199.    C0451--Kentucky State University
200.    C0452--Southern Wesleyan University
201.    C0453--Eastern Maine Community College
202.    C0455--Bard College at Simon's Rock
203.    C0460--University of Colorado Denver
204.    C0462--Southern California Institute of Architecture
205.    C0466--University of Arkansas at Monticello
206.    C0467--University of Saint Joseph
207.    C0468--Cedarville University
208.    C0471--0livet College
209.    C0475--Valencia College
210.    C0479--University of North Texas Health Sciences Center
211.    C0480--South Plains College
212.    C0484--Texas A&M University- Texarkana
213.    C0485--Texas Tech University School of Allied Health Sciences
214.    C0486--Granite State College
215.    C0487--Queens University of Charlotte
216.    C0491--University of California San Francisco- Dental
217.    C0495--University of Central Florida College of Medicine
218.    C0496--Union Institute and University
219.    C0830--Gordon College
220.    C1105—Northeastern University
221.    C1130-- Oglethorpe University
222.    C1292--St. Catherine University
223.    C1531--The Citadel
224.    C1544--Hampden-Sydney College
225.    C1558--Central Methodist University
226.    C1560--University of Arkansas Community College at Morrilton
227.    C1582--Marshall B. Ketchum University
228.    Cl589--Teachers College, Columbia University
229.    C1590--University of Rio Grande
230.    C1607--Graduate School USA
231.    C1615--Lock Haven University
232.    C1618--Middlebury College
233.    C1634--Bryan College of Health Sciences
234.    C1635--Lord Fairfax Community College
235.    C1637--John Marshall School of Law
236.    C1643--Criswell College
237.    C1644--Laboure College
238.    Cl647--York College of Pennsylvania
239.    C1704--Columbia College
240.    C1705--University of Alberta
241.    C1707--Institute of Doctoral Studies in the Visual Arts
242.    C1712--Notre Dame de Namur University
243.    C1717--East Tennessee State University

244. Olin College of Engineering
245. University of Dayton Subscription Agreement
246. Berry College
247. Bethel College-Mishawaka
248. Carroll University
249. Dakota Wesleyan University
250. Deree College, The American College of Greece
251. Dine College
252. Florida Southern College
253. Golden Gate Baptist Theological Seminary
254. Henderson State University
255. Heritage University
256. Lake Erie College
257. Limestone College
258. Linfield College-McMinnville Campus
259. Loma Linda University
260. Louisiana State University Eunice
261. Luther Seminary
262. Maine College of Art, Hosted
263. Maranatha Baptist Bible College
264. Mitchell Technical Institute
265. Mount Saint Mary College
266. Northwest Indian College
267. Oglala Lakota College
268. Oregon Health & Science University
269. Phillips Graduate Institute
270. Princeton Theological Seminary
271. Queens College - CUNY
272. Sitting Bull College
273. Southern Maine Community College
274. University of British Columbia
275. University of California-Los Angeles
276. University of New Haven, Hosted Reports Only
277. University of North Carolina at Chapel Hill - College/University
278. Ursuline College
279. Western Dakota Technical Institute

i. Vendor Agreement with National Grid regarding utilities used in the AMS Business

j. Vendor Agreement with National Fuel regarding utilities used in the AMS Business

k. Vendor Agreement with Verizon regarding phone service used in the AMS Business

**Schedule 3.10(c)**
**Cure Amounts on ConnectEDU Contracts[6]**

| Name of Party to Lease or Contract | Notice Name | Address 1 | Address 2 | City | State | Zip | Description of Contract or Lease | Cure Amount |
|---|---|---|---|---|---|---|---|---|
| Crystal Rock LLC | | P.O. Box 10028 | | Waterbury | CT | 06725 | Agreement | $38.45 |
| Doyle Security Systems | | 792 Calkins Road | | Rochester | NY | 14623 | Agreement | $123.91 |
| Dyn | | 150 Dow Street | Tower Two | Manchester | NH | 03101 | Agreement | $0.00 |
| Paetec Communication | | P.O. Box 9001013 | | Louisville | KY | 40290-1013 | Partner Agreement with Smarter Services | $22,631.16 |
| Educause | | P.O. Box 910787 | | Denver | CO | 80291 | Service Agreement dated November 10, 2006. | $1,875.00 |
| Five Star Cleaning Service | | 44 Pryor Avenue | | Tonawanda | NY | 14150 | Agreement | $188.50 |
| Jenzabar | | P.O. Box 55018 | | Boston | MA | 02205-5018 | Partner Agreement dated May 19, 2009 | $0.00 |
| Jenzabar | | P.O. Box 55018 | | Boston | MA | 02205-5018 | First Addendum to Partner Agreement dated October 2, 2013 | $0.00 |
| Blackboard | | 650 Massachusetts Avenue | | N.W.Washington, DC | | 20001-3796 | Partner Agreement with Blackboard | $2,500.00 |
| Desire2Learn | | 151 Charles Street West | Suite 400 | Kitchener | Ontario | N26 1HG | Partner Agreement with Desire2Learn | $500.00 |
| North Forest Properties # 1 LLC | | P.O. Box 3107 | | Buffalo | NY | 14240-3107 | Lease Agreement dated July 21, 2011. | $1,805.10 |
| Time Warner Cable | | P.O. Box 70872 | | Charlotte | NC | 28272 | Agreement | $720.05 |
| WAICU | | 122 W. Washington | Suite 700 | Madison | WI | 53703 | Vendor Licensing | $0.00 |

[6] [Note: The Companies agree to update this Schedule 3.10(c) prior to the Closing, to provide updated amounts that are as of a date that is within three (3) days of the Closing Date.]

| Name of Party to Lease or Contract | Notice Name | Address 1 | Address 2 | City | State | Zip | Description of Contract or Lease | Cure Amount |
|---|---|---|---|---|---|---|---|---|
| | | Ave. | | | | | Agreement | |

## Schedule 3.13

### Proprietary Rights

**(a) Contracts relating to AMS Proprietary Rights**

1. Visual FoxPro 9.0 (two licenses)
2. Software's IP Works SSL (AMS has a license for unlimited distribution)
3. IDM Solutions - UltraEdit (two licenses)
4. Graphics Server 5.0 (AMS has a license for unlimited distribution)
5. Windows XP Pro (Development environment – one licenses MS)
6. ChilKatCrypt2 – for authentication within the CoursEval application (licensed with unlimted free distribution)
7. ChilKat Mail2 – for sending email within the CoursEval application (licensed with unlimited free distribution)
8. eTalus – an application framework in Visual FoxPro licensed by AMS from Academic Solutions Plus, LLC
9. Licenses granted to AMS pursuant to an Amended and Restated Software License Agreement dated as of July 31, 2010 among The Research Foundation of State University of New York, Academic Software Plus, LLC and AMS.
10. The following workstation software licenses:
    - (6) Microsoft Office Pro 2010 Licenses (Word, Excel, PowerPoint, Access, Outlook)
    - (3) Microsoft Visio 2010
    - (5) Microsoft Project 2010
    - (4) Microsoft Publisher 2010
    - (3) Microsoft Access 2010
    - (6) Snagit Licenses
    - (1) Help and Manual Professional Addition V6.4
    - (4) Log Me In licenses
    - (5) Microsoft Windows 7 operating system
11. The following subscriptions:
    - (6) Carbonite Pro – for workstation backup
    - (1) Higher Education Directory – for sales research and contact names

**(d) Registered Trademarks**

Based on a search of the USPTO trademark database, Academic Management System, Inc. 600 Atlantic Avenue, 20th Floor Boston MA 02210, is the current owner of 1 trademark registration noted in the chart below.

Note that a Security Interest from Academic Management System, Inc. to Liaison International LLC recorded on 8/26/2010 was incorrectly released to ConnectEdu, Inc. instead of Academic Management System, Inc. on March 19, 2014. The error was due to the information provided to the USPTO on the Recordation Form Cover Sheet. The Release states the Grantor as Academic Management System, Inc. The Companies are in the process of properly filing the Release with the USPTO. Such filing shall be made prior to the Closing.

| Trademark | Registration No. | Registration Date | Owner | Assignments | Next Maintenance Due |
|-----------|------------------|-------------------|-------|-------------|----------------------|
| COURSEVAL | 2,524,708 | 1/1/2002 | Academic Management System, Inc. | 1) Conversion from Liaison International Inc. to Liaison International LLC recorded on 8/28/2012<br><br>2) Security Interest from Liaison International LLC and Liaison Holdings LLC to Webster Bank, National Association recorded on 11/5/2009<br><br>3) Release of Secured Party from Webster Bank, National Association to Liaison International LLC recorded on 11/5/2010<br><br>4) Assignment from Liaison International LLC to Academic Management System, Inc. recorded on 8/26/2010<br><br>5) Security Interest from Academic Management System, Inc. to Liaison International LLC recorded on 8/26/2010<br><br>6) Release of Security Interest from Liaison International, Inc. to ConnectEdu, Inc. recorded on 3/19/2014 (Security Interest was incorrectly released to ConnectEdu, Inc. instead of Academic Management System, Inc. – Release correctly states the parties) | Declaration of Use & Renewal Due: 1/1/2022 |
| Class 42: PROVIDING TEMPORARY USE OF ON-LINE NON-DOWNLOADABLE COMPUTER SOFTWARE USED TO AUTOMATE THE FACULTY AND COURSE EVALUATION PROCESS | | | | | |

**(g) Net Names**

COURSEVAL.NET – Registration Expires on 7/18/2014
COURSEVAL.ORG – Registration Expires on 3/17/2016
COURSEVAL.CO – Registration Expires on 10/31/2014
COURSEVAL.BIZ – Registration Expires on 10/31/2014
COURSEVAL.INFO – Registration Expires on 11/1/2014
COURSEVAL.US – Registration Expires on 10/31/2014
COURSEVALUATION.COM – Registration Expires on 3/17/2016
COURSEVALUATION.NET – Registration Expires on 3/17/2016
COURSEVALUATION.ORG – Registration Expires on 3/17/2016
ACADEMICMANAGEMENT.COM – Registration Expires on 12/29/2015
The CEDU Domain Names

### Schedule 3.15

**Employees**

1. Michelle Borucki – Senior Account Manager
2. Mary D'Arrigo – Project Manager/Requirements Analyst
3. Brian Hopewell – VP of Sales
4. Christopher Probst – CoursEval Product Manager.
5. David Neiss – Senior Account Manager
6. Laura Sandino – Senior Account Manager

## Schedule 3.18

### Significant Relationships

The list of customers of AMS are set forth on Item Nos. 1-279 on Schedule 3.10(a)(ii), subsection (h).

## Schedule 3.19(a)

## AMS Accounts Receivable

**Company Name:** Academic Management Systems, Inc.
**Report Name:** Customer Aging Report
**As of Date:** 5/15/2014
**Created On:** 5/15/2014
AMS--Academic Management Systems, Inc.
**Location:**
As of Date: 05/15/2014

| Customer ID | Customer Name | Invoice | GL Posting Date | Invoice Date | Due Date | -0 | 1-30 | 31-60 | 61-90 | 91-120 | 121- | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| C0438 | Ana G Mendez University System | INV-002020 | 2/21/2014 | 2/21/2014 | 3/23/2014 | 0 | 0 | 0 | 6,000.00 | 0 | 0 | 6,000.00 |
| **Total for C0438** | | | | | | 0.00 | 0.00 | 0.00 | 6,000.00 | 0.00 | 0.00 | 6,000.00 |
| C0455 | Bard College at Simon's Rock | INV-002293 | 4/23/2014 | 4/23/2014 | 5/23/2014 | 0 | 3,800.00 | 0 | 0 | 0 | 0 | 3,800.00 |
| **Total for C0455** | | | | | | 0.00 | 3,800.00 | 0.00 | 0.00 | 0.00 | 0.00 | 3,800.00 |
| C0034 | California State University - Channel Isl | INV-002296 | 4/23/2014 | 4/23/2014 | 5/23/2014 | 0 | 13,160.00 | 0 | 0 | 0 | 0 | 13,160.00 |
| **Total for C0034** | | | | | | 0.00 | 13,160.00 | 0.00 | 0.00 | 0.00 | 0.00 | 13,160.00 |
| C0711 | City University of New York (CUNY) | INV-001721 | 11/19/2013 | 11/19/2013 | 12/19/2013 | 0 | 0 | 0 | 0 | 0 | 6,930.00 | 6,930.00 |
| **Total for C0711** | | | | | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 6,930.00 | 6,930.00 |
| C0087 | Ferrum College | INV-002286 | 4/23/2014 | 4/23/2014 | 5/23/2014 | 0 | 9,000.00 | 0 | 0 | 0 | 0 | 9,000.00 |
| **Total for C0087** | | | | | | 0.00 | 9,000.00 | 0.00 | 0.00 | 0.00 | 0.00 | 9,000.00 |
| C1607 | Graduate School | INV- | 3/31/2014 | 3/31/2014 | 4/30/2014 | 0 | 0 | 3,500.00 | 0 | 0 | 0 | 3,500.00 |

| ID | Name | Invoice | Date | Date | Date | | | | | | | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | USA | 002134 | | | | | | | | | | |
| **Total for C1607** | | | | | | 0.00 | 0.00 | 3,500.00 | 0.00 | 0.00 | 0.00 | **3,500.00** |
| C0436 | Huston-Tillotson University | INV-002030 | 2/25/2014 | 2/25/2014 | 3/27/2014 | 0 | 0 | 0 | 2,400.00 | 0 | 0 | 2,400.00 |
| **Total for C0436** | | | | | | 0.00 | 0.00 | 0.00 | 2,400.00 | 0.00 | 0.00 | **2,400.00** |
| C0127 | Jenzabar, Inc. | INV-002182 | 4/11/2014 | 4/11/2014 | 5/11/2014 | 0 | 0 | 26,325.00 | 0 | 0 | 0 | 26,325.00 |
| **Total for C0127** | | | | | | 0.00 | 0.00 | 26,325.00 | 0.00 | 0.00 | 0.00 | **26,325.00** |
| C0451 | Kentucky State University | INV-002297 | 4/23/2014 | 4/23/2014 | 5/23/2014 | 0 | 10,000.00 | 0 | 0 | 0 | 0 | 10,000.00 |
| **Total for C0451** | | | | | | 0.00 | 10,000.00 | 0.00 | 0.00 | 0.00 | 0.00 | **10,000.00** |
| C0158 | Masdar Institute of Science and Technology | INV-002135 | 4/2/2014 | 4/2/2014 | 6/1/2014 | 0 | 0 | 4,400.00 | 0 | 0 | 0 | 4,400.00 |
| **Total for C0158** | | | | | | 0.00 | 0.00 | 4,400.00 | 0.00 | 0.00 | 0.00 | **4,400.00** |
| C0205 | North Carolina Central University | INV-002287 | 4/23/2014 | 4/23/2014 | 5/23/2014 | 0 | 16,020.00 | 0 | 0 | 0 | 0 | 16,020.00 |
| **Total for C0205** | | | | | | 0.00 | 16,020.00 | 0.00 | 0.00 | 0.00 | 0.00 | **16,020.00** |
| C0206 | North Central Missouri College | INV-002288 | 4/23/2014 | 4/23/2014 | 5/23/2014 | 0 | 6,600.00 | 0 | 0 | 0 | 0 | 6,600.00 |
| **Total for C0206** | | | | | | 0.00 | 6,600.00 | 0.00 | 0.00 | 0.00 | 0.00 | **6,600.00** |
| C1583 | Queens College CUNY | INV-002327 | 4/28/2014 | 4/28/2014 | 5/28/2014 | 0 | 16,400.00 | 0 | 0 | 0 | 0 | 16,400.00 |
| **Total for C1583** | | | | | | 0.00 | 16,400.00 | 0.00 | 0.00 | 0.00 | 0.00 | **16,400.00** |
| C0282 | Taylor University | INV-002289 | 4/23/2014 | 4/23/2014 | 5/23/2014 | 0 | 7,260.00 | 0 | 0 | 0 | 0 | 7,260.00 |
| **Total for** | | | | | | 0. | 7,260.00 | 0.00 | 0.00 | 0.00 | 0.00 | **7,260.00** |

**C0282**

| ID | Name | Invoice | Date | Date | Date | | | | | | | | | | Amount |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| C0311 | University of Buffalo - College of Arts & Sciences | INV-002283 | 4/23/2014 | 4/23/2014 | 5/23/2014 | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | 350 | 350.00 |
| **Total for C0311** | | | | | | | 0.00 | | 0.00 | | 0.00 | | 0.00 | | 350.00 |
| C1810 | University of Dayton | INV-002324 | 5/1/2014 | 5/1/2014 | 5/31/2014 | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | 19,200.00 | 19,200.00 |
| **Total for C1810** | | | | | | | 0.00 | | 0.00 | | 0.00 | | 0.00 | | 19,200.00 |
| C0342 | University of Miami | INV-002282 | 4/23/2014 | 4/23/2014 | 5/23/2014 | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | 12,880.00 | 12,880.00 |
| **Total for C0342** | | | | | | | 0.00 | | 0.00 | | 0.00 | | 0.00 | | 12,880.00 |
| C0344 | University of Michigan - Dentistry | INV-002330 | 5/7/2014 | 5/7/2014 | 6/6/2014 | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | 1,000.00 | 1,000.00 |
| **Total for C0344** | | | | | | | 0.00 | | 0.00 | | 0.00 | | 0.00 | | 1,000.00 |
| C0359 | University of New England | INV-002299 | 4/23/2014 | 4/23/2014 | 5/23/2014 | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | 11,616.00 | 11,616.00 |
| **Total for C0359** | | | | | | | 0.00 | | 0.00 | | 0.00 | | 0.00 | | 11,616.00 |
| C0362 | University of North Carolina - Pembroke | INV-002291 | 4/23/2014 | 4/23/2014 | 5/23/2014 | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | 15,360.00 | 15,360.00 |
| **Total for C0362** | | | | | | | 0.00 | | 0.00 | | 0.00 | | 0.00 | | 15,360.00 |
| C0378 | University of the Incarnate Word | INV-002285 | 4/23/2014 | 4/23/2014 | 5/23/2014 | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | 18,440.00 | 18,440.00 |
| **Total for C0378** | | | | | | | 0.00 | | 0.00 | | 0.00 | | 0.00 | | 18,440.00 |
| C0394 | Valley City State University | INV-002316 | 4/24/2014 | 4/24/2014 | 5/24/2014 | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | 8,400.00 | 8,400.00 |

| | | Invoice | Date | Date | Due Date | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total for C0394 | | | | | | 0.00 | 8,400.00 | 0.00 | 0.00 | 0.00 | 0.00 | 8,400.00 |
| C0400 | Webster University | INV-002181 | 4/9/2014 | 4/9/2014 | 5/9/2014 | 0 | 0 | 24,200.00 | 0 | 0 | 0 | 24,200.00 |
| Total for C0400 | | | | | | 0.00 | 0.00 | 24,200.00 | 0.00 | 0.00 | 0.00 | 24,200.00 |
| C0441 | Wesley College | INV-002132 | 3/31/2014 | 3/31/2014 | 4/30/2014 | 0 | 0 | 1,800.00 | 0 | 0 | 0 | 1,800.00 |
| Total for C0441 | | | | | | 0.00 | 0.00 | 1,800.00 | 0.00 | 0.00 | 0.00 | 1,800.00 |
| C0437 | Westchester Community College | INV-002301 | 4/23/2014 | 4/23/2014 | 5/23/2014 | 0 | 16,800.00 | 0 | 0 | 0 | 0 | 16,800.00 |
| Total for C0437 | | | | | | 0.00 | 16,800.00 | 0.00 | 0.00 | 0.00 | 0.00 | 16,800.00 |
| C0412 | Western University of Health Sciences | INV-002178 | 4/3/2014 | 4/3/2014 | 5/3/2014 | 0 | 0 | 350 | 0 | 0 | 0 | 350 |
| Total for C0412 | | | | | | 0.00 | 0.00 | 350.00 | 0.00 | 0.00 | 0.00 | 350.00 |
| Grand Totals | | | | | | 0 | 186,286.00 | 60,575.00 | 8,400.00 | 0 | 6,930.00 | 262,191.00 |

## Schedule 3.19(b)

### AMS Accounts Payable

**Company Name:** Academic Management Systems, Inc.
**Report Name:** Vendor Aging Report
**As of Date:** 4/29/2014
**Created On:** 4/29/2014
**Location:** AMS--Academic Management Systems, Inc.

As of Date: 04/29/2014

| Vendor ID | Vendor Name | -0 | 1-30 | 31-60 | 61-90 | 91-120 | 121- | Total | |
|---|---|---|---|---|---|---|---|---|---|
| V0139 | Five Star Cleaning Service | 0 | 188.5 | 0 | 0 | 0 | 0 | **188.5** | 44 Pryor Avenue, |
| V0221 | National Fuel | 0 | 48.64 | 0 | 0 | 0 | 0 | **48.64** | PO Box 4103, Buffalo, NY, 14264, United States |
| V0340 | Time Warner Cable | 0 | 720.05 | 0 | 0 | 0 | 0 | **720.05** | PO Box 70872, Charlotte, NC, 28272-0872, United States |
| V0405 | Crystal Rock, LLC | 0 | 38.45 | 0 | 0 | -75 | 0 | **38.45** | PO Box 10028 Waterbury, CT 06725-0028 |
| | **Grand Totals** | **0** | **995.64** | **0** | **0** | | **0** | **920.64** | |

## Schedule 3.20

### Employee Benefit Plans

- Medical insurance benefits through Tufts Health Plan
- Dental insurance benefits through Humana
- Vision care insurance benefits through Humana
- Group life and accidental death and dismemberment insurance benefits through Lincoln Financial Group
- Group long-term disability benefits through Lincoln Financial Group
- Group short-term disability benefits through Lincoln Financial Group
- COBRA benefits through ADP
- ConnectEDU and AMS 401K plan